## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

VENEZUELAN ASSOCIATION OF MASSACHUSETTS; NATIONAL TPS ALLIANCE; ASYLUM SEEKER ADVOCACY PROJECT; SERVICE EMPLOYEES INTERNATIONAL UNION AFL-CIO; AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 32BJ,

     *Plaintiffs*,

     v.

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; JOSEPH B. EDLOW, in his official capacity as the Director of USCIS; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,

     *Defendants*.

Case No.

## COMPLAINT
## FOR STAY UNDER 5 U.S.C. SECTION 705,
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

i

**INTRODUCTION**

1.     Asylum and Temporary Protected Status ("TPS") are critical humanitarian protections enshrined in the United States' longstanding immigration laws. Asylum protects individuals fleeing persecution. TPS protects individuals who cannot safely return to their countries of origin due to war, natural disaster, or other extraordinary crises. Asylum seekers and TPS holders have complied with U.S. law and contribute tens of billions of dollars to the American economy each year while also contributing to our communities. Now, however, U.S. Citizenship and Immigration Services ("USCIS") is unlawfully denying tens of thousands of asylum applicants and TPS holders the right to work to support themselves and their families. Plaintiffs, unions and membership organizations whose members include asylum applicants and TPS holders, challenge USCIS's illegal actions that, absent judicial relief, will force their members out of the authorized workforce and inevitably deprive thousands more of their statutory right to seek asylum.

2.     Plaintiffs challenge four policies that purport to implement the One Big Beautiful Bill Act ("H.R. 1" or "Act"), which limited the duration of TPS holders' employment authorization and imposed fees to apply for asylum for the first time in history, including an annual fee assessed each year an asylum application is pending.

3.     First, Plaintiffs challenge USCIS's July 22, 2025 Federal Register Notice ("July 2025 FRN"). The July 2025 FRN imposed the annual asylum fee on individuals whose applications were filed before H.R. 1 was enacted. The July 2025 FRN also stated that TPS employment authorization documents ("EADs") would be limited to a period of no more than 1 year, or the duration of the TPS designation period, whichever is shorter.

4.     Second, Plaintiffs challenge USCIS's policy to apply the July 2025 FRN retroactively to issue one-year EADs to TPS holders who filed EAD renewal applications before H.R. 1's enactment but received their EADs after July 22, 2025. Plaintiffs refer to this policy as

"the July 2025 Cap Policy." The Cap Policy impacted TPS holders who both had a pending work permit renewal pending when H.R. 1 was enacted and had more than a year remaining on their TPS designation as of July 2025.

5.     Third, Plaintiffs challenge a March 2026 USCIS website update ("March 2026 Update"). The March 2026 Update interpreted H.R. 1 to retroactively limit the duration of automatic employment authorization extensions issued to TPS holders from El Salvador, Sudan, and Ukraine who have not received a new EAD card. Because of the Update, many TPS holders risk being unable to work as soon as July 22, 2026.

6.     Fourth, Plaintiffs challenge an interim final rule published by USCIS on April 29, 2026 ("April 2026 IFR"). The April 2026 IFR creates new and severe consequences for non-payment of the annual asylum fee: if the fee is not paid on time (even if the applicant did not receive notice of the due date), USCIS will "reject" the application, resulting in abrupt termination of work authorization. Even worse, rejected applicants will be unable to refile for asylum within the statutory one-year asylum deadline, because, by definition, rejections for failure to pay the annual asylum fee will occur only after one year has passed. Further, without any mention or discussion in the text of the IFR, the April 2026 IFR quietly deleted the longstanding requirement for the government to process initial work permits based on seeking asylum within 30 days.

7.     These four policies ("the Challenged Policies") are unlawful for multiple reasons.

8.     All four policies are unlawful because USCIS announced and implemented each of them without going through the required notice-and-comment rulemaking procedures and without satisfying any exceptions to normal rulemaking requirements.

9.     The July 2025 Cap Policy, April 2026 IFR, and March 2026 Update are also unlawful because they violate the TPS statute's requirement that DHS "shall" provide TPS holders with employment authorization "effective throughout the period the [noncitizen] is in temporary

2

protected status," 8 U.S.C. § 1254a(a)(1)(B), (2), and are arbitrary and capricious.

10.    In addition, the July 2025 Cap Policy and March 2026 Update are unlawful because they apply H.R. 1's changes retroactively, even though H.R. 1 does not express a clear Congressional intent to apply retroactively. And, by unlawfully taking away a period of work authorization that had already been granted to TPS holders without individual notice or opportunity to be heard, they violate TPS holders' due process rights.

11.    The July 2025 FRN and April 2026 IFR are also unlawful because they (1) apply retroactively to asylum seekers who filed their asylum applications before H.R. 1 was enacted; (2) violate the statutory guarantee that eligible noncitizens may apply for asylum and receive an individualized adjudication; (3) violate asylum seekers' due process rights by rejecting asylum applications without notice or opportunity to respond; and (4) are arbitrary and capricious.

12.    The April 2026 IFR is arbitrary and capricious because it quietly eliminated a longstanding regulatory provision requiring USCIS to process initial asylum-based EAD applications within 30 days, without acknowledging or explaining it was doing so.

13.    Collectively, the Challenged Policies operate to dramatically weaken the statutory protections afforded to TPS holders and asylum seekers by forcing asylum seekers and TPS holders out of the authorized workforce and depriving them of their ability to provide for themselves and their families. This not only causes extreme hardship to asylum seekers and TPS holders, it also harms the economy. Asylum seekers' and TPS holders' multibillion dollar contributions to the U.S. economy flow directly to U.S. communities, businesses, workers, and consumers. Employers have long relied on TPS holders and asylum seekers to fill essential workforce needs, particularly in industries already facing persistent labor shortages. The Challenged Policies directly jeopardize these contributions.

14.    The Challenged Policies also expose asylum seekers to unfair rejection of their

3

applications, removal proceedings, detention, and deportation to countries where they fear persecution.

15.     Because the Challenged Policies are unlawful and will cause irreparable harm to Plaintiffs' members, this Court should postpone them and, ultimately, set them aside under the Administrative Procedure Act. *See* 5 U.S.C. §§ 705, 706. The Court should also issue an order preserving employment authorization for the full TPS designation period or the full automatic extension period, as applicable, for TPS holders who applied for employment authorization before H.R. 1 was enacted.

**JURISDICTION AND VENUE**

16.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the claims arise under federal law, including the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq.

17.     This case arises under the United States Constitution; the APA, 5 U.S.C. §§ 701 et seq.; and the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 et seq. and its implementing regulations.

18.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1) because Plaintiff the Venezuelan Association of Massachusetts is incorporated and has its principal place of business in this district.

**THE PARTIES**

19.     **Plaintiff Venezuelan Association of Massachusetts ("VAM")** is a non profit, membership-based organization incorporated in Massachusetts with a principal place of business in Dedham, Massachusetts. VAM's mission is to guide, educate, inform, and assist newly arriving migrants in Massachusetts and across the United States on immigration-related issues, including TPS, asylum, and work authorization. VAM provides its members with free community education,

4

referrals, and assistance so that migrants can access legal support, understand their rights, and navigate rapidly changing immigration policies. VAM is also dedicated to educating and informing the public on issues of relevance to Venezuelans as well as fostering connections and integration within the Venezuelan community across the nation.

20.     As of June 2026, VAM has over 23,000 members from Venezuela, Colombia, El Salvador, Mexico, the Dominican Republic, Ecuador, Haiti, Honduras, and Cuba who reside all over the United States, including in Massachusetts. Approximately 50% of VAM's members are from Venezuela, and the other 50% are from various countries. To join VAM, individuals complete a questionnaire identifying their interests and needs, such as humanitarian efforts for Venezuelans, immigration services, basic necessities, or social events. Based on their responses, members receive tailored communications and outreach for relevant services.

21.     There are several Salvadoran VAM members with TPS who live in Massachusetts. In addition, thousands of VAM members have asylum applications (Form I-589) pending before U.S. Citizenship and Immigration Services ("USCIS") or the immigration court ("EOIR"). VAM staff maintain frequent contact with several members who have TPS or pending asylum applications and who joined VAM seeking guidance and support in understanding changes regarding TPS and navigating the asylum process.

22.     VAM's staff, leadership, and volunteers experience a much higher volume of requests for information and assistance every time a new policy or rule related to immigration is issued. Given the number of recent new policy changes and announcements related to immigration, TPS, and asylum law, VAM has expanded its immigration-law workshops, informational sessions, and written resources far beyond VAM's initial scope.

23.     VAM brings this case on behalf of its members. The Challenged Policies are already having a significant negative impact on VAM's members and will continue to impact them

5

going forward.

24.     **Plaintiff the National TPS Alliance ("NTPSA")** is a member-led organization whose mission is to defend the TPS program and win a path to permanent residency for TPS holders. NTPSA is fiscally sponsored by the Central American Resource Center ("CARECEN") of California, a non-profit organization headquartered in Los Angeles, California, which has worked for more than four decades to provide immigrant integration programs, deliver immigration legal services, and foster civic participation and community engagement on immigration policy, education reform, and workers' rights.

25.     NTPSA organizes actions to raise public awareness about TPS and the contributions TPS holders make to this country, facilitates community and civic engagement by TPS holders, and provides access to timely and accurate TPS-related information and services to its members. Membership in the NTPSA is free and voluntary. Individuals can become NTPSA members either by joining a local NTPSA committee, like the Massachusetts NTPSA Committee, or by submitting an individual membership application. NTPSA's members set the organization's priorities, lead and participate in NTPSA's local committees and working groups, and select and serve on NTPSA's Executive Committee.

26.     NTPSA brings this action on behalf of its members. The vast majority of NTPSA's members are TPS holders, including TPS holders from El Salvador, Sudan, and Ukraine; the rest are family members of TPS holders and other individuals who wish to support the TPS community. The NTPSA has more than 500 Salvadoran TPS holder members living in 30 states and D.C. The NTPSA also has a number of Ukrainian and Sudanese TPS holder members. Many NTPSA members face imminent loss of employment as a result of USCIS's implementation of H.R. 1.

27.     **Plaintiff the Asylum Seeker Advocacy Project ("ASAP")** is a national voluntary non profit membership organization of asylum seekers from 175 countries who are now living in

the United States. With more than 700,000 members, ASAP is the largest membership organization of asylum seekers in the nation. ASAP is headquartered in New York, New York.

28.    ASAP provides members with legal and community support, including time-sensitive updates, legal resources, and opportunities for members to work together for nationwide systemic reform based on the priorities identified by its membership.

29.    Asylum seekers apply to join ASAP by filling out a voluntary online membership form. ASAP issues each member a digital membership card and member ID that they can use to identify themselves to ASAP and access the full range of member benefits. ASAP's members do not pay any fees or costs for their membership.

30.    ASAP members collectively determine the organization's advocacy agenda and policy priorities. ASAP regularly gathers feedback from members that is used to ensure that ASAP's services and advocacy efforts remain responsive to members. ASAP brings this case on behalf of its members. Thousands of ASAP members have pending applications for asylum with USCIS, including members who filed their applications before H.R. 1 was enacted. Many ASAP members have already expressed stress or confusion about how to pay the annual asylum fee and fear that their asylum applications may be rejected despite their good faith efforts to pay the fee. ASAP members join ASAP at different stages of the asylum process—including before they have received their first work permit based on a pending asylum application. ASAP members regularly apply for initial work permits based on pending asylum applications. ASAP receives questions from members related to the initial work permit application process at its help desk every month.

31.    **Plaintiff Service Employees International Union AFL-CIO ("SEIU")** is a labor organization founded in 1921 by immigrant janitors from Eastern Europe, Africa, Turkey, Spain, and Ireland. Today, the union represents approximately two million members in healthcare, the public sector, and property services—over 25% of whom identify as immigrants. SEIU has over

150 local union affiliates across the United States, Puerto Rico, and Canada. In Massachusetts, the union and its local union affiliates represent approximately 85,000 members across the state. SEIU is headquartered in Washington, D.C.

32.    SEIU's members include physicians, long-term care workers, janitors, security officers, airport workers, librarians, child-care workers, educators, fast food workers, and employees across all levels of government. A significant number of SEIU members are foreign-born U.S. citizens, lawful permanent residents, and immigrants authorized to work in the United States. Many of SEIU's members have mixed-status families.

33.    SEIU's membership includes many TPS holders, including from El Salvador and Ukraine. TPS holders are employed across SEIU-represented industries, including in health care and property services. SEIU also represents asylum applicants with employment authorization. SEIU brings this action on behalf of its members.

34.    SEIU's work is guided by its vision for a just society where all workers are valued and all people respected—no matter where they are from or the color of their skin; where all families and communities can thrive; and where they leave a better and more equitable world for future generations. An important pillar of SEIU's vision is the union's commitment to immigrant justice, which is enshrined in the union's Constitution and Bylaws. SEIU has embraced its heritage as a union of immigrants and has stood on the frontline of immigrant justice for many decades, including through its national immigrant justice campaign called iAmerica.

35.    **Plaintiff Service Employees International Union Local 32BJ ("32BJ SEIU")** is the largest union of property service workers in the United States, with approximately 185,000 members. 32BJ SEIU members work as cleaners, property maintenance workers, doormen, security officers, airport workers, window cleaners, building engineers, school and food service workers, and railroad and factory workers. 32BJ SEIU represents members across the Northeast—

in Massachusetts, New Hampshire, Rhode Island, Connecticut, New Jersey, New York, Delaware, Pennsylvania, Maryland, Northern Virginia, and Washington, D.C. The local union also represents workers in southern Florida and as far west as Montana. In Massachusetts, specifically, 32BJ SEIU represents approximately 22,000 workers across the state. The Massachusetts office is located at 26 West Street in Boston.

36.     32BJ SEIU is a local union affiliate of SEIU. 32BJ SEIU works to ensure that all workers—regardless of race, gender, religion or nationality—are treated with dignity and respect. Its mission is to ensure that all workers have a path to a better life. To achieve this mission, the local union builds power and transforms lives by organizing across the sectors where its members work to win the wages, benefits, respect, and dignity they deserve. 32BJ SEIU seeks to create a better tomorrow for all by building on the pillars of economic, social, racial, and environmental justice. A crucial part of 32BJ SEIU's work is to advocate for and protect immigrant workers' rights, including by providing trainings to workers, addressing immigration-related grievances, and negotiating legal benefits for members that cover immigration matters.

37.     32BJ SEIU's members reflect the full breadth of America today. Its members come from diverse backgrounds, including dozens of countries around the world and families with generations-long roots in the United States. The local union has a large immigrant membership, including members who are Salvadoran TPS holders. 32BJ SEIU brings this action on behalf of its members.

38.     **Defendant United States Citizenship and Immigration Services ("USCIS")** is the sub-agency within the Department of Homeland Security headquartered in Camp Springs, Maryland, and responsible for, among other things, processing asylum applications, applications for TPS, and requests for employment authorization.

39.     **Defendant Joseph B. Edlow** is sued in his official capacity as the Director of

9

USCIS.

40.     **Defendant Markwayne Mullin** is sued in his official capacity as the Secretary of Homeland Security. In this capacity, he directs each of the component agencies within the Department of Homeland Security, including USCIS. In his official capacity, Defendant Mullin is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103.

41.     **Defendant Department of Homeland Security ("DHS")** is an executive agency of the United States headquartered in Washington, D.C. DHS and its components, including USCIS, are the agencies principally charged with implementing and enforcing the immigration laws and policies of the United States.

**FACTUAL ALLEGATIONS**

**I.     The Challenged Policies**

42.     This lawsuit challenges four of Defendants' policies that purport to implement provisions of H.R. 1 impacting TPS holders and asylum seekers.

43.     First, USCIS's July 22, 2025 Federal Register Notice ("July 2025 FRN") partially implements the annual asylum fee for all affirmative asylum applicants. It also states in the preamble that each TPS EAD card will be limited to a period of no more than 1 year, or the duration of the TPS designation period, whichever is shorter.

44.     Second, in the July 2025 Cap Policy, USCIS applied the July 2025 FRN retroactively to issue one-year EADs to TPS holders who filed EAD renewal applications before H.R. 1 was enacted. The Cap Policy impacts TPS holders from El Salvador, Sudan, and Ukraine who had more than a year remaining on their TPS designation in July 2025, when H.R. 1 was enacted.

45.     Third, USCIS issued a website update on or around March 13, 2026 ("March 2026 Update") that retroactively shortens the duration of automatic employment authorization

10

extensions for TPS holders from El Salvador, Sudan, and Ukraine.

46.    Fourth, USCIS published an interim final rule on April 29, 2026 ("April 2026 IFR") that further regulates both the annual asylum fee for all asylum applicants and the duration of TPS EADs for all TPS holders. The April 2026 IFR also silently deletes the 30-day processing requirement for initial EADs for asylum applicants.

47.    Where referred to collectively in this Complaint, these four policies—the July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR—are called "the Challenged Policies." USCIS announced and implemented each of the Challenged Policies without going through required notice-and-comment rulemaking procedures and without satisfying any exceptions to normal rulemaking.

48.    Because USCIS rolled out the Challenged Policies through a series of overlapping actions that obscured which policies applied to which applicants and how each would operate in practice, this Complaint does not discuss them chronologically. Instead, to present the issues more clearly, this Complaint first explains in detail how the Challenged Policies operate in the context of TPS-related work authorization and then explains in detail how they operate in the context of asylum and asylum-based work authorization.

II.    **Temporary Protected Status ("TPS")**

   **A. Background on TPS and TPS-Related Work Authorization Prior to H.R. 1**

49.    TPS is a form of humanitarian relief, allowing eligible foreign nationals from war-torn or disaster-stricken countries to live and work lawfully in the United States while it is unsafe to return to their countries of origin. Congress created TPS in 1990. Immigration Act of 1990, Pub L. No. 101-649, § 302, 104 Stat. 4978, 5030–36 (1990). Today, there are hundreds of thousands of TPS holders, including many who have held TPS for over two decades. *See, e.g., Extension of the Designation of El Salvador for Temporary Protected Status*, 90 Fed. Reg. 5953, 5954 (Jan. 17,

2025) (noting that El Salvador was designated for TPS in 2001 and the designation has been extended 11 times).

50.    Under the TPS statute, the Secretary of Homeland Security may designate a country for TPS based on armed conflict, natural disaster, or other "extraordinary and temporary conditions."[1] 8 U.S.C. § 1254a(b)(1), (c)(1)(A). The Secretary may then grant TPS to nationals of the designated country who were in the United States at the time of designation and meet other criteria.

51.    If a person is granted TPS, they may not be removed from the United States while the status is in effect. *Id.* § 1254a(a)(1)(A).

52.    In addition, the Secretary "shall authorize the [noncitizen] to engage in employment in the United States and provide the [noncitizen] with an 'employment authorized' endorsement or other appropriate work permit." *Id.* § 1254a(a)(1)(B). "Work authorization . . . shall be effective throughout the period the [noncitizen] is in temporary protected status." *Id.* § 1254a(a)(2). Noncitizens who establish a prima facie case of TPS eligibility receive the same benefits as TPS holders until a final determination is made on their eligibility. *Id.* § 1254a(a)(4).

53.    Once granted TPS, a noncitizen "is in temporary protected status," *id.*, "for as long as the TPS designation lasts," unless DHS withdraws their status on individual eligibility grounds. *Sanchez v. Mayorkas*, 593 U.S. 409, 412–13 (2021); *see also* 8 U.S.C. § 1254a(c)(3) (grounds for withdrawal).

54.    Initial TPS designations last between 6 and 18 months. 8 U.S.C. § 1254a(b)(2)(B).

---

[1] Although the TPS statute references the "Attorney General," the government has long taken the position that the Attorney General's functions under the TPS statute were transferred to the Secretary of Homeland Security. In practice, the Secretary exercises those functions.

At least 60 days before a designation is set to expire, the Secretary must review conditions in the designated country and decide whether designation remains warranted. If conditions continue to warrant designation, the designation is extended for an additional period of 6, 12, or 18 months. *Id.* § 1254a(b)(3)(C).

55.    Before H.R. 1, USCIS used three means to "provide [TPS holders] with an 'employment authorized' endorsement or other appropriate work permit" that is "effective throughout" their TPS status. 8 U.S.C. § 1254a(a)(1)(B), (2).

56.    First, TPS holders could apply for EADs valid for the duration of each TPS designation period. *See, e.g.*, 90 Fed. Reg. at 5953–54 ("USCIS will issue new EADs with a September 9, 2026 expiration date to eligible beneficiaries granted TPS under El Salvador's designation who timely re-register and apply for EADs.").

57.    Second, USCIS sometimes used Federal Register Notices to automatically extend EADs for all TPS holders from a particular country "without any further action" on the part of the TPS holder. *See, e.g., id.* at 5956.

58.    Third, USCIS automatically extended a TPS holder's EAD for 540 days from the expiration date on the face of the EAD when the TPS holder filed a renewal EAD application. *Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants*, 89 Fed. Reg. 101208 (Dec. 13, 2024) (codified at 8 C.F.R. § 274a.13(d)(1)(i)).

59.    USCIS used these three methods in combination to ensure that TPS holders had an "effective" means of establishing work authorization "throughout" the full duration of their TPS. 8 U.S.C. § 1254a(a)(2). In particular, USCIS used automatic extensions to fill gaps that would otherwise have arisen because—due to relatively short designation periods, late notice of extension decisions, and long processing times—USCIS often failed to process EAD renewals in the time

13

between an extension announcement and expiration of the prior TPS period, meaning TPS holders were left with facially expired EADs. *See, e.g.*, 90 Fed. Reg. at 5954 (providing a one-year automatic extension for TPS holders from El Salvador because "DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires.").

60.    On January 17, 2025, USCIS announced extensions of the existing TPS designations for El Salvador, Ukraine, and Sudan, each for a period of 18 months. 90 Fed. Reg. 5953 (extension through September 9, 2026); *Extension of the Designation of Ukraine for Temporary Protected Status*, 90 Fed. Reg. 5936 (Jan. 17, 2025) (extension through October 31, 2026); *Extension of Sudan for Temporary Protected Status*, 90 Fed. Reg. 5944 (Jan. 17, 2025) (extension through October 31, 2026). Individuals previously granted TPS under these designations were required to re-register during a 60-day period running from January 17, 2025, through March 18, 2025. *See* 90 Fed. Reg. at 5953; 90 Fed. Reg. at 5937; 90 Fed. Reg. at 5945.

61.    In each extension notice, USCIS said that it would issue new EADs valid for the full length of the extension. *See* 90 Fed. Reg. at 5953–54 ("USCIS will issue new EADs with a September 9, 2026 expiration date to eligible beneficiaries granted TPS under El Salvador's designation who timely re-register and apply for EADs."); *id.* at 5945 ("USCIS will issue new EADs with an October 19, 2026, expiration date to eligible beneficiaries granted TPS under Sudan's designation who timely re-register and apply for EADs."); *id.* at 5937 ("USCIS will issue new EADs with an October 19, 2026, expiration date to eligible beneficiaries granted TPS under Ukraine's designation who timely re-register and apply for EADs."). In other words, USCIS guaranteed that TPS holders who applied to renew their EADs under the extensions would receive EADs that were effective throughout the extension period.

62.    In each extension notice, USCIS also "recognize[d] that not all re-registrants may receive a new EAD before their current EAD expires." 90 Fed. Reg. at 5954 (El Salvador); *see*

14

*also id.* at 5937 (Ukraine); *id.* at 5945 (Sudan). To prevent gaps in work authorization, USCIS provided "two ways" TPS holders' EADs could be automatically extended. *Id.* at 5956 (El Salvador); *id.* at 5939 (Ukraine); *id.* at 5948 (Sudan). First, USCIS automatically extended *all* expiring EADs issued to TPS holders from each country for one year "without any further action" on the part of the TPS holder. *Id.* at 5956 (El Salvador); *id.* at 5939 (Ukraine); *id.* at 5948 (Sudan). Second, USCIS explained that TPS holders who applied to renew their EAD during the re-registration period would be eligible for a 540-day automatic extension. *Id.* at 5956 (El Salvador); *id.* at 5939 (Ukraine); *id.* at 5948 (Sudan).

63.     TPS holders from El Salvador, Sudan, and Ukraine who applied to renew their TPS-based EADs during the re-registration period for their country received "Notice[s] of Action" from USCIS explaining that they qualified for an automatic 540-day extension. Each Notice of Action stated: "[Y]ou can show this notice with your expired EAD to your employer for employment eligibility verification (Form I-9) purposes. The automatic extension is for up to 540 days from the expiration date printed on the front of your EAD."

64.     TPS holders from El Salvador, Sudan, and Ukraine began relying on their automatic 540-day extensions as soon as their EADs expired.

65.     For TPS holders from El Salvador with EADs that expired on March 9, 2025 (the last day of El Salvador's previous designation), the 540-day automatic extension lasts through August 31, 2026. For TPS holders from Ukraine and Sudan with EADs that expired on April 19, 2025 (the last day of their previous designations), the 540-day automatic extension lasts through October 11, 2026. 90 Fed. Reg. 5936; 90 Fed. Reg. 5944.

66.     The employment authorization situation for TPS holders from El Salvador, Ukraine, and Sudan, as described in the January extension notices, is summarized in this chart:

15

| Country | Previous TPS/EAD Expiration Date | Last date to re-register/qualify for automatic 540-day EAD extension | Current TPS Expiration Date | 540-day extension date |
|---|---|---|---|---|
| El Salvador | 3/9/2025 | 3/18/2025 | 9/9/2026 | 8/31/2026 |
| Ukraine | 4/19/2025 | 3/18/2025 | 10/19/2026 | 10/11/2026 |
| Sudan | 4/19/2025 | 3/18/2025 | 10/19/2026 | 10/11/2026 |

**B. H.R. 1 Limits the Duration of TPS EADs**

67.    The President signed H.R. 1 on July 4, 2025. As relevant to TPS, H.R. 1 imposed a fee for each initial application, and each application to renew or extend employment authorization for TPS holders. 8 U.S.C. § 1811(a). H.R. 1 also limited the duration of each TPS "employment authorization." Under 8 U.S.C. § 1811(a), "[a]ny employment authorization for a[] [noncitizen] granted temporary protected status, or any renewal or extension of such employment authorization, shall be valid for a period of 1 year or for the duration of the designation of temporary protected status, whichever is shorter." Under 8 U.S.C. § 1803(c), "[e]ach initial employment authorization shall be valid for a period of 1 year, or for the duration of the [noncitizen's] temporary protected status, whichever is shorter."

68.    Although H.R. 1 limited the duration of each TPS-related "employment authorization," it did not repeal the statutory requirement that DHS "provide [TPS holders] with an 'employment authorized' endorsement or other appropriate work permit . . . effective throughout the period the [noncitizen] is in temporary protected status . . . ." 8 U.S.C. § 1254a(a)(1)–(2). It also did not make the duration limit retroactively applicable to people who had applied for or received employment authorizations before H.R. 1 passed. *See id.* § 1811(a).

**C. USCIS Issues the July 22, 2025 FRN and Applies the July 2025 Cap Policy**

69.    On July 22, 2025, USCIS issued a notice in the Federal Register regarding some of

16

the H.R. 1 fees. *USCIS Immigration Fees Required by HR-1 Reconciliation Bill*, 90 Fed. Reg. 34511 (July 22, 2025) ("July 2025 FRN"). The July 2025 FRN referenced the duration limit for TPS EADs in passing: "[t]he renewal or extension period for employment authorization shall be approved for a period of no more than 1 year, or for the duration of the designation of TPS, whichever is shorter." *Id.* at 34514.

70.    Although the July 2025 FRN did not say that USCIS intended to apply H.R. 1's TPS EAD duration provisions retroactively, starting on July 22, 2025, USCIS applied the July 2025 FRN to issue one-year EADs to TPS holders, including NTPSA members, who had applied to renew their EADs before enactment of H.R. 1. USCIS did so even where it had previously announced via Federal Register Notice that TPS holders would receive EADs valid for the full length of their 18-month extension period. Plaintiffs refer to this policy as the July 2025 Cap Policy.

71.    The APA requires notice-and-comment rulemaking whenever an agency promulgates a legislative rule. *See N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). "[A] legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Id.* (internal quotation marks and citation omitted). The July 2025 Cap Policy qualifies as a legislative rule because it stripped affected TPS holders of weeks or months of work authorization that they had already been granted by USCIS when USCIS extended the TPS designations. But USCIS did not comply with the APA's procedural requirements for legislative rules. USCIS never publicly set forth the Cap Policy in a standalone document, much less publish it 30 days before its effective date, inform the public of "the time, place, and nature of public rule making proceedings"; refer "to the legal authority under which the rule is proposed"; or detail "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b), (d). Nor did USCIS

17

"give interested persons an opportunity" to comment by submitting "written data, views, or arguments." *Id.* § 553(c).

### D. USCIS Ends Automatic 540-Day Employment Authorization Extensions, But Does Not Apply the Change Retroactively

72.     On October 30, 2025, months after H.R. 1 became law, USCIS amended its regulations to end the practice of automatic 540-day extensions, including for TPS holders, but only as to EAD renewal applications filed *after* October 30, 2025. *See Removal of the Automatic Extension of Employment Authorization Documents*, 90 Fed. Reg. 48799 (Oct. 30, 2025); 8 C.F.R. § 274a.13(d)). DHS explicitly stated that the rule change "does not retroactively affect those [noncitizens] who have already timely and properly filed a renewal EAD application before October 30, 2025." 90 Fed. Reg. at 48811–12.

73.     Also on October 30, 2025, USCIS updated its *Handbook for Employers*. The updated *Handbook*, which remains the same to this day, says that 540-day automatic extensions "apply to renewal requests timely filed before Oct. 30, 2025." USCIS, *Handbook for Employers (M-274): Guidance for Completing Form I-9* § 5.1, *Automatic Extensions Based on a Timely Filed Application to Renew Employment Authorization and/or Employment Authorization Document Before Oct. 30, 2025* (Oct. 30, 2025), https://perma.cc/39LG-K8KX. The Handbook does not say that TPS holders who received notices granting them 540-day extensions could later be stripped of those extensions because of H.R. 1. *See id.*

### E. Significant Backlogs in EAD Renewal Processing Leave Most TPS Holders Dependent on Automatic EAD Extensions

74.     Between October 1, 2025 and December 31, 2025 (the most recent period for which data are available), USCIS reported that it processed 6,227 TPS-based EAD renewals, of which it approved 5,938 and denied 289, for an overall approval rate of 95%. *See* USCIS, Immigration and

Citizenship Data, *Form I-765, Application for Employment Authorization, Eligibility Category and Filing Type (Fiscal Year 2026, Quarter 1)* (June 12, 2026), https://perma.cc/FWN6-A4CF.

75. USCIS further reported that 216,660 TPS-based EAD renewal applications remained pending as of December 31, 2025. *Id.*

76. If USCIS continues to process TPS-based EAD renewals at a rate of 6,227 per quarter, it would take approximately 34 quarters—more than *eight years*—to process the 216,660 TPS-based EAD renewal applications that were pending on December 31, 2025.

77. An NTPSA survey of Salvadoran TPS holders found that of 291 Salvadoran TPS holders who applied to renew their EADs between January 17 and March 18, 2025, only 28 (less than 10%) had received new work permits as of May 2026.

78. Salvadoran, Sudanese, and Ukrainian TPS holders who have not yet received new EADs due to the USCIS backlog must rely on automatic extensions to establish their work authorization.

**F. A March 2026 USCIS Website Update Creates Confusion for TPS Holders**

79. Around March 13, 2026, USCIS updated the landing page of its website on Temporary Protected Status by revising the language discussing "Employment Authorization Document (EAD) Extension." This portion of the website previously contained a short summary of how a person with TPS can receive an automatic extension of their EAD. USCIS, *Temporary Protected Status* (last updated Feb. 13, 2026), https://perma.cc/46ER-6N7H.

80. By March 13, 2026, USCIS had replaced this portion of the TPS landing page to say that the "length and availability of automatic extensions of TPS-based EADs have been impacted" by, among other things, USCIS's implementation of" H.R. 1. USCIS, *Update to TPS Page on EAD Automatic Extensions* (Mar. 13, 2026), https://perma.cc/6PA2-XT85 ("March 2026 Update").

81. For the first time, USCIS announced that, because of H.R. 1, TPS holders who applied to renew their EADs before October 30, 2025 could not rely on their 540-day automatic extensions, even if they received Notices of Action telling them their EADs had been extended by 540 days. *Id.* ("If you have a TPS-based EAD and maintain TPS status, and your renewal application was pending on or filed after July 22 but before Oct. 30, 2025, your automatic extension is limited by H.R. 1 to 1 year or the duration of TPS, whichever is shorter. You cannot claim the full 540-day extension, even if it is listed on your . . . notice."). For those who filed for an extension before July 22, 2025, USCIS announced that if the "receipt notice has a 'Received Date' of July 21, 2025, or earlier, the up-to-540-day automatic extension applies; however, any part of this extension that falls after July 22, 2025, cannot last longer than 1 year from this date or for the duration of the TPS designation period, whichever is shorter." *Id.*

82. The E-Verify website also released an update on March 13, 2026 that contained similar information and referred to the USCIS website update for more information. *See Update to TPS Page on EAD Automatic Extensions*, E-Verify, https://perma.cc/WD3J-NUZE. E-Verify is the Internet-based system that compares information entered by an employer from an employee's Form I-9 Employment Eligibility Verification, to records available to DHS and the Social Security Administration to confirm employment eligibility. E-Verify, *What is E-Verify?*, https://perma.cc/XHU3-U378 (archived June 29, 2026).

83. The March 2026 Update was the public's first indication that USCIS may be applying the TPS employment authorization duration limitation in H.R. 1 to automatic EAD extensions, including automatic EAD extensions provided to TPS holders who applied to renew their EADs before H.R. 1 was enacted.

84. Following the March 2026 Update, employers received emails from E-Verify with the text of the March 2026 Update, including the retroactive shortening of the EAD extension

20

many TPS holders are relying on to show work authorization.

85.     Consistent with the March Update, some NTPSA, VAM, SEIU, and 32BJ SEIU members have been told by their employers that their 540-day automatic extensions will expire on July 22, 2026—*less than* 540 days from the expiration date on the face of their EAD.

86.     This lack of clarity has created great confusion and anxiety among NTPSA, VAM, SEIU, and 32BJ SEIU members because they do not know when their work authorization expires.

87.     The March 2026 Update's interpretation of H.R. 1 is wrong and impermissibly retroactive because 8 U.S.C. §§ 1803(c) and 1811(a) do not state that H.R. 1's one-year limitation for TPS-related employment authorization applies to applications that were filed before H.R. 1 passed.

88.     The March 2026 Update also violates the Secretary's statutory duty to provide TPS holders with "an 'employment authorized' endorsement or other appropriate work permit . . . effective throughout the period [they are] in temporary protected status," 8 U.S.C. § 1254a(a)(1)(B), (2), because it leaves TPS holders without any effective work permit, even though they are still in temporary protected status.

89.     The March 2026 Update qualifies as a legislative rule because it stripped affected TPS holders of weeks or months of work authorization that they had already been granted by USCIS and that they are entitled to under 8 C.F.R. § 274a.13(d)(1). But USCIS did not comply with the APA's procedural requirements for legislative rules.

### G.  USCIS Publishes the April 2026 Interim Final Rule

90.     On April 29, 2026, USCIS issued an interim final rule implementing various portions of the immigration provisions in H.R. 1. *USCIS Immigration Fees and Related Procedures Required by H.R. 1 Reconciliation Bill*, 91 Fed. Reg. 22952 (Apr. 29, 2026) ("April 2026 IFR").

21

91.    The IFR invited public comments, and on May 29, NTPSA, ASAP, and SEIU submitted a joint comment, along with 81 other organizations, describing the IFR's negative and unlawful effects on TPS holders and asylum seekers.

92.    However, the IFR became effective on May 29, 2026, before USCIS considered any of the comments submitted. *Id.* USCIS defended issuing the rule as an interim final rule under the "good cause" and procedural rule exceptions. *Id.* at 22953, 22962–63. USCIS claimed that prior notice and comment would be impracticable and contrary to the public interest because H.R. 1 requires immediate implementation "and provides no discretion to DHS on the provisions implemented in" the rule. *Id.* at 22953. But these exceptions do not apply. H.R. 1 did not have an implementation date, and USCIS created consequences for TPS holders in the IFR that are not in H.R. 1.

93.    As relevant to TPS, the IFR did two things. First, the IFR disclosed (in a footnote), that USCIS had applied the July 2025 FRN to "calculat[e] the H.R. 1 caps [for TPS EADs] from the date of adjudication" of the EAD application. 91 Fed. Reg. at 22960 n.75. In other words, USCIS had been providing TPS holders with EADs valid for only one year after the date USCIS *adjudicated their application*. *Id.*

94.    Second, the IFR revised 8 C.F.R. § 244.12 to limit the duration of each initial EAD, and each renewal, to one year. *Id.* at 22972. It further provided that, when an EAD expires before the TPS period ends, the TPS holder "must obtain a renewal to continue employment authorization." *Id.* USCIS admitted that TPS beneficiaries "could face gaps in employment authorization" and lose their jobs while they waited for USCIS to adjudicate their applications to renew their EADs. *Id.* at 22961. And it acknowledged that, in the past, USCIS used methods like automatic extensions to avoid such gaps. *Id.* at 22960. Yet, even as USCIS capped the EAD validity period at one year, USCIS did not provide any way to ensure that TPS holders could

22

maintain their work authorizations throughout their TPS designations, as the TPS statute continues to require. *See* 8 U.S.C. § 1254a(a)(2).

95.     USCIS attempted to justify this failure by reinterpreting the TPS statute. According to USCIS, the agency does not need to ensure that TPS holders remain work-authorized throughout the TPS period. *See* 91 Fed. Reg. at 22961. USCIS acknowledged the statutory requirement that work authorization be "effective throughout the period [TPS holders are] in temporary protected status . . . ." *Id.* at 22960 (quoting 8 U.S.C. § 1254a(a)(2)). But USCIS reinterpreted the TPS statute's subsection (a)(2) to define only "who is eligible" for work authorization, not the "duration" that such authorization must remain in effect. *Id.* at 22961. USCIS believed that H.R. 1 somehow compelled this interpretation by limiting the duration of each "employment authorization" to one year (or the duration of TPS, if shorter). *Id.* at 22961.

96.     When two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). H.R. 1 and the TPS statute's employment authorization provisions are "capable of co-existence." *Id.* H.R. 1 limits any single TPS-related "employment authorization" to one year. 8 U.S.C. § 1811(a). The TPS statute requires the Secretary to provide TPS holders with employment authorization "effective throughout" the period of TPS. 8 U.S.C. § 1254a(a)(2). Those directives are fully compatible: if a TPS designation lasts longer than one year, USCIS must either process EAD renewal applications quickly enough that TPS holders can receive new EADs before their old EADs expire or provide automatic extensions of 12 months or less, like it has done in the past, to ensure work authorization "effective throughout," 8 U.S.C. § 1254a(a)(2), the TPS period. *See* 8 C.F.R. § 274a.13(e) (noting that USCIS can automatically extend TPS EADs via "Federal Register notice regarding procedures for renewing TPS-related employment documentation").

97.    In failing to give effect to the TPS statute's guarantee that TPS holders will receive work authorization "effective throughout" their period of TPS, the IFR misinterprets H.R. 1 and violates 8 U.S.C. § 1254a(a)(1)(B) and 8 U.S.C. § 1254a(a)(2).

98.    The amended regulation also violates the TPS statute's employment authorization provisions because it requires TPS holders to "obtain a renewal to continue employment authorization" upon expiration of their "1 year" EAD. 8 C.F.R. § 244.12(a). But USCIS did not acknowledge that its persistent backlog in processing TPS EADs makes it impossible for TPS holders with designations that last longer than one year to maintain employment authorization. In the IFR, USCIS recognized that some TPS holders "could face gaps in employment authorization" and suggested that applicants "would need to file timely renewals." 91 Fed. Reg. at 22961. But even if TPS holders applied to renew their EADs right when they receive them, many would still inevitably face gaps in their work authorization due to USCIS's own processing backlogs. By requiring TPS holders to "obtain a renewal," when they have no control over USCIS processing of renewals and, given persistent backlogs, it is often impossible for TPS holders to obtain a renewal before their current EAD expires, the amended regulation violates the TPS statute's requirement to provide employment authorization effective throughout the TPS period.

99.    In addition, USCIS claimed that "current TPS designation timeframes do not place TPS holders and applicants at risk of experiencing gaps in employment authorization." *Id.* This is plainly incorrect. For those TPS holders who have not yet received their renewed EAD after they applied for one in early 2025, like Plaintiffs' members, the March 2026 Update does place them at risk of experiencing gaps in employment authorization because it purports to shorten the automatic extension they are entitled to under 8 C.F.R. § 274a.13(d)(1)(i). USCIS's own data show that it approves approximately 95% of TPS EAD renewal applications, *supra* ¶ 74, meaning that TPS holders who are overwhelmingly likely to remain eligible for work authorization nevertheless

face unnecessary lapses in work authorization.

100.    Some NTPSA members who re-registered in early 2025, prior to H.R. 1's enactment, will also imminently experience a gap in employment authorization, because pursuant to the July 2025 Cap Policy USCIS issued their EAD for only one year from the date USCIS *adjudicated their application*, leaving them with a gap in work authorization before their current TPS designation expires. 91 Fed. Reg. at 22960 n.75.

101.    Thus, like the March 2026 Update, the IFR violates the statutory mandate to provide TPS holders with work permits "effective throughout" "the period [they are] in temporary protected status." 8 U.S.C. § 1254a(a)(1)–(2).

### H.  The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Harm the TPS Holder Plaintiffs

102.    Many TPS holders, including members of NTPSA, VAM, SEIU, and 32BJ SEIU, will lose their jobs—and their only means of providing for themselves and their families—on July 22, 2026, as a result of the March 2026 Update. If USCIS had given NTPSA, VAM, SEIU, 32BJ SEIU, and these organizations' members an opportunity to comment on the March 2026 Update before USCIS published it and sent the E-Verify communication, they could have explained why the March 2026 Update's interpretation of H.R. 1 is unlawful and harmful.

103.    Other TPS holders, including NTPSA members, have received EADs with seemingly arbitrary expiration dates that will expire while they are still in temporary protected status as a result of the July 2025 Cap Policy. After their EADs expire but while they remain in temporary protected status, these TPS holders will be unable to work, or provide for themselves and their families. If USCIS had disclosed the July 2025 Cap Policy before the April 2026 IFR or given NTPSA, VAM, SEIU, and 32BJ SEIU and their members an opportunity to comment on the July 2025 Cap Policy or April 2026 IFR, they could have explained why this was an unlawful and

harmful interpretation of H.R. 1.

104.    Still, other TPS holders, including members of NTPSA, VAM, SEIU, and 32BJ SEIU, are experiencing anxiety and confusion because they do not know if their 540-day automatic employment authorizations extensions will remain valid for the full 540 days, or will instead expire early on July 22, 2026.

105.    "Estefania"[2] is a Salvadoran VAM member with TPS who lives in Massachusetts. Estefania depends entirely on her TPS-based work permit to support herself and care for her family, including her son in El Salvador and her U.S. citizen son who was born in Boston. She has been waiting for her work permit renewal, but in the meantime she has been working under the automatic extension of her current work permit. Her employer—a global commercial company— has told her that, according to E-Verify, her work permit will be considered expired on July 22. Her employer has told her that she will have to resign if she cannot present a new work permit before July 22.

106.    Estefania has lived in Boston since 2012 and has held TPS since then, working for the same company under her work permit.  She also works with Uber to supplement her income so she can support her children. As a single mother, the impending loss of her work permit means not only the possible loss of both her jobs, but also the inability to renew her driver's license. Losing her work permit before she expected could leave Estefania without sufficient income to support her children and without valid documents to drive or continue working, even though her TPS does not legally expire until September 9 and her work permit extension does not expire until August 31.

107.    NTPSA member "Isaac" is a Salvadoran TPS holder living in Lynn, Massachusetts.

---

[2] Plaintiffs' members are using pseudonyms in the Complaint.

26

Isaac is a father of four children, who he supports through his job at a local university, where he has worked for over two decades. He and his wife bought their first home several years ago. Isaac's work permit is based on his TPS and lists an expiration date of March 9, 2025. Isaac applied to renew his work permit in February 2025. He received a receipt notice from USCIS stating that his employment authorization was extended for 540 days from the expiration date on the face of his work permit. He showed his work permit and receipt notice to Human Resources (HR) personnel, and they confirmed he was authorized to continue working through August 31, 2026.

108.    However, on March 24, 2026, Isaac received an email from HR saying that, because of the March 2026 Update, his extension will expire on July 22, 2026 instead of August 31, 2026. Isaac still has not received a new work permit. If he cannot provide updated proof of work authorization before July 22, he will lose his job. If he loses his job, he and his family will also lose their health insurance. Isaac is worried about his ability to pay his mortgage and continue to provide for his family. He is also worried about his son's access to treatment he depends on to manage a behavioral condition. He is so stressed about his impending loss of work authorization that he has not been able to sleep at night.

109.    NTPSA member "Luis" is a Salvadoran TPS holder who lives in Riverside, California and works as a warehouse manager. He came to the United States when he was 16 years old and completed high school and college in Los Angeles, graduating Magna Cum Laude with a 4.0 GPA. Luis's work permit is based on his TPS and has a March 9, 2025 expiration date. Luis re-registered for TPS and applied to renew his work permit during the most recent re-registration period for El Salvador. However, he still has not received a new work permit. He has been able to establish his work authorization by providing the USCIS receipt notice for his work permit renewal application, which says his work permit is automatically extended for 540 days.

110.    Initially, his employer's HR department told him his extension was valid through

27

August 31, 2026. However, about a month ago, HR personnel informed him that his automatic extension was no longer valid for 540 days but would instead expire on July 22, 2026. Luis must provide new proof of employment authorization before then but has no way to do so. He does not know what he will do if he loses his job. He is the father of three U.S. citizen children, including an 11- and 13-year-old who depend on him to provide for them.

111.    NTPSA member "Sonia" is a Salvadoran TPS holder in her 60's living in Houston, Texas. She works as a cleaner in the food industry and has been with the same employer for 25 years. Sonia sends part of her earnings to support her adult daughter and three grandchildren, who live in El Salvador. She receives health insurance through her job and takes medication for high blood pressure and high cholesterol. Sonia's work permit is based on her TPS and has a March 9, 2025 expiration date. Sonia applied to renew her work permit during the latest re-registration period for El Salvador, but she still has not received a new work permit. In March 2025, she showed her employer the USCIS receipt notice for her work permit renewal application, which shows she timely applied to renew and says that her employment authorization is extended for 540 days. Her employer accepted the documents as proof of ongoing work authorization.

112.    However, about two weeks ago, her employer told her that her 540-day extension would expire early, on July 22, 2026, and that she would need to provide updated documents to continue working. There is nothing else Sonia can show to establish her work authorization. She is worried if she loses her job she will lose her health insurance, along with access to the medicine she relies on to control her blood pressure and cholesterol. She also worries that she will be unable to support herself economically, or to send money to her daughter and grandchildren.

113.    NTPSA member "Aleksandr" is a Ukrainian TPS holder living in North Carolina. He supports his wife, a stay-at-home mother, and their two young U.S. citizen children with his job as a software engineer. His work permit is based on his TPS and has an April 19, 2025

expiration date. Aleksander re-registered for TPS and applied to renew his work permit during the most recent re-registration period for Ukraine. He received a receipt notice saying his employment authorization is automatically extended for 540 days but has not yet received a new work permit. Initially, Aleksandr's employer accepted his receipt notice as proof that he remained authorized to work through October 11, 2026.

114. Recently, Aleksandr alerted his employer to the March 2026 Update on the USCIS website that says TPS-related EAD automatic extensions will end early, on July 22, 2026. Aleksandr was concerned that it could affect his employment authorization and he does not want to work without valid authorization. In response, his employer stated that Aleksandr would need to present an updated work permit to continue his employment beyond that date. If Aleksandr loses his job, his family will immediately be plunged into a financial crisis and would likely have to turn to community food assistance.

115. NTPSA member "Hanafi" is a Sudanese TPS holder living in Texas. He is an ICU doctor, is married to a U.S. citizen, and has two young U.S. citizen children. Hanafi treats patients in the hospital ICU and also provides specialized care to severely ill outpatients in his weekly clinic hours. Hanafi's work permit is based on his TPS and has an April 19, 2025 expiration date. Hanafi re-registered for TPS and applied to renew his work permit in January 2025, just days after USCIS announced an extension of Sudan's TPS designation. He received a receipt notice saying his work permit is automatically extended for 540 days, which he provided to his employer, but has not yet received a new work permit. Initially, the legal department at the medical center where Hanafi works told him he could continue working through October 2026. However, around April 2026, Hanafi received an email from the legal department saying that, due to a new update from USCIS, his automatic extension would be valid only until July 22, 2026.

116. If Hanafi loses his ability to work on July 22, it will harm him, his family, his

29

patients, and his colleagues. Hanafi has been seeing many of his outpatients for years; he has developed close relationships with them and knows their medical history so well he can often anticipate health problems they may experience. Hanafi often gives these patients his personal cell phone number so they can reach him in case of an emergency. He worries that if he has to transfer his patients to other physicians in his practice, it will increase the burden on the physicians and disrupt the continuity of care his patients have been receiving. Hanafi is also worried about how he and his family will manage without the income from his work or the health care his children receive from his employer-provided health insurance. He has already been forced to make plans to move his family to a smaller apartment to prepare for an extended period of unemployment. And he worries that without health insurance, he will be forced to delay needed follow-up care for his three-year-old son who had surgery just a few months ago.

117.    NTPSA member "Fatima" is a Sudanese TPS holder living in Virginia. She works on health systems development for a non profit organization. Fatima re-registered for TPS and applied to renew her work permit during the first week of the most recent re-registration period for Sudan, which ran from January 17, 2025 to March 18, 2025. USCIS approved her work permit renewal on July 22, 2025 and issued her a new work permit with a July 22, 2026 expiration date. Fatima was confused, because her prior EADs had always run for the full length of the TPS designation period. She was also confused because she knew other Sudanese TPS holders who applied to renew their work permits *after* she did, but received new work permits before July 22, 2025 that do not expire until October 19, 2026, which is the end of Sudan's current TPS designation period. In April 2026, Fatima paid approximately $700 to renew her current work permit, but she has not yet received a new work permit. If she does not receive a new work permit before July 22, she will lose her job and will likely also lose her home.

118.    "Blanca" is a TPS holder from El Salvador and an NTPSA member living in New

30

York. She is legally blind. Until recently, Blanca worked at a factory, but a few weeks ago she was laid off because business was slow. Blanca re-registered for TPS and applied to renew her TPS work permit during the most recent re-registration period for El Salvador. In August 2025, she received an approval notice from USCIS extending her TPS through September 9, 2026. Around the same time, she received a new work permit, with an August 20, 2026 expiration date. Blanca did not understand why her work permit expires before her TPS expires, because over the past 25 years, her work permits have always been valid for the full length of each TPS approval. She is currently looking for a new job but is worried that her limited period of work authorization will make it more difficult.

119.   NTPSA member "Daniel" is a Salvadoran TPS holder living in Houston, Texas. He has lived in the United States since he was 19 years old. Daniel works in the food industry as an industrial mechanic. He re-registered for TPS and applied to renew his work permit during the most recent re-registration period for El Salvador. On July 30, 2025, he received an approval notice for his TPS re-registration, stating that his TPS was extended through September 9, 2026. About a week later, he received a new work permit, but rather than expiring on September 9, 2026, it expires weeks earlier, on July 30, 2026. Daniel did not understand why the work permit's expiration was different from his TPS approval, because, for the past 25 years, his TPS and work permits have always run concurrently. He called USCIS's 1-800 customer assistance number and spoke with an operator who told him that his work permit should be considered valid until September 9, 2026. However, his employer has told him he needs to provide updated work authorization documents by July 30, 2026 or he will lose his job. He does not know how he will support himself or his 22-year-old U.S. citizen son if he cannot work.

120.   Local SEIU union affiliates from across the country—from Massachusetts to Washington to California—have reported that members who are TPS recipients have contacted

31

their local unions because employers have told these members that their work authorizations are set to expire on July 22, 2026. Members are confused because they thought that they were entitled to the automatic 540-day extension and were relying on the extension to continue in their jobs. This includes members of Local 32BJ SEIU.

121.    **32BJ SEIU Member A** is a Salvadoran TPS recipient who entered the United States in 1994 and has always applied for TPS and work authorization extensions promptly within the application period. He has been a 32BJ SEIU member since 1996. 32BJ SEIU Member A lives and works in Boston for an international corporation and pays taxes annually. 32BJ SEIU Member A has a large family in the United States, including his wife and two U.S. citizen children. 32BJ SEIU Member A's children are thriving in school. His 14-year-old daughter, who aspires to be a nurse, will attend high school in the fall. 32BJ SEIU Member A is determined to do everything in his power to make his daughter's college education financially possible.

122.    32BJ SEIU Member A, his wife, and children receive health insurance through the local union's employer-funded 32BJ Health Fund. The health insurance provides regular and urgent medical care for their two children and enables 32BJ SEIU Member A to see an endocrinologist who monitors his pre-diabetes. 32BJ SEIU Member A and his family depend on TPS work authorization for their financial well-being, their access to medical care, and the educational future of his children.

123.    **32BJ SEIU Member B** is a Salvadoran TPS recipient who arrived in the United States in 1993. After his initial grant of TPS, he applied for TPS and work authorization extensions promptly within the application period. He has worked and lived continuously in the Boston area for the past 33 years and paid taxes throughout that time. Since 2011, 32BJ SEIU Member B has worked at a university in the metropolitan Boston area and has been a member of the local union. He works in the maintenance department and sets up student events including commencement

ceremonies.

124.    32BJ SEIU Member B has a wife and two U.S. citizen children. His 14-year-old daughter is in high school and plans to go to college. 32BJ SEIU Member B is committed to making his daughter's higher education future a reality. 32BJ SEIU Member B, his wife, and children depend on 32BJ SEIU's employer-funded 32BJ Health Fund for all of their medical treatment. This health insurance has provided pediatric care for his children, and for the past five years diabetic care for 32BJ SEIU Member B. One year ago, 32BJ SEIU Member B was hospitalized for over a week due to his diabetes. Without the health insurance that his job and the 32BJ Health Fund provided, he would have incurred staggering medical debt.

125.    32BJ SEIU Member B provided his employer his government-issued employment authorization document and a copy of his USCIS Notice of Action indicating that his application for an extension of his work authorization was filed as required. Nonetheless, his supervisor informed him that based on USCIS information, his employment authorization will expire on July 22, 2026, and he will no longer be authorized to work. Without the employment authorization that TPS provides, 32BJ SEIU Member B and his family would be unable to access the medical care upon which they depend and afford food, shelter, and other necessities.

126.    **32BJ SEIU Member C** is a Salvadoran TPS recipient who has lived and worked in the United States continuously for more than 26 years. After having received her initial grant of TPS and work authorization, she always promptly applied for TPS and work authorization extensions within the application period. 32BJ SEIU Member C has been a member of 32BJ SEIU for 17 years. She works in Washington, D.C., cleaning high-rise commercial buildings. Together with her husband, she owns a home for which they saved for many years. Her husband has a gardening business that employs five to six workers. The couple pay income taxes, property taxes, and payroll taxes for the business.

127.   32BJ SEIU Member C relies on the 32BJ Health Fund that provides employer-funded health insurance. Through this insurance, she is able to afford to see doctors who regularly monitor her diabetes, heart problems, and medication. She is active in the local union where she has many friends and co-workers. She also helps support her family in El Salvador. 32BJ SEIU Member C worries that the March 2026 Update will result in the loss of her job, causing her to lose her home, her medical insurance, her health, her decades-long community of co-workers, and her ability to support her impoverished mother in El Salvador. 32BJ SEIU Member C is emotionally devastated by the consequences of the USCIS policy.

128.   **32BJ SEIU Member D,** a Salvadoran TPS recipient, arrived in the United States in 1999 where he has lived and worked continuously for the past 27 years. He applied for TPS and work authorization extensions promptly throughout the years that he has been a TPS recipient. Throughout his years in the United States, he always paid taxes. For the past decade, he has been an active member and leader of 32BJ SEIU. Since 2012, he has worked in a large hospital as a maintenance lead, ensuring the hospital facilities are safe and efficient. During the COVID-19 pandemic, his responsibilities included the logistics and distribution of personal protective equipment ("PPE") for the hospital. His job duties also require him to handle scheduling and payroll issues for his crew.

129.   32BJ SEIU Member D lives in Maryland with his legal resident cousins where he contributes to the cost of his cousin's mortgage. In addition, he helps support his family in El Salvador who rely on his remittances to pay for his sister's dialysis treatments and his elderly mother's rent and food. 32BJ SEIU Member D depends on the health insurance plan he receives through 32BJ SEIU's employer-funded 32BJ Health Fund. He is scheduled for surgery to remove several concerning growths in his throat. Without his medical insurance, which he receives because of his employment and work authorization, he would be unable to pay for the surgery he requires.

130.    32BJ SEIU Member D relies on his TPS work authorization for his economic and personal well-being. The impact of the recent USCIS policy prematurely terminating work authorization has drastic and serious consequences on his ability to pay for his rent, his food, his medical care, and for his family members' needs in El Salvador. In addition, 32BJ SEIU Member D's sense of self-worth is dependent on the contributions he is able to make through his employment to his patients, his co-workers, and his union. Loss of employment would be personally and emotionally devastating.

## III.    Asylum

### A.  Background on Asylum and Asylum-Based Work Authorization Prior to H.R. 1

131.    The INA gives noncitizens "physically present in the United States" the right to apply for asylum. 8 U.S.C. § 1158(a)(1). A noncitizen may receive asylum if they meet the definition of a "refugee": that is, if they have a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their home country. *Id.* §§ 1158(b)(1)(A), 1101(a)(42); 8 C.F.R. § 208.14.

132.    To be eligible for asylum, a noncitizen must "demonstrate[] by clear and convincing evidence" that they filed their application within one year of their arrival in the United States, with limited exceptions. 8 U.S.C. § 1158(a)(2)(B), (D).

133.    Being granted asylum comes with significant benefits: asylees may live and work in the United States and apply for lawful permanent residence. *See* 8 U.S.C. §§ 1158(c)(1), 1159.

134.     A noncitizen applying for asylum must fill out and file an I-589 form. USCIS, *Asylum* (May 18, 2026), https://perma.cc/89HJ-335V. If a noncitizen wishes to apply for asylum and is not in removal proceedings before an immigration judge, then the noncitizen generally submits their application to USCIS, a subagency within DHS. 6 U.S.C. § 271(b)(3).

135.    A Form I-589 is also considered an application for withholding of removal and can

35

be used to seek protection under the United Nations Convention Against Torture ("CAT"), 8 C.F.R. § 208.3(b), but those forms of relief can only be considered by an immigration judge in removal proceedings.[3] *See* 8 U.S.C. § 1231(b)(3)(A); 8 C.F.R. §§ 1208.16(a), 1208.17(a)–(b). If USCIS does not grant an asylum application and the applicant is removable from the United States, the applicant is referred to removal proceedings, and the immigration judge considers their pending I-589 application, along with any other application for relief filed by the noncitizen. 8 U.S.C. § 1229a(c)(4).

136.    Under 8 C.F.R. § 103.2(a)(7), USCIS may reject applications that do not meet filing requirements at the time of submission, including because the application is incomplete, does not include the proper filing fee, or is not signed. USCIS rejection is an intake-stage mechanism that treats an application as though it was never accepted for processing. *See id.* § 103.2(a)(7)(ii) ("A benefit request which is rejected will not retain a filing date."); *see also id.* § 208.3(c)(3) (rejection of incomplete application). If a rejected applicant wishes to have their application receipted and accepted for processing, there is no appeal provided; they must file a new application. *Id.* § 103.2(a)(7)(iii) ("A rejection of a filing with USCIS may not be appealed."); *id.* § 208.3(c)(3)(iii) (rejected application "shall be resubmitted by the applicant as a complete application if he or she wishes to have the application considered").

---

[3] Withholding of removal and CAT also are based on a fear of return to the noncitizen's country of origin, but they have higher standards of proof and confer fewer benefits. 8 U.S.C. § 1231(b)(3); 8 C.F.R. §§ 1208.16–18. To grant either application, the immigration judge must first order the noncitizen removed from the United States, and the grant of protection only prevents the government from executing the removal order to the specific country or countries where the applicant has demonstrated a likelihood of persecution or torture. *See id.* It does not prevent the government from removing the noncitizen to another country or lead to permanent immigration status in the United States. *Id.* Third-country removals are becoming increasingly common in the Trump Administration. *See* Am. Immigr. Council, *Fact Sheet: Third-Country Removals in United States Immigration Policy* (Dec. 2025), https://www.americanimmigrationcouncil.org/wp-content/uploads/2025/12/Third-Country-Removals-Factsheet_1225.pdf.

137. The asylum regulations authorize USCIS to return incomplete applications, but only at the time of filing. 8 C.F.R. § 208.3(c)(3). The regulations require USCIS to return those applications within 30 days so applicants may correct and refile them, and they provide that applications returned as incomplete do not begin the employment authorization clock.[4] *Id.*

138. Before H.R. 1, USCIS had never required the payment of any fee associated with filing an asylum application, nor had USCIS ever required an individual immigrant applying for an immigration benefit to pay an annual fee for any application or petition that was already pending. April 2026 IFR, 91 Fed. Reg. at 22956–57.

139. Asylum applicants are entitled to remain in the United States while their applications are pending unless and until they receive a final removal order. *See* 8 U.S.C. § 1182(a)(9)(B)(iii).

140. Most asylum applicants are eligible to apply for employment authorization after their asylum application has been pending for 150 days, and to receive employment authorization after their asylum application has been pending for 180 days. 8 C.F.R. § 208.7(a). Prior to the April 2026 IFR, the regulation specified that USCIS "shall have 30 days from the date of filing of the request employment authorization to grant or deny that application." *Id.* Once granted, employment authorization can be renewed until a final decision is made on the asylum application (including on appeal at the Board of Immigration Appeals). *Id.* § 208.7(b).

141. While the law generally requires that asylum applications be adjudicated within 180 days of filing, 8 U.S.C. § 1158(d)(5)(A)(iii), USCIS often takes many years to adjudicate an asylum application. *See* Nat'l Immigr. Forum, *Explainer: Asylum Backlogs* (Jan. 23, 2024),

---

[4] The asylum clock measures the number of days that an I-589 Form has been pending with USCIS or an immigration judge. USCIS, *The 180-Day EAD Clock Notice* (Mar. 2025), https://perma.cc/Z7E5-RG3H.

https://perma.cc/7AKK-5PQ6 (average wait time for adjudication of an asylum case before USCIS is over 6 years).

142.    The asylum statute and regulations entitle asylum applicants to an individualized adjudication of their application once it is accepted for filing. 8 C.F.R. § 208.9(a); *RAICES v. Mullin*, 174 F.4th 81, 105–11 (D.C. Cir. 2026). USCIS may (1) grant the application; (2) refer the noncitizen to removal proceedings before an immigration judge if the noncitizen is inadmissible to or deportable from the United States (during which time an asylum application is still pending and work authorization is valid); or (3) deny the application, if the noncitizen has valid status in the United States. 8 C.F.R. §§ 208.14(c), 1208.14(b), (c). If their application is referred to an immigration judge, they may also appeal a denial of the decision from the immigration judge, during which time they are able to receive and maintain work authorization. *Id*. § 1003.1(b)(3); *id*. §§ 208.7(b)(2)–(3).

### B.  H.R. 1 Creates Fees on Asylum for the First Time in U.S. History

143.    Signed on July 4, 2025, H.R. 1 imposed new fees for many immigration applications. Pub L. No. 119-21, §§ 100001–100018, 139 Stat. 72, 364–85 (codified at 8 U.S.C. §§ 1801–1815).

144.    For the first time in U.S. history, H.R. 1 required noncitizens to pay a fee to file an asylum application. *See* 8 U.S.C. § 1802(a). H.R. 1 also established that, "for each calendar year that [a noncitizen's] application for asylum remains pending" USCIS or EOIR, as applicable, "shall require the payment of a fee, equal to the amount specified in subsection (b)." *Id*. § 1808(a). Section 1808(b)(1) provides for an initial amount of $100 "[f]or fiscal year 2025" (or such amount as the Secretary of Homeland Security or Attorney General, as applicable, establishes by rule). The fee is then adjusted annually for inflation. *Id*. § 1808(b)(2). H.R. 1 was silent as to what would happen if an applicant were to fail to pay the annual asylum fee.

38

**C. USCIS Publishes a July 22, 2025 Federal Register Notice Addressing H.R. 1 Asylum Fees**

145.    On July 22, 2025, without going through notice and comment, USCIS issued a notice in the Federal Register regarding some of the H.R. 1 fees. *USCIS Immigration Fees Required by HR-1 Reconciliation Bill*, 90 Fed. Reg. 34511 (July 22, 2025) ("July 2025 FRN" or "FRN").

146.    The fees outlined in the FRN were required to be submitted for any immigration benefits request postmarked on or after the date of publication, July 22, 2025; any form postmarked on or after August 21, 2025, without the proper filing fee would be rejected. *Id.* at 34516.

147.    The FRN specified that the initial asylum filing fee would apply to any application filed on or after July 22, 2025. *Id*. at 34514.

148.    In addition, in the July 2025 FRN, USCIS "interpret[ed]" the annual asylum fee ("AAF") provision of H.R. 1 to require that any noncitizen who filed an asylum application on or before October 1, 2024, and whose application is still pending as of September 30, 2025, must pay the AAF for fiscal year 2025. *Id.* at 34515. USCIS did not make clear when the payment for fiscal year 2025 would be due. *See id.* But USCIS said that noncitizens who applied on or before October 1, 2024, would have to pay the AAF as of September 30 in each subsequent year that the application remained pending. *Id.* This led many asylum seekers to think that they had to pay the first AAF by September 30, 2025. *See, e.g.*, Liz Veazey, *Asylum Seekers in Panic Over Trump's Unclear $100 Fee*, The City (Sep. 29, 2025), https://perma.cc/NC3F-DS4K.

149.    According to the July 2025 FRN, any noncitizen who filed an asylum application after October 1, 2024, that remains pending with USCIS for more than 365 days must pay the AAF each year on the anniversary of their initial filing date. 90 Fed. Reg. at 34515.

150.    USCIS claimed that the language in H.R. 1 was clear and unambiguous, and that

therefore the imposition of the AAF on applications that were filed before H.R. 1 was passed was not retroactive. *Id.* (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994)). At the same time, USCIS admitted it was not applying the *initial* asylum fee, established in the same legislation, to any asylum applications filed before the date of publication of the July 2025 FRN. *Id.* at 34514.

151.    H.R. 1 did not clearly and unambiguously authorize imposing annual asylum fees on applications that had already been pending at the time H.R. 1 was enacted. Therefore, the July 2025 FRN unlawfully imposed the AAF retroactively in two ways. First, asylum seekers must pay the AAF even if they filed their applications before H.R. 1 was enacted. Second, USCIS counts the time an asylum seeker's application was pending before H.R. 1 was enacted to determine whether the application remains pending for a full calendar year, as stated in 8 U.S.C. § 1808(a).

152.    The AAF imposes new legal obligations and consequences for asylum seekers. USCIS was therefore incorrect to state in the July 2025 FRN that imposing the AAF retroactively is simply a "procedural" change, 91 Fed. Reg. at 34515.

153.    The July 2025 FRN also did not consider the reliance interests of asylum seekers who submitted their asylum applications before H.R. 1 was enacted. Specifically, the July 2025 FRN glossed over asylum applicants' understanding that they would not need to pay fees to keep their asylum application pending, maintain eligibility for work authorization, and ultimately obtain an individualized decision on the merits of their application. It is not reasonable to assume asylum applicants could have foreseen an annual asylum fee given that USCIS has never previously charged immigrant applicants an annual fee while their immigration application was pending.

154.    The July 2025 FRN said that USCIS would provide notice to each asylum applicant who was required to pay the AAF of when and how the fee needed to be paid, as well as "the consequences of failure to pay." *Id.* at 34515. But the July 2025 FRN did not tell asylum applicants when to expect the notice regarding payment of the AAF, how they would receive the notice,

40

whether there would be a way to determine if their fee is due without receiving the notice, or whether they could pay the AAF early.

155. The July 2025 FRN added that "for additional clarity" it might "codify these fees. . . in a future rule," *id.* at 34516, but it did not wait for that future rule to require many asylum applicants to pay the annual asylum fee.

156. The APA requires notice-and-comment rulemaking whenever an agency promulgates a legislative rule. *See N.H. Hosp. Ass'n*, 887 F.3d at 70. "[A] legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *Id.* (internal quotation marks and citation omitted). The July 2025 FRN is a legislative rule because it imposes a new obligation, the annual asylum fee, on asylum seekers who filed their applications before H.R. 1 was enacted even though H.R. 1 does not contemplate this retroactive application. But USCIS did not give the public an opportunity to submit comments, in violation of the APA. 5 U.S.C. § 553(c). USCIS also failed to publish the July 2025 FRN 30 days before its effective date. *See id.* 553(b).

### D. USCIS's Implementation of the July 2025 FRN Creates Confusion for Asylum Seekers

157. Lack of clarity in the July 2025 FRN regarding when the first AAF would be due and USCIS's failure to explain when it would begin sending notices or providing a mechanism to pay the AAF created mass panic among asylum seekers. *See, e.g.*, Veazey, *Asylum Seekers in Panic Over Trump's Unclear $100 Fee*.

158. USCIS's decision to impose the AAF on individuals who applied for asylum before H.R. 1 was enacted contributed to the fear and confusion created by USCIS's chaotic implementation of the AAF. USCIS would have had ample time to provide individuals applying for asylum after H.R. 1 information about an annual fee. In fact, based on the plain language of

H.R. 1, the first AAF would not become due until one calendar year after July 4, 2025, for asylum applications that "remain pending" after a "calendar year" had passed from H.R. 1's enactment. 8 U.S.C. § 1808(a).

159.    Nevertheless, USCIS failed to account for asylum applicants' substantial reliance interests arising from the fee-free regime that existed when they filed. Those reliance interests required USCIS to provide especially clear notice and implementation guidance before imposing new obligations on pending applicants.

160.    Instead, USCIS rushed to implement the AAF, yet did not even set up a mechanism to accept payment until after September 30, 2025, the date referenced in the July 2025 FRN that had been interpreted by asylum applicants as the deadline to pay the AAF for the first time. In late September 2025, thousands of ASAP members with asylum cases pending before USCIS reached out to ASAP reporting that they were confused about when and how to pay the AAF.

161.    On or about October 2, 2025, USCIS added information to the Fee Schedule page of its website stating that USCIS began sending notices to asylum seekers about the AAF on October 1, 2025. USCIS, *G-1055, Fee Schedule* (Oct. 2, 2025), https://perma.cc/CM2R-G5VJ. USCIS announced that when individuals receive the notice, they "should pay the fee within 30 days." *Id.* Around the same date, USCIS posted on its website a form for payment of the AAF. USCIS, *Annual Asylum Fee*, https://perma.cc/C4F4-SSHY (archived Oct. 3, 2025) ("USCIS AAF Payment Page").

162.    Some ASAP members and other asylum seekers tried to pay the AAF but were unable to do so, despite their cases having been pending for more than a year. Other asylum seekers logged into the USCIS AAF Payment Page to find that it said their AAF was due, and so they were then able to make their AAF payment. However, many asylum applicants who were able to pay the AAF through the USCIS AAF Payment Page never received a notice and only found out the

AAF was due because they proactively checked the USCIS AAF Payment Page and found they were able to pay. Despite having paid, asylum applicants were left concerned about whether they had paid on time since the USCIS AAF Payment Page does not state when the 30-day notice period begins, does not provide a deadline for paying the AAF, and, even after payment, the confirmation page suggests that no AAF is currently due and that USCIS will notify the applicant when the fee *first* becomes due, creating uncertainty about whether the payment was successfully recorded.

163.     This created fear and confusion among asylum seekers about when to expect their fee notice, whether USCIS had recorded their payment, and concern that they would accidentally miss their 30-day window to pay the AAF. Asylum seekers were concerned their asylum cases could be dismissed if they missed their chance to pay the AAF. *See* Myah Ward, *Trump put a new fee on asylum seekers. Many say they don't know how to pay*, Politico (Oct. 21, 2025), https://perma.cc/BRW2-AQ4T.

164.     On October 3, 2025, Plaintiff ASAP filed a lawsuit against USCIS and EOIR challenging the July 2025 FRN, as well as an EOIR memorandum imposing the AAF on individuals with asylum applications pending before the immigration court system. *See* Complaint, *ASAP v. EOIR*, 1:25-cv-03299 (D. Md. Oct. 3, 2025), Dkt. No. 1.

165.     On October 30, 2025, the district court issued a stay of the July 2025 FRN pursuant to the APA, 5 U.S.C. § 705, finding that ASAP was likely to succeed on its claim that USCIS and EOIR had arbitrarily adopted divergent and inconsistent implementation schemes for the AAF. *Asylum Seeker Advoc. Proj. v. EOIR*, 808 F. Supp. 3d 708, 719–20 (2025). As a result of the Court's order, asylum applicants before USCIS were not required to pay the AAF through January of 2026. On February 2, 2026, the district court lifted the stay, paving the way for USCIS to begin

charging the annual asylum fee again.[5] *Asylum Seeker Advoc. Project v. EOIR*, No. 25-CV-03299, 2026 WL 262552, at *8–9 (D. Md. Feb. 2, 2026).

166.    ASAP, VAM, and their members, remain concerned about asylum applicants potentially missing the 30-day window to pay the annual asylum fee or not receiving notice that they must pay.

167.    It is still the case that the USCIS AAF Payment Page does not state when the 30-day notice period begins or provide a deadline for paying the AAF.

168.    Unlike the EOIR payment process for the AAF, which allows asylum applicants to pay the AAF any time, the USCIS AAF Payment Page can only be used to pay the AAF after the fee becomes due. That makes receiving notice of when that 30-day window starts even more important, since there is no way to pay early.

169.    ASAP members and immigration attorneys have reported to ASAP that notices were sent to outdated attorney addresses or to prior attorneys of record despite attorneys having updated their contact information or representation information with USCIS.

170.    Even when notices to pay the AAF have been received, they instructed applicants to pay within 30 days without explaining whether that period ran from the date the notice was generated, mailed, received, or some other date, leaving applicants unable to determine their actual deadline.

171.    These notice deficiencies have caused widespread confusion and anxiety among ASAP members with pending USCIS asylum applications. ASAP members including Aaron, Emad, and Mark Anthony reported receiving no notice from USCIS despite having long-pending

---

[5] ASAP subsequently voluntarily dismissed USCIS and Director Edlow from its lawsuit. Notice of Voluntary Dismissal (May 22, 2026), Dkt. No. 114; Notice of Voluntary Dismissal (May 26, 2026), Dkt. No. 117.

asylum applications, while others received notices that lacked essential information. Still others, such as Richard, encountered contradictory messages from USCIS after submitting payment that suggested the fee was "not due" or that a future notice for the "first" annual asylum fee would issue even after payment had already been made, reinforcing uncertainty about whether USCIS had properly recorded their payment. Collectively, these experiences demonstrate an ongoing pattern in which USCIS's notice practices have failed to provide applicants with clear, reliable, and timely notice of their alleged payment obligations, forcing asylum seekers to guess whether and when they must act to protect their pending asylum applications.

## E.   USCIS Creates New and Severe Consequences for Nonpayment of Annual Asylum Fees in the April 2026 IFR

172.   On April 29, 2026, USCIS issued an interim final rule implementing various portions of the immigration provisions in H.R. 1. The IFR amends the regulations to set forth consequences for failure to pay the AAF.  91 Fed. Reg. 22952 ("April 2026 IFR" or "IFR"). The IFR also silently eliminates the 30-day processing requirement for initial work permits based on a pending asylum application – a change wholly unrelated to H.R. 1.

173.   The IFR invited public comments, but became effective on May 29, 2026, before USCIS considered any of the comments submitted. *Id.* USCIS defended issuing the rule as an interim final rule under the "good cause" and procedural rule exceptions to notice-and-comment rulemaking. *Id.* at 22953, 22962. USCIS claimed that prior notice and comment would be impracticable and contrary to the public interest because H.R. 1 requires immediate implementation "and provides no discretion to DHS on the provisions implemented in" the rule. *Id.* at 22953. But these exceptions do not apply. H.R. 1 did not have an implementation date, and USCIS created consequences for asylum seekers in the IFR that are not in H.R. 1, including rejection of the asylum claim for failure to pay the AAF and elimination of the 30-day regulatory

45

requirement for USCIS to process initial EADs for asylum applicants.

174.    ASAP has helped members to share their perspective on proposed regulations that impact them. For example, ASAP has conducted surveys to gather members' thoughts and to include their thoughts in organizational comments prior to a regulation being finalized.

175.    Given the significance of USCIS's interpretation of H.R. 1 and the severity of consequences the July 2025 FRN and April 2026 IFR create, particularly retroactive application of the AAF and the "rejection" and EAD termination provisions, ASAP members' comments would have been important to demonstrate how harmful the FRN and IFR would be. On May 29, 2026, ASAP, NTPSA, SEIU and 81 other organizations signed on to a comment on behalf of 84 immigration law and advocacy organizations pointing out these and other issues with the IFR, but ASAP's members did not get an opportunity to weigh in before the FRN or IFR became effective.

176.    Prior to the April 2026 IFR, USCIS represented in court that it would not take adverse action against asylum applicants who failed to timely pay the AAF until they completed rulemaking on the matter. *See* Notice in Resp. to Order, *ASAP v. EOIR*, No. 1:25-cv-03299-SAG (D. Md. Oct. 29, 2025), Dkt. No. 50. While USCIS did issue a regulation, it did so without going through the notice and comment process.

177.    The April 2026 IFR imposes new and extraordinarily severe consequences for nonpayment of the AAF within 30 days of receiving notice—even as USCIS has systemically failed to provide adequate notice since it began charging the annual asylum fee. If the fee is not paid within the requisite time period, USCIS will "reject" an asylum application it had already accepted and that remained pending, thereby treating the filing as though it had never been properly accepted for processing. 91 Fed. Reg. at 22957; *see also id.* at 22971 (adding 8 C.F.R. § 106.2(c)(15)).

178.    A "rejection" also immediately terminates asylum-based work authorization. *See*

46

*id.* at 22957; *see also id.* at 22972 (revising 8 C.F.R. § 208.7(b)(1)).

179.    USCIS regulations and longstanding practice refer to rejection as a legal mechanism reserved for filings USCIS refuses to accept at intake and, before the April 2026 IFR, it had never been applied to any applications USCIS has accepted and that have been pending for years. 8 C.F.R. §§ 103.2(a)(7)(ii)–(iii), 208.3(c)(3). In the April 2026 IFR, USCIS admitted it had never before required a recurring, annual fee for a pending benefits application. 91 Fed Reg. at 22957.

180.    There is no mechanism to appeal or seek review of a decision to reject an application. 8 C.F.R. § 103.2(a)(7)(iii). The IFR also provides no grace period beyond the 30-day notice window.

181.    The IFR states that rejected applicants may file a new asylum application, 91 Fed. Reg. at 22957, but by definition, any asylum application subject to the AAF has already been pending for more than one year, meaning a new application would most certainly be precluded by the statutory one-year filing deadline for asylum applications. 8 U.S.C. § 1158(a)(2)(B).

182.    Applicants have no control over how long USCIS takes to adjudicate their case. Applicants could therefore wait for years and pay hundreds of dollars in annual fees and still have their case "rejected."

183.    The IFR also says that, if an applicant fails to pay the AAF, and they lack lawful status, DHS will either initiate expedited removal proceedings or issue a notice to appear and commence removal proceedings before an immigration judge.  91 Fed. Reg. at 22957.

184.    For asylum applicants who are placed in removal proceedings, instead of continuing in the non-adversarial affirmative asylum system they voluntarily entered, they would be forced to start over in a defensive process against DHS counsel, potentially facing detention and the threat of removal from the United States to countries where they fear persecution. *See* 8

47

U.S.C. §§ 1226(a), 1229a.

185.    Once the noncitizen is in removal proceedings, they would need to file a new I-589 Form with the immigration judge as a defense to removal. *Id.* § 1229a(c)(4). But, as discussed above, asylum applicants subject to the AAF face the one-year filing deadline for asylum if they attempt to re-apply in proceedings, making it likely they would only be eligible for withholding of removal or protection under the Convention Against Torture. 8 U.S.C. § 1158(a)(2)(B).

186.    Other asylum applicants could be placed in expedited removal under the April 2026 IFR. Expedited Removal is a truncated alternative to full removal proceedings. It applies to noncitizens arriving in the United States and noncitizens who have not been admitted or paroled into the United States, and who have not demonstrated that they have been physically present in the United States for two years. 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii). A noncitizen subject to expedited removal is ordered removed "without further hearing or review" unless the noncitizen indicates an intention to apply for asylum or a fear of persecution, in which case they are entitled to an interview with an asylum officer. *Id.* § 1225(b)(1)(A)(i).

187.    If the asylum officer finds no credible fear of persecution, the noncitizen can request review of that decision by an immigration judge. If the immigration judge disagrees with the asylum officer and finds a credible fear, the noncitizen is then placed in regular removal proceedings. 8 C.F.R. § 1208.30(g)(2)(iv)(B). If, however, the immigration judge affirms the asylum officer's adverse finding, the applicant is subject to removal "without further hearing or review." 8 U.S.C. § 1225(b)(1)(A)(i), (B)(iii); *see id.* § 1252(a)(2)(A), (e).

188.    In the IFR, USCIS claimed that rejecting an asylum application that is pending and was already accepted for filing is consistent with the best interpretation of 8 U.S.C. § 1808(b). 91 Fed. Reg. at 22958. But the language of H.R. 1 does not mention the rejection of already long pending asylum cases for failure to pay the AAF, nor, indeed, does it say anything about whether

48

there are such adverse consequences or what they should be. *See id*.

189.    Rejecting an asylum application that was previously accepted for filing also violates 8 C.F.R. § 208.9(a) which provides that "USCIS shall adjudicate the claim of each asylum applicant whose application is complete within the meaning of . . . [8 C.F.R. § 208.3](c)(3) . . . and is within the jurisdiction of USCIS." If an asylum applicant files a Form I-589 asylum application that USCIS has accepted as complete, then misses the 30-day window to pay the AAF one or several years later, that does not retroactively render the application incomplete within the meaning of 8 C.F.R. § 208.3(c)(3). Rather, the IFR adds 8 C.F.R. § 208.3(c)(6), which says that "[i]f an applicant does not pay the annual asylum fee . . . within 30 days of the fee notice date, the application will be rejected and this paragraph (c) shall not apply." In other words, USCIS must adjudicate the claims of asylum applicants whose application is considered complete at the time of filing per 8 C.F.R. § 208.3(c)(3), notwithstanding the AAF. *See* 8 C.F.R. § 208.9(a). H.R. 1 did not change this obligation.

190.    Rejecting an application that was accepted for filing and has remained pending for at least a year is also inconsistent with USCIS's past practice and use of the rejection as an intake-based mechanism.

191.     In the IFR, USCIS considered but declined multiple other ways that it could have implemented the AAF, such as denying the application, rejecting the application without referring the person to removal proceedings but creating a bar to re-filing an application, and holding applications in abeyance until the fee is paid. 91 Fed. Reg. at 22958–59. USCIS disregarded these alternatives mainly *because* those alternatives would provide asylum applicants with greater procedural protections than rejection, as well as continued work authorization, rather than because those alternatives would not be the best reading of the statute. *See id.* In other words, USCIS expressly rejected alternatives in favor of an implementation designed to be as strict and

49

unforgiving as possible.

192.   DHS also did not consider other alternatives to rejection such as late-payment notices, grace periods, requests for missing evidence, notices of intent to deny, or opportunities to cure before rejecting asylum applications. These are mechanisms USCIS uses in other contexts. *See* 8 C.F.R. § 103.2(b)(8)(ii)–(iv).

193.   USCIS also failed to consider referring individuals who do not pay the AAF and are otherwise inadmissible or removable to removal proceedings before an immigration judge. In those circumstances, the noncitizen's asylum application would remain pending, and their employment authorization would continue while their asylum application is considered by the immigration judge.

194.   The IFR also does not provide sufficient explanations for why it believes AAF advances the objectives of H.R. 1. 91 Fed. Reg. at 22959.

195.   USCIS's implementation of the AAF has created a situation in which each year an asylum application remains pending, a missed fee payment—potentially due to a notice the applicant never received—can result in the loss of a long-pending asylum application, immediate termination of asylum-based work authorization, and the permanent loss of eligibility for asylum and asylum-based work authorization in the future, all without any adjudication of the underlying asylum claim's merits or without any opportunity to appeal or otherwise seek redress. USCIS failed to adequately consider these consequences, and the reliance interests of asylum seekers, their families, unions, employers, and communities, in the IFR.

196.   For asylum seekers who applied before H.R. 1 was enacted, USCIS's implementation of the AAF also attaches draconian legal consequences – rejection of a pending asylum application and denial of the right to an individualized adjudication – retroactively to conduct that occurred before H.R. 1 was signed into law.

50

197.   USCIS's decision, in the IFR, to reject pending asylum applications for failure to pay the AAF, immediately terminate employment authorization, and expose asylum applicants to removal proceedings and deportation also will have a significant impact on the economy, but USCIS failed to conduct the required economic impact analysis in the April 2026 IFR. Asylum seekers who are work-authorized contribute tens of billions of dollars to the U.S. economy each year—contributions the IFR directly jeopardizes. Conservative estimates associate the arrival of approximately 760,000 working-age asylum seekers between 2021 and 2023 with roughly $200 billion in additional GDP per year—approximately $263,000 per asylum seeker. This wealth flows directly into U.S. cities, businesses, workers, and consumers. DHS itself has previously recognized that restricting asylum-based work authorization alone could cost tens of billions of dollars in lost annual wages,[6] but skipped economic analysis in the April 2026 IFR, on the false assumption that the IFR's impact would be minimal beyond H.R. 1 itself. 91 Fed. Reg. at 22953.

198.   Further, the IFR failed to consider significant reliance interests. For years, asylum seekers have structured their lives around long-standing regulations, policies, and practices governing access to asylum protection and lawful employment. Unions, employers, and local communities have similarly relied on the continued participation of these workers in the U.S. economy. Yet the IFR introduces new procedural hurdles that acutely threaten continued access to humanitarian protection and stable work authorization. DHS failed to meaningfully consider reliance on how the previous system operated, including the lack of any annual requirements to maintain pendency, and the stability the previous system provided for continuity of employment. Further, DHS failed to consider applicants' lack of familiarity with such requirements before

---

[6] *See Employment Authorization Reform for Asylum Applicants*, 91 Fed. Reg. 8616, 8621 (Feb. 23, 2026) (DHS estimates under proposed rule restricting asylum-based work authorization that asylum seekers could lose between $34.6 billion and $126.6 billion in wages each year).

attaching severe consequences like application "rejection," loss of work authorization, and exposure to removal proceedings.

199.    In a footnote, USCIS said that once the IFR becomes effective USCIS will send notices to applicants who have not paid the AAF "informing them of how non-payment affects their application." 91 Fed. Reg. at 22954 n.7. It is unclear whether USCIS intends to reject applications for those noncitizens who received a notice before April 29, 2026, and failed to timely pay the fee. If it does, this would be yet another retroactive application by USCIS, because USCIS did not say that rejection would be a consequence of failure to pay the AAF until the April 2026 IFR.

**F.    The April 2026 IFR Silently Eliminates the Longstanding Requirement That USCIS Process Initial Asylum-Based EADs Within 30 Days**

200.    Without any notice, explanation, or acknowledgment, the April 2026 IFR also silently eliminated the longstanding regulatory requirement that USCIS process initial EADs based on pending asylum applications within 30 days.

201.    The second-to-last page of the April 2026 IFR contains USCIS's amendment to 8 C.F.R. § 208.7(a)(1), which removes language from the regulation requiring USCIS to adjudicate initial asylum-based work permits "30 days from the date of filing" the application. 91 Fed. Reg. at 22972.

202.    No text in the April 2026 IFR's summary, preamble, or regulatory discussion mentions or explains that DHS is eliminating this longstanding 30-day adjudication requirement for asylum-based work permits. To the contrary, when summarizing its amendments to § 208.7(a)(1), DHS states only that it is adding "new language" related to the consequences of a rejected application, making no mention of deleting the existing 30-day adjudication requirement. 91 Fed. Reg. at 22958.

52

203.    DHS stated that the April 2026 IFR is meant to "codify certain immigration fees and other provisions required by the One Big Beautiful Bill Act (H.R. 1)." 91 Fed. Reg. at 22952. Yet nothing in H.R. 1 addresses the regulatory requirement that USCIS adjudicate initial asylum employment authorization applications within 30 days.

204.    In the April 2026 IFR, DHS also did not acknowledge that two months prior, it had already undertaken a separate notice-and-comment rulemaking specifically addressing the same 30-day adjudication requirement. *See Employment Authorization Reform for Asylum Applicants,* 91 Fed. Reg. 8616 (Feb. 23, 2026) ("February 2026 NPRM"). In the February 2026 NPRM, DHS proposed extending the initial work permit processing deadline to 180 days and creating new exceptions to it, explaining why it was *not* proposing to eliminate the 30-day processing requirement. *See id.* at 8618–19, 8621, 8623, 8634–35. DHS gave the public 60 days to comment on this, and other, substantive changes to asylum applicants' ability to access work authorization. More than 7,000 individuals, businesses, state and local governments, labor unions, and organizations commented on the changes in the February 2026 NPRM. The comment period for the February 2026 NPRM closed 5 days before the April 2026 IFR was published.

205.    The 30-day processing requirement at 8 C.F.R. § 208.7(a)(1) has existed since 1994, and asylum seekers have relied on it to secure timely work authorization. *See Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization*, 59 Fed. Reg. 62284, 62289–303 (Dec. 5, 1994). In fact, since 2018, a federal court has permanently enjoined USCIS from violating the well-established 30-day processing requirement. *Gonzalez Rosario v. U.S. Citizenship and Immigr. Servs.*, 365 F. Supp. 3d 1156, 1160–62 (W.D. Wash. 2018). USCIS has also tried to eliminate its 30-day processing deadline before via notice-and-comment rulemaking, and a federal court blocked the agency's attempt to do so in *CASA de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020). DHS's February

53

2026 NPRM acknowledged that history. 91 Fed. Reg. at 8634.

206.    The public had no reason to suspect that DHS was considering eliminating the longstanding 30-day adjudication requirement in the April 2026 IFR. The February 2026 NPRM proposed extending the deadline to 180 days, not eliminating it altogether. The April 2026 IFR, in turn, was presented as implementing H.R. 1's fee and TPS EAD duration provisions, which have nothing to do with the timeline for processing initial asylum-based employment authorization applications. Nothing in the IFR's title, summary, preamble, or text alerted the public that DHS was silently deleting the 30-day adjudication requirement.

207.    ASAP's members would have benefitted from commenting on the elimination of the regulatory requirement that USCIS process initial EADs for asylum applicants within 30 days. On June 29, 2026, ASAP discovered that the IFR also contained revised regulations eliminating the 30-day processing requirement for initial work permits for asylum applicants and submitted an additional standalone comment on the last day of the comment period. *See* Comment Letter from Asylum Seeker Advocacy Project, on USCIS Immigration Fees and Related Procedures Required by H.R.1 Reconciliation Bill, Docket No. USCIS-2026-0133 (June 29, 2026), https://www.regulations.gov/comment/USCIS-2026-0133-0073.

208.    In 2019, ASAP members also opposed a prior DHS Notice of Proposed Rulemaking that eliminated the 30-day processing requirement.  *See* Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applications, 84 Fed. Reg. 47148 (Sept. 9, 2019) ("September 2019 NPRM"). ASAP was able to notify members of the 30-day processing issue raised in the February 2026 NPRM and the September 2019 NPRM before the corresponding comment periods closed, and hundreds of members contributed their thoughts to ASAP's comments on those rulemakings.

209.    In contrast, ASAP was not able to notify members that the 30-day processing rule

was silently eliminated in the April 2026 IFR before the change apparently took effect on May 29, 2026 and before the comment period closed on June 29, 2026. As a result, many members were deprived of the opportunity to comment on this change.

### G. The July 2025 FRN and April 2026 IFR Harm Asylum Seeking Members of VAM and ASAP

210. Collectively, thousands of asylum seekers who are members of ASAP and VAM have filed an asylum application that is pending with USCIS, including many who filed their applications in September of 2024 or earlier and are thus subject to the AAF. Many asylum seekers who are members of ASAP have also applied for initial work permits based on their pending asylum applications.

211. Members of ASAP and VAM who have applied for an initial work permit based on a pending asylum application can no longer expect to receive a decision on their work permit application within 30 days. Any delay in work authorization causes significant financial hardship. Given that work permit backlogs can be a year or longer, asylum applicants could be forced to wait indefinitely for an initial work permit.

212. Many of VAM and ASAP's members have been or will be required to pay the AAF even though they filed their asylum application when it was free to do so and did not anticipate that a fee would be required to obtain an individualized adjudication.

213. Imposing the extraordinary consequence of rejection for VAM's and ASAP's members subject to the AAF creates financial hardship, as well as the prospect of loss of employment authorization, removal to countries where they fear persecution, or removal to a third country if their applications are rejected after they fail to pay the fee in a timely manner. In addition, because many members of VAM and ASAP have had asylum applications pending for years, they have built substantial ties in the United States. Many have U.S. citizen children and

55

face the prospect of being separated from them and other family members if they are removed.

214. Since USCIS began implementing the AAF in September of 2025, ASAP members have repeatedly reported problems receiving AAF notices, including notices sent to incorrect addresses, and notices sent to former attorneys or representatives who no longer represent them. Some ASAP members never received the notice at all. This has forced many applicants to continually monitor USCIS's online portal to determine whether their 30-day payment window may have started.

215. In addition, for those ASAP and VAM members who applied for asylum on or before October 1, 2024, and whose applications remained pending on September 30, 2025, USCIS has not provided information about when it will issue payment notices to those members who did not already receive them.

216. Before the AAF was stayed by court order, when USCIS did issue notices, the deadline to pay was often unclear.

217. USCIS also does not allow asylum applicants to proactively pay the AAF until the 30-day window for payment begins, creating stress and uncertainty for VAM and ASAP members.

218. Members of VAM and ASAP are concerned they will face similar uncertainty, confusion, and stress because of the IFR. Now the stakes are much higher because USCIS will reject their application and immediately terminate their work authorization if they fail to pay the AAF within 30 days of notice—which they may not receive or may receive late—each year their application remains pending, a timeframe entirely outside their control.

219. Several members of VAM and ASAP explain the harms the July 2025 FRN and April 2026 IFR have caused and will continue to cause:

220. **Yamileth i**s a VAM member who lives in Massachusetts. She is from Venezuela and came to the United States along with her husband and son in 2024 on humanitarian parole,

56

and then applied for asylum with USCIS that same year. Yamileth works in a restaurant kitchen, where she has been working since she got her work permit. Yamileth never received a notice from USCIS about the annual asylum fee. VAM offered to help her find out whether she was required to pay the annual asylum fee, and when VAM went onto the USCIS website where the fee is paid, it showed that she was able to pay. As soon as Yamileth learned that she could pay the annual asylum fee, she paid it. She is very afraid that USCIS will reject her asylum application and take away her work permit, which she depends on. Yamileth is very afraid because last year she did not receive the USCIS notice about the annual asylum fee, and she is worried that the same thing will happen to her again in the future. She does not know what to do, but she is very nervous because she does not know when she will next be required to pay the fee.

221.    **Emad** is an Egyptian ASAP member living in Virginia. He came to the United States lawfully. Before his visa expired, he applied for asylum with USCIS in 2018 and completed his asylum interview the following month—but nearly eight years later, he is still waiting for a decision. During this long wait, Emad has faced financial hardship. Emad's income is the only source of support for his wife and four children. Although he holds a degree in education, he has worked many types of jobs to make ends meet, including jobs that are far from his professional background—such as in poultry plants, and now as a machine operator. The AAF is very challenging for Emad to afford in addition to his family's basic expenses. In October 2025, Emad received a new interview notice from USCIS, but the notice did not include anything about the AAF. Emad went to check the USCIS website, and he learned his annual asylum fee was due. He paid the annual asylum fee in November 2025. However, Emad is worried that since he did not receive notice the first time, that he will not receive notice the next time his AAF is due.

222.    **Mehmet** is an asylum seeker and ASAP member. Mehmet applied for asylum with USCIS in 2022. In October 2025, Mehmet received a text message from USCIS saying there had

57

been a change in his case, which prompted him to check his online account. Upon checking his USCIS online account, he found an alert telling him his AAF was due in 30 days; however, he did not understand when the 30-day period started. Because a court order had paused USCIS's implementation of the fee at that time, Mehmet did not pay the AAF in October of 2025. Mehmet thought he would receive another notice from USCIS if the court order was lifted and he had to pay $100 to pay the AAF. But he did not receive additional notice. When Mehmet learned about the new consequences in the April 2026 IFR, he was afraid he would be deported for not paying the fee. He proactively checked the AAF Payment Page and learned that it was possible to pay the AAF in his case, so he paid $100 to USCIS in May 2026. Mehmet is confused and sad that applicants like him could be deported for not paying the fee when it is unclear when the deadline is. He remains confused, stressed, anxious, and afraid about the AAF. He worries that the lack of guidance will increase online scams. He feels uncertain and stressed about when his next AAF could become due, whether he will receive notice, and whether he will be deported if he does not receive notice of the fee or cannot afford to pay in time.

223.    **Aaron** is an ASAP member from Haiti, living in Maryland. He came to the United States in 2021 and applied for asylum and INA withholding with USCIS that same year. His case remains pending. Aaron did not get notice of the AAF from USCIS, but he learned his AAF was due when an ASAP attorney proactively looked up his case on the USCIS website and notified him that it was due. Aaron then paid the annual asylum fee with USCIS in April 2026. Aaron and his wife are having a lot of trouble making ends meet, and he is worried he cannot afford to continue paying the annual asylum fee each year.

224.    **Mark Anthony** is an ASAP member from Nigeria who lives in Pennsylvania. He came to the United States in 2019 and applied for asylum and INA withholding with USCIS in 2020. Mark Anthony learned about the new annual asylum fee through news reports. He paid the

fee because he was concerned about how it could affect his case if he did not pay.

225.   **Sharon** is an ASAP member from South Africa who lives in California. Sharon applied for asylum with USCIS more than a decade ago. She recently received a letter from USCIS requesting payment of the annual asylum fee and she paid it. It is particularly frustrating to her because she has waited for many years for USCIS to make a decision in her case, despite wanting to have resolution in her case sooner. Sharon worries that she may not be able to pay the annual asylum fee in the future. Sharon is not currently able to work because she is recovering from surgery and a cancer diagnosis.

226.   **Syed** is an asylum seeker and ASAP member from India who now lives in California. Syed applied for asylum and INA withholding in 2024 with USCIS. Syed found out about the AAF from the ASAP member newsletter. So, he paid the fee on October 22, 2025. Several days after making the payment, he received a notice from USCIS directing him to pay the AAF. The notice did not make it clear what day his fee was due. Syed is worried he does not know when he will need to pay the AAF for the second time, or whether he will get notice with enough time to pay the AAF before the deadline.

227.   **Alba** is an ASAP member from Honduras, now living in Texas. Alba applied for asylum and INA withholding with EOIR upon entering the United States. Her case was dismissed at EOIR, and she was instructed to apply for asylum with USCIS if she wanted to continue her case. She applied for asylum in 2024 with USCIS. She received notice from USCIS that her AAF was due, and she paid it on November 10, 2025. It was difficult for her to afford this expense.

228.   **Richard** is an ASAP member from Venezuela who lives in Florida. He arrived in the United States in 2017 and applied for asylum, withholding of removal, and protection under the CAT with USCIS that same year. Richard is very worried about the annual asylum fee. Richard received notice that his AAF was due on October 7, 2025, and paid the AAF to USCIS on October

59

9, 2025 through the AAF Payment Page. When Richard later returned to the AAF Payment Page and re-entered his information, he saw the following message: "At this time, the Annual Asylum Fee payment is not due for this case. USCIS will issue a notice the first time the Annual Asylum Fee is due." This message implied that Richard had not yet paid the AAF for the first time, even though he had. Richard then received a receipt from USCIS by mail on October 21, 2025 stating he had paid the AAF. But for months after receiving the physical receipt, the AAF Payment Page continued to display the same message, implying that Richard had not yet paid the AAF. Richard feels confused about why the AAF Payment Page still displays this message even after he paid the fee and even after he received his physical receipt confirming payment. He is worried that USCIS will not honor his AAF payment, that his work permit could be terminated, and that his asylum application could be rejected without a decision being made in his case.

229. ASAP members **Reinaldo** and **Elena**, a married couple from Venezuela who live in Florida, have been waiting almost ten years for USCIS to decide their family's asylum application. The AAF has caused them significant stress, anxiety, and frustration. After spending nearly a decade following every rule and doing everything USCIS has asked of them, they feel it is deeply unfair to be charged additional fees they never expected, because of delays they did not cause and cannot control. The AAF also creates an added financial burden and another obligation they must carefully track and budget for while working hard to meet their family's ongoing expenses and responsibilities. Reinaldo and Elena received a notice in the mail from USCIS in May 2026. When they received the notice in the mail stating that they had 30 days from the date of the notice to pay, about 15 days had already passed, leaving them with only about two weeks to gather the money and make the payment. They then paid the AAF later in May 2026. The uncertainty of not knowing how long they will continue waiting, whether the AAF will increase, whether and how they will receive notice from USCIS in the future, or what future requirements

60

may be imposed leaves Reinaldo and Elena feeling powerless and trapped in legal limbo. The AAF

policy has heightened their fear about their future and undermined their sense of dignity, making

them feel as though they are being punished despite having complied with the law at every step.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the APA, 5 U.S.C. §§ 553, 706(2)(D)**
**July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR**
**Issued Without Observance of Procedure Required by Law**
**(All Plaintiffs)**

230.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

231.    A reviewing court must "hold unlawful and set aside agency action" that is "without

observance of procedure required by law." 5 U.S.C. § 706(2)(D).

232.    The APA requires that agencies provide public notice of, and opportunity to

comment on, legislative rules before their promulgation. *See id.* §§ 553(b), (c).

233.    The notice must inform the public of "the time, place, and nature of public rule

making proceedings"; refer "to the legal authority under which the rule is proposed"; and detail

"either the terms or substance of the proposed rule or a description of the subjects and issues

involved." 5 U.S.C. § 553(b). The agency then must "give interested persons an opportunity" to

comment on the proposed rule by submitting "written data, views, or arguments." *Id*. § 553(c).

234.    The APA also requires that any substantive rule be published at least 30 days prior

to its effective date. *See id*. § 553(d).

235.    The July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026

IFR are legislative rules within the meaning of the APA.

236.    USCIS did not comply with the APA's procedural requirements when it made the

July 2025 FRN, July 2025 Cap Policy, and March 2026 Update immediately effective without

61

providing an opportunity for notice and comment.

237.    USCIS's failure to publish the July 2025 FRN, July 2025 Cap Policy, and the March 2026 Update 30 days before their effective date violates 5 U.S.C. § 553(d).

238.    USCIS did not comply with the APA's procedural requirements when it made the April 2026 IFR effective before the end of the comment period, without considering the public comments submitted.

239.    Further, the April 2026 IFR provided no notice, explanation, or acknowledgment that it was removing the longstanding 30-day processing requirement from 8 C.F.R. § 208.7(a)(1), leaving the public with no meaningful opportunity to comment.

240.    No exception to notice-and-comment procedures applies to the July 2025 FRN, the July 2025 Cap Policy, the March 2026 Update, or the April 2026 IFR.

241.    USCIS's failure to follow the procedural requirements of 5 U.S.C. §§ 553(b)–(d) renders the July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR invalid.

## COUNT II

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C) –
July 2025 Cap Policy and March 2026 Update – TPS EADs
Contrary to Law and in Excess of Statutory Authority (Unlawfully Retroactive)
(NTPSA, VAM, SEIU, and 32BJ SEIU)**

242.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

243.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

244.    The July 2025 Cap Policy and March 2026 Update are each final agency action under the APA. *Id*. § 704.

245.    A statute may not "operate retroactively . . . absent clear congressional intent

favoring such a result." *Landgraf*, 511 U.S. at 280. H.R. 1 does not specify whether the one-year validity period for TPS employment authorization applies to employment authorization sought or received before H.R. 1 yes was enacted.

246. Here, USCIS is imposing H.R. 1's TPS EAD duration provisions retroactively to applications that were submitted prior to July 4, 2025, without clear authorization from Congress.

247. The July 2025 Cap Policy and March 2026 Update have an impermissibly retroactive effect because they attach new legal consequences, the premature loss of employment authorization, to TPS-based employment authorization renewal applications submitted before H.R. 1 was enacted.

248. In the July 2025 Cap Policy, USCIS applied the July 2025 FRN to issue one-year EAD cards to TPS holders who applied to renew their employment authorization before H.R. 1 was enacted, even though, at the time those TPS holders filed their employment authorization renewal applications, USCIS promised to issue them EADs valid for the full length of their TPS period.

249. The March 2026 Update is also retroactive because it purports to shorten the 540-day automatic extension provided by 8 C.F.R. § 274a.13(d)(1)(i) for TPS holders who applied to renew their work authorization before H.R. 1 was enacted, including for TPS holders who received individual Notices of Action before H.R. 1 was enacted informing them their EADs had been extended for 540 days.

## COUNT III

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C) –**
**July 2025 FRN and April 2026 IFR – Annual Asylum Fee**
**Contrary to Law and in Excess of Statutory Authority (Unlawfully Retroactive)**
**(ASAP and VAM)**

250. The paragraphs above are incorporated and reasserted as if fully set forth herein.

63

251.    A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law" or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C).

252.    The July 2025 FRN and April 2026 IFR are each final agency action under the APA. *Id*. § 704.

253.    A statute may not "operate retroactively . . . absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280.

254.    Here, USCIS is imposing H.R. 1's annual asylum fees on applications that were submitted prior to July 4, 2025, without clear authorization from Congress.

255.    The July 2025 FRN and April 2026 IFR are impermissibly retroactive because they apply the annual asylum fee to people who applied for asylum before H.R. 1 was enacted. *Landgraf*, 511 U.S. at 280.

256.    The July 2025 FRN and April 2026 IFR are impermissibly retroactive because they count the time that asylum applications were pending prior to July 4, 2025, to determine the 365-day trigger for when a fee becomes due. *Landgraf*, 511 U.S. at 280.

257.    The July 2025 FRN and April 2026 IFR have an impermissibly retroactive effect because they attach new legal consequences to applications filed before H.R. 1 was enacted, including an annual payment obligation and the annual risk of application rejection, abrupt termination of work authorization, and adverse immigration consequences for failure to pay within 30 days of notice.

**COUNT IV**

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law, Excess of Statutory Authority**
**July 2025 Cap Policy, March Update and April 2026 IFR – TPS EADs**
**(NTPSA, VAM, SEIU, and 32BJ SEIU)**

258. The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR each create gaps in TPS holders' employment authorization in violation of the TPS statute's requirement to "provide" TPS holders with employment authorization "throughout the period [they are] in temporary protected status." 8 U.S.C. § 1254a(a)(1)–(2).

259. Under the July 2025 Cap Policy, USCIS issued one-year EADs to Salvadoran, Ukrainian, and Sudanese TPS holders who had more than one year remaining on their TPS, without providing any means to obtain work authorization for the remainder of their TPS period.

260. The March 2026 Update also left TPS holders with no means of obtaining employment authorization. The Update purports to shorten the automatic 540-day extension that TPS holders who have not yet received new EADs are relying on to work, without providing any alternative means to establish work authorization.

261. The April 2026 IFR amended 8 C.F.R. § 244.12 to require TPS holders to "obtain a renewal to continue employment authorization" upon expiration of their "1 year" EAD. 8 C.F.R. § 244.12(a). But due to processing delays, it is impossible for TPS holders to obtain a renewal in time to avoid a gap in work authorization, nor is there any automatic extension available to TPS holders who apply to renew their EADs outside the TPS re-registration period, so the April 2026 IFR leaves TPS holders with no way to obtain employment authorization effective for their full TPS period.

262. The April 2026 IFR is also an incorrect interpretation of H.R. 1 because it fails to give any effect to the TPS statute's mandate that TPS employment authorization be "effective throughout the period the [non-citizen] is in TPS status." *Id.* § 1254a(a)(2). H.R. 1 and 8 U.S.C. § 1254a(a)(2) "are capable of co-existence," so USCIS must give effect to both. *Radzanower*, 426 U.S. at 155.

65

**COUNT V**

**Violation of the APA, 5 U.S.C. § 706(2)(A), (C) – Contrary to Law, Excess of Statutory Authority**
**July 2025 FRN and April 2026 IFR Violate the INA and Implementing Regulations –**
**Annual Asylum Fee**
**(VAM and ASAP)**

263.    The July 2025 FRN and April 2026 IFR violate the INA's guarantee that eligible noncitizens may apply for asylum and violate USCIS's regulatory obligation to adjudicate asylum applications. *See* 8 U.S.C. § 1158(a)(1); 8 C.F.R. § 208.9(a); *RAICES,* 174 F.4th 81.

264.    The April 2026 IFR is further contrary to law because it creates an unauthorized "rejection" mechanism for pending asylum applications. The INA and its implementing regulations require USCIS to adjudicate accepted asylum applications and authorize only the dispositions set forth in the regulations. *See* 8 C.F.R. §§ 208.9(a), 208.14(c). Nothing in the INA, 8 C.F.R. § 208.3(a)(3), or H.R. 1 authorizes USCIS to reject long-pending asylum applications for nonpayment of the annual asylum fee.

265.    By replacing adjudication with rejection, the April 2026 IFR deprives asylum applicants of the procedural protections guaranteed by the INA and its implementing regulations, including an individualized adjudication of their claims, the procedures that ordinarily follow an adverse asylum decision, and continued employment authorization as provided by law. *See* 8 C.F.R. §§ 208.9(a), 208.14(c), 208.7(b), 1003.1(b)(1); 8 U.S.C. § 1158(d)(5)(A)(iv); *RAICES*, 174 F.4th at 105–11.

266.    By adopting an unauthorized mechanism that extinguishes pending asylum claims and deprives applicants of those protections, the April 2026 IFR is contrary to law and must be set aside.

**COUNT VI**

**Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious**

66

**July 2025 Cap Policy, March 2026 Update, and April 2026 IFR – TPS EADs**
**(VAM, NTPSA, SEIU, 32BJ SEIU)**

267.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

268.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

269.    The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are each final agency action under the APA. *Id*. § 704.

270.    The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are each arbitrary and capricious because, among other reasons, USCIS failed to articulate a reasoned explanation for the decisions, which represent changes in the agency's longstanding policy; entirely failed to consider important aspects of the problem; offered explanations for the decisions that run counter to the evidence before the agency; relied on incorrect and inaccurate data; failed to consider reasonable alternatives; and failed to consider reliance interests.

271.    Because the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are arbitrary and capricious, they must be set aside under 5 U.S.C. § 706(2)(A).

## COUNT VII

**Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary & Capricious**
**July 2025 FRN and April 2026 IFR – Annual Asylum Fee**
**(VAM and ASAP)**

272.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

273.    The APA provides that courts "shall . . . hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

274.    The July 2025 FRN and April 2026 IFR are each final agency action under the

67

APA. *Id*. § 704.

275.    Among other reasons, the July 2025 FRN and April 2026 IFR each are arbitrary and capricious because USCIS failed to articulate a reasoned explanation for their decisions, which represents a change in the agency's longstanding policy; entirely failed to consider important aspects of the problem; offered explanations for their decisions that run counter to the evidence before the agency; relied on incorrect and inaccurate data; failed to consider reasonable alternatives; and failed to consider reliance interests.

276.    Because the July 2025 FRN and April 2026 IFR are arbitrary and capricious, they must be set aside under 5 U.S.C. § 706(2)(A).

### COUNT VIII

**Violation of the APA, 5 U.S.C. § 706(2)(A) – Arbitrary and Capricious**
**April 2026 IFR – 30-Day Processing Timeline**
**(VAM and ASAP)**

277.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

278.    The APA requires an agency changing a longstanding policy to acknowledge the change, provide a reasoned explanation, and consider any serious reliance interests. 5 U.S.C. § 706(2)(A).

279.    The April 2026 IFR silently eliminates the longstanding requirement in 8 C.F.R. § 208.7(a)(1) that USCIS adjudicate initial asylum employment authorization applications within 30 days. Yet DHS nowhere acknowledges that it is eliminating the requirement or explains why it is doing so. Instead, the IFR is presented as implementing H.R. 1's fee provisions and related amendments, which have nothing to do with the processing of initial asylum employment authorization applications.

280.    DHS likewise failed to consider asylum seekers' substantial reliance interests in the 30-day adjudication requirement or the consequences of eliminating the only regulatory deadline

68

governing initial asylum employment authorization applications. Nor did DHS acknowledge that, just two months earlier, it had proposed a different amendment to the same regulation through notice-and-comment rulemaking.

281.    By silently eliminating a decades-old regulatory protection without acknowledging the change, providing a reasoned explanation, or considering reliance interests, DHS acted arbitrarily and capriciously in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT IX

**Violation of the APA, 5 U.S.C. § 706(2)(A) – *Accardi* Doctrine
March 2026 Update Violates the *Accardi* Doctrine
(VAM, NTPSA, SEIU, and 32BJ SEIU)**

282.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

283.    The March 2026 Update is contrary to the express terms of the INA's implementing regulations described above and should therefore be set aside under the principle articulated in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

284.    USCIS's actions, as set forth above, including prematurely terminating automatic employment authorization extensions for TPS beneficiaries, fail to comply with the issuing agencies' regulations and controlling policies and are therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## COUNT X

**Violation of the Due Process Clause of the Fifth Amendment to the United States
Constitution – Annual Asylum Fee
(ASAP and VAM)**

285.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

286.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." The Due Process Clause "applies to all 'persons' within the United States, including [noncitizens], whether their presence

69

here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

287.  USCIS's policies implementing H.R. 1's annual asylum fee do not provide adequate procedures to ensure applicants receive notice that their fee is due, how and when to pay, and what the consequences of nonpayment will be. In practice to date, USCIS has systematically failed to provide adequate notice to asylum seekers that their annual asylum fee is due, with many asylum seekers only discovering their 30-day payment window is open (and their fee is due) by repeatedly checking online portals.

288.  At the same time, USCIS's implementation of the annual asylum fee by "rejecting" applications for failure to timely pay the fee deprives asylum applicants of the opportunity to seek the relief that the INA and its implementing regulations entitle them to pursue.

289.  "Rejection" is a legal mechanism reserved for filings USCIS refuses to accept as incomplete at intake and has never been applied to asylum applications the agency has already accepted and kept pending for years. The regulations do not provide any mechanism to appeal or seek review of a decision to reject an asylum application. *See* 8 C.F.R. § 103.2(a)(7)(iii). Therefore, unlike with an adjudicative decision, asylum applicants will be left with virtually no recourse to challenge rejections of their long-pending asylum claims under the IFR.

290.  The IFR's assertion that applicants may simply refile after rejection does not cure the deprivation of due process. Any applicant subject to the annual asylum fee necessarily has had an asylum application pending for more than one year. If USCIS rejects that application for nonpayment, the applicant will be barred from filing a new asylum application because the statutory one-year filing deadline has already elapsed during the pendency of the original application. 8 U.S.C. § 1158(a)(2)(B). The IFR thus deprives applicants of any meaningful opportunity to obtain adjudication of their asylum claims, converting what it characterizes as a procedural "rejection" into the permanent loss of asylum eligibility—and related work

70

authorization—without a hearing on the merits.

291.    The Due Process Clause requires notice and opportunity to be heard prior to a deprivation of a liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). USCIS's implementation of the annual asylum fee violates the due process rights of asylum seekers because it does not provide them with adequate notice of when to pay the fee, an option to pay proactively, time or opportunity to respond before their asylum application is rejected, or a way to appeal the decision to reject their application. *See A.A.R.P. v. Trump*, 605 U.S. 91, 95 (2025).

### COUNT XI

**Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution – TPS EADs (VAM, NTPSA, SEIU, 32BJ SEIU)**

292.    The paragraphs above are incorporated and reasserted as if fully set forth herein.

293.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." The Due Process Clause "applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

294.    TPS holders have a property interest in TPS work authorization such that they are entitled to procedural due process protections. *Mansor v. USCIS*, 685 F. Supp. 3d 1000*,* 1013–14 (W.D. Wash. 2023).  By unlawfully taking away a period of work authorization that had already been granted to TPS holders without individual notice or opportunity to be heard, USCIS's policies implementing H.R. 1's TPS EAD duration provisions violate TPS holders' due process rights.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Declare that the July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are procedurally defective for

failing to undergo notice and comment, are contrary to law, are arbitrary and capricious, and violate due process;

2.    Temporarily restrain, preliminarily enjoin and/or stay the July 2025 FRN, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR pursuant to Federal Rule of Civil Procedure 65(a) and (b) and/or 5 U.S.C. § 705 during the pendency of this suit;

3.    Enter an order pursuant to 5 U.S.C. § 705 "preserv[ing]" the 540-day automatic employment authorization extensions provided to TPS holders who applied to renew their EADs before July 4, 2025;

4.    Enter an order pursuant to 5 U.S.C. § 705 "preserv[ing]," for the full length of the relevant TPS period (through September 9, 2026 for El Salvador and October 19, 2026 for Sudan and Ukraine), the validity of employment authorization document cards issued to TPS holders who applied to renew their EADs before July 4, 2025;

5.    Permanently enjoin the July 2025 IFR, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR;

6.    Enter an order vacating and setting aside the July 2025 IFR, July 2025 Cap Policy, March 2026 Update, and April 2026 IFR pursuant to 5 U.S.C. § 706;

7.    Award Plaintiffs' counsel attorneys' fees and costs for this action; and

8.    Award such other and further relief that the Court may deem just, equitable, and proper.

72

Dated: July 1, 2026

Conchita Cruz* (NY Bar No. 5550769)
Jessica Hanson† (MA Bar No. 714653; CA
Bar No. 313247)
Marcela X. Johnson* (GA Bar No. 328871)
**ASYLUM SEEKER ADVOCACY
PROJECT**
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone: (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
marcela.johnson@asaptogether.org


Jessica Karp Bansal* (CA Bar No. 277347)
**NATIONAL DAY LABORER
ORGANIZING NETWORK**
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689
jessica@ndlon.org

_/s/ Sean Ouellette_
Sean Ouellette (MA Bar No. 697559)
Jennie L. Kneedler* (DC Bar No. 500261)
Steven Y. Bressler* (DC Bar No. 482492)
Brian D. Netter* (DC Bar No. 979362)
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Telephone: (202) 448-9090
souellette@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org

_Counsel for All Plaintiffs_

\* Motion to appear _pro hac vice_ forthcoming
† Application for admission forthcoming