**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| VENEZUELAN ASSOCIATION OF MASSACHUSETTS, *et al.*, | |
| *Plaintiffs*, | Case No. 1:26-cv-13038 |
| v. | Leave to File Excess Pages Granted on July 6, 2026 |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY
OF AGENCY ACTION UNDER 5 U.S.C. § 705**

**INTRODUCTION**

Our immigration laws provide important protections to those seeking refuge from danger in the United States, including people fleeing persecution who have applied for asylum and people granted Temporary Protected Status ("TPS") because their homelands are experiencing war, natural disaster, or other humanitarian crises. One of those protections is the ability to work lawfully in the United States. People seeking asylum or who have received TPS depend on their employment authorization to provide for themselves and their families and support the national economy through their work in key industries. Yet, thousands of TPS holders are at risk of losing their ability to work on July 22, 2026, because of Defendants' unlawful actions. Plaintiffs therefore respectfully request a ruling from this Court by July 21, 2026, staying these actions pursuant to Section 705 of the Administrative Procedure Act ("APA").[1]

National TPS Alliance members Isaac, Hanafi, and Aleksandr are three of the people who face irreparable harm absent a stay. Isaac is a Salvadoran TPS holder who has lived in Massachusetts and worked for the same university employer for over twenty years. Hanafi is a Sudanese TPS holder and ICU physician in Texas, where he cares for critically ill patients. Aleksandr is a Ukrainian TPS holder living in North Carolina, where he supports his young family with his job as a software engineer. Each received a notice from U.S. Citizenship and Immigration Services ("USCIS") telling them their employment authorization had been extended for 540 days, which they are currently relying on to work. But recently, each was told by their employer that their employment authorization extension had been cut short, and that they would lose their job on

---

[1] If the Court does not fully resolve this motion by July 21, 2026, the Court should temporarily stay the March 2026 Update to USCIS's website and preserve TPS work authorizations that are currently set to expire on July 22, 2026 due to that Update, pending a final decision on the motion.

July 22, 2026. Isaac, Hanafi, and Aleksandr each have U.S. citizen children who depend on them and are afraid of what will happen if they cannot work. Like Isaac, Hanafi, and Aleksandr, tens of thousands of immigrant workers with TPS face the threat of losing their jobs on July 22, 2026, because USCIS has unlawfully cut off their work authorization.

In three policies purporting to implement the One Big Beautiful Bill Act ("H.R. 1")—a USCIS policy implementing a July 22, 2025 Federal Register Notice ("July 2025 Cap Policy"), a March 2026 Update ("March 2026 Update") to USCIS's website, and an April 29, 2026 interim final rule ("April 2026 IFR")—USCIS took away work-authorized time from TPS holders who applied for work authorization before H.R. 1 was enacted. Nothing in H.R. 1 authorized that sudden cutoff. H.R. 1 limited the duration of TPS "employment authorization"—that is, each initial grant or renewal—to the shorter of one year or the length of the TPS designation period, but Congress did not make that limit retroactive. In applying it retroactively anyway, USCIS exceeded its statutory authority.

Worse, USCIS imposed the one-year limit without providing a way for people to avoid gaps in work authorization while USCIS adjudicates their renewal applications. In doing so, it failed to comply with the TPS statute's mandate to "provide" TPS holders with work authorization "effective throughout the period they are in temporary protected status," a command that H.R. 1 left in force. 8 U.S.C. §§ 1254a(a)(1)(B), (2). USCIS's retroactive contortion of H.R. 1 not only upends settled expectations of thousands of immigrants and their employers but also creates a Kafkaesque situation that will cause gaps in TPS holders' future employment authorization in violation of the TPS statute.

The April 2026 IFR also makes significant substantive changes affecting asylum applicants. It imposes new and severely punitive consequences on asylum seekers who fail to pay

2

H.R. 1's annual asylum fee ("AAF"). Among other things, the IFR permanently extinguishes their asylum claims and related work authorization without adequate notice, additional payment reminders, or an opportunity to appeal. As a result, hundreds of thousands of asylum seekers risk losing both their work authorization and their ability to pursue asylum. Many of these people have lived and worked in the United States for years but are now at risk of suddenly falling out of the authorized workforce each year. The IFR also quietly deletes the longstanding requirement that USCIS adjudicate initial asylum-based employment authorization applications within 30 days—a change wholly unrelated to H.R. 1 and made without notice or explanation.

USCIS unlawfully bypassed notice-and-comment procedures in issuing the July 2025 Cap Policy, the March 2026 Update, and the April 2026 IFR, rendering these policies procedurally defective under the APA. The March 2026 Update and April 2026 IFR also are contrary to law and arbitrary and capricious, in violation of the APA.

Plaintiffs the Venezuelan Association of Massachusetts ("VAM"), the National TPS Alliance ("NTPSA"), and the Asylum Seeker Advocacy Project ("ASAP"), three national membership organizations representing the interests of asylum seekers and TPS holders, as well as the Service Employees International Union ("SEIU") and one of its local affiliates, 32BJ SEIU, bring this suit on behalf of their members to vacate USCIS's unlawful agency actions implementing H.R. 1. By way of this motion, Plaintiffs seek to stay USCIS's July 2025 Cap Policy, March 2026 Update, and April 2026 IFR in order to prevent TPS holders from losing their work authorization as soon as July 22, 2026, and to prevent asylum seekers from losing or facing indefinite delays in obtaining work authorization. *See* 5 U.S.C. § 705.

## BACKGROUND

### I.   Temporary Protected Status Designations and Work Authorization Before H.R. 1

The TPS program allows eligible foreign nationals to live and work lawfully in the United States while it is unsafe to return to their countries of origin. The Secretary of Homeland Security may designate a country for TPS based on armed conflict, natural disaster, or other "extraordinary and temporary conditions.[2] 8 U.S.C. § 1254a(b)(1). The Secretary may then grant TPS to nationals of the designated country who were in the United States at the time of designation and meet other criteria. *Id.* § 1254a(c)(1)(A). Once granted TPS, a noncitizen "is in temporary protected status" and may not be removed from the United States, *id.* § 1254a(a)(2), "for as long as the TPS designation lasts," unless DHS withdraws their status on individual eligibility grounds. *Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021).

In addition, the Secretary "shall authorize" TPS holders "to engage in employment in the United States and provide" them "with an 'employment authorized' endorsement or other appropriate work permit." 8 U.S.C. § 1254a(a)(1)(B). "Work authorization . . . shall be effective throughout the period the [noncitizen] is in temporary protected status." *Id.* § 1254a(a)(2).

Initial TPS designations last for 6 to 18 months. *Id.* § 1254a(b)(2)(B). TPS status can be extended for 6, 12, or 18 additional months. *Id.* § 1254a(b)(3)(C). The most common designation period has been 18 months.[3] Extension decisions are typically announced around 60 days before

---

[2] Although the TPS statute references the "Attorney General," the government has long taken the position that the Attorney General's functions under the TPS statute were transferred to the Secretary of Homeland Security by 8 U.S.C. § 1103 and 6 U.S.C. § 557. In practice, the Secretary exercises those functions.

[3] S*ee generally* Jill H. Wilson, Cong. Rsch. Serv., RS20844, *Temporary Protected Status and Deferred Enforced Departure* 8–30 (Aug. 28, 2025) (describing history of TPS designations).

the expiration of the prior TPS period.[4] Hundreds of thousands of individuals have been living and working in the United States for decades under TPS designations that have been consistently extended because of continued instability in their countries of origin. *See, e.g.*, *Extension of the Designation of El Salvador for Temporary Protected Status*, 90 Fed. Reg. 5953, 5954 (Jan. 17, 2025) (noting 2001 El Salvador TPS designation has been extended 11 times).

Before H.R. 1, TPS holders could apply for an EAD (i.e., a physical work permit) valid for the duration of a TPS designation. *See, e.g.*, 90 Fed. Reg. at 5953–54. But due to relatively short designation periods, late notice of extension decisions, and long processing times, USCIS often failed to process EAD renewals in the time between an extension announcement and expiration of the prior TPS period, meaning TPS holders were left with facially expired EADs. *See, e.g., id.* at 5954 (providing a one-year automatic extension for TPS holders from El Salvador because "DHS recognizes that not all re-registrants may receive a new EAD before their current EAD expires"). To fill these gaps and comply with the statutory requirement to ensure TPS holders had employment authorization "effective throughout" their TPS status, 8 U.S.C. § 1254a(a)(1)(B), (2), USCIS provided two types of automatic extensions. First, USCIS regularly extended EADs for all TPS holders from a particular country via Federal Register Notice, "without any further action" on the part of the TPS holder. 90 Fed. Reg. at 5956. Second, USCIS automatically extended an individual TPS holder's EAD for 540 days when they filed a renewal EAD application during the TPS re-registration period. *See Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants*, 89 Fed. Reg. 101208 (Dec. 13, 2024) (codified at 8 C.F.R. § 274a.13(d)(1)(i)).

---

[4] *See* GAO, *Temporary Protected Status: Steps Taken to Inform and Communicate Secretary of Homeland Security's Decisions*, GAO-20-134, at 33 (2020), https://perma.cc/RDY5-CQMC.

On January 17, 2025, USCIS extended existing TPS designations for El Salvador, Ukraine, and Sudan, each for a period of 18 months. 90 Fed. Reg. at 5953; *Extension of the Designation of Ukraine for Temporary Protected Status*, 90 Fed. Reg. 5936 (Jan. 17, 2025); *Extension of Sudan for Temporary Protected Status*, 90 Fed. Reg. 5944 (Jan. 17, 2025). People previously granted TPS under these designations were required to re-register for TPS during a 60-day period running from January 17, 2025 through March 18, 2025. *See* 90 Fed. Reg. at 5953 (El Salvador); 90 Fed. Reg. at 5037 (Ukraine); 90 Fed. Reg. at 5945 (Sudan). In each extension notice, USCIS announced the typical methods by which TPS holders could maintain their work authorization. USCIS said that it would issue new EADs valid for the full length of the extension. USCIS also automatically extended all TPS EADs for each country for one year and stated that TPS holders who applied to renew their EAD during the re-registration period would receive a 540-day automatic extension of their EAD pending processing of their renewal application. *See, e.g.*, 90 Fed. Reg. at 5943–44.

Consistent with this promise, TPS holders who applied to renew their TPS-based EADs during the re-registration period for their country received individual "Notice[s] of Action" from USCIS explaining that they qualified for an automatic 540-day extension. Each Notice of Action stated: "[Y]ou can show this notice with your expired EAD to your employer for employment eligibility verification (Form I-9) purposes. The automatic extension is for up to 540 days from the expiration date printed on the front of your EAD." Ex. 1, Palma Decl. Ex. A.

Due to ongoing—and worsening—agency processing delays, thousands of TPS holders from El Salvador, Ukraine, and Sudan who followed these steps are still waiting for their EAD renewal applications to be processed. *See* Ex. 1, Palma Decl. ¶¶ 27–31.[5] In the meantime, TPS

---

[5] USCIS reports a backlog of 216,220 TPS EAD renewal applications as of December 31, 2025. *See* USCIS, Immigration and Citizenship Data, *Form I-765, Application for Employment Authorization, Eligibility Category and Filing Type (Fiscal Year 2026, Quarter 1)* (June 12, 2026),

holders with pending renewal applications have EADs that facially expired on the date that the prior TPS designation period expired (March 9, 2025, for El Salvador and April 19, 2025, for Sudan and Ukraine). But those who applied to renew and received the automatic work permit extension can continue working lawfully for 540 days beyond the expiration date on the face of their EAD. *See* 8 C.F.R. § 274a.13(d)(1)(i); Ex. 1, Palma Decl. ¶ 26. The chart below summarizes the current work authorization situation for TPS holders from El Salvador, Ukraine, and Sudan who are relying on the 540-day automatic extension. TPS holders from El Salvador should be authorized to work until August 31, 2026, 90 Fed. Reg. at 5953, and TPS holders from Ukraine and Sudan should be authorized to work until October 11, 2026. 90 Fed. Reg. at 5937; 90 Fed. Reg. at 5945.

| Country | Expiration Date of Previous TPS Designation & EAD | Last date to re-register for TPS and qualify for automatic 540-day EAD extension | Expiration Date of Current TPS Designation (per Jan. 2025 Extensions) | Expiration Date of 540-day Automatic Work Permit Extension |
|---|---|---|---|---|
| El Salvador | 3/9/2025 | 3/18/2025 | 9/9/2026 | 8/31/2026 |
| Ukraine | 4/19/2025 | 3/18/2025 | 10/19/2026 | 10/11/2026 |
| Sudan | 4/19/2025 | 3/18/2025 | 10/19/2026 | 10/11/2026 |

## II.   H.R. 1 and USCIS's Implementation of the Act as to TPS Holders

### A. Congress Imposes New Limitations on the Duration of TPS EADs in H.R. 1

On July 4, 2025, the President signed H.R. 1 into law. It imposed a fee for each application to renew or extend TPS-based employment authorization. 8 U.S.C. § 1811(a). H.R. 1 also limited

---

https://perma.cc/FWN6-A4CF.  At current processing times, it would take more than *eight years* to process all pending applications. An NTPSA survey found that only 10% of Salvadoran TPS holders who applied to renew their EADs during the re-registration period had received new EADs by May 2026—over fifteen months later. Ex. 1, Palma Decl. ¶ 31.

the duration of each TPS "employment authorization," i.e., each EAD and each "renewal or extension" to one year or the duration of TPS, whichever is shorter. *Id.*; *accord id.* § 1803(c). In other words, as USCIS admits, H.R. 1 limits only "how long employment authorization may remain valid in any single grant or renewal." *USCIS Immigration Fees and Related Procedures Required by H.R. 1 Reconciliation Bill*, 91 Fed. Reg. 22952, 22961 (Apr. 29, 2026) ("April 2026 IFR"). H.R. 1 did not disturb the requirement that USCIS provide TPS holders with employment authorization "effective throughout" their period of TPS status, *id.* §§ 1254a(a)(1)(B), (2), which DHS has historically ensured. *See* 90 Fed. Reg. at 5943–44. And it did not make the change to the duration of each "employment authorization" retroactive.

### B.  USCIS Issues the July 2025 FRN

On July 22, 2025, USCIS issued a notice in the Federal Register regarding some of the H.R. 1 fees. *USCIS Immigration Fees Required by HR-1 Reconciliation Bill*, 90 Fed. Reg. 34511 (July 22, 2025) ("July 2025 FRN"). The FRN said that "[t]he renewal or extension period for employment authorization shall be approved for a period of no more than 1 year, or for the duration of the designation of TPS, whichever is shorter." *Id.* at 34514. The July 2025 FRN did not say USCIS would apply H.R. 1's one-year limit retroactively. But (as it publicly acknowledged only months later) USCIS applied the July 2025 FRN to issue one-year EADs to TPS holders who filed EAD renewal applications before H.R. 1 was enacted, including NTPSA members Fatima, Blanca, and Daniel. Ex. 1, Palma Decl. ¶¶ 29–32. The decision to apply H.R. 1's one-year cap retroactively—the "July 2025 Cap Policy"—impacted TPS holders from El Salvador, Sudan, and Ukraine, all of whom had more than a year remaining on their TPS designation as of July 2025. Because of the policy, starting in July 2025, USCIS issued EADs valid for only one year, rather than the length of the TPS designation. 91 Fed. Reg. at 22960 n.75.

8

### C.  USCIS Prospectively Ends Automatic 540-Day Extensions

On October 30, 2025, USCIS amended its regulations to end automatic 540-day extensions, but only as to EAD renewal applications filed after October 30, 2025. *See Removal of the Automatic Extension of Employment Authorization Documents*, 90 Fed. Reg. 48799, 48800 (Oct. 30, 2025); 8 C.F.R. § 274a.13(d).[6] On the same day, USCIS updated its Handbook for Employers. The updated Handbook continues to say that 540-day automatic extensions "apply to renewal requests timely filed before Oct. 30, 2025."[7]

### D.  USCIS's March 2026 Update Creates Confusion for TPS Holders

Around March 13, 2026, USCIS caused confusion among employers and immigrant workers by updating its TPS website to revise language discussing "Employment Authorization Document (EAD) Extension" to directly conflict with the revised 8 C.F.R. § 274a.13(d) and the USCIS Handbook for Employers. This March 2026 Update announced that, because of H.R. 1, work authorizations of TPS holders who applied for an EAD renewal before October 30, 2025 were no longer automatically extended for the full 540-day period provided in 8 C.F.R. § 274a.13(d)(1), even if the full 540-day extension had already been conferred before USCIS's July 22, 2025 Notice. USCIS, *Update to TPS Page on EAD Automatic Extensions* (Mar. 13, 2026), https://perma.cc/6PA2-XT85.[8] For those who filed for an EAD renewal before July 22, 2025,

---

[6] This interim final rule is subject to ongoing litigation. *See Behdin v. Edlow*, No. 26-cv-00566 (N.D. Cal.).

[7] USCIS, *Handbook for Employers (M-274): Guidance for Completing Form I-9 § 5.1, Automatic Extensions Based on a Timely Filed Application to Renew Employment Authorization and/or Employment Authorization Document Before Oct. 30, 2025* (Oct. 30, 2025), https://perma.cc/39LG-K8KX.

[8] This portion of the website previously contained a short summary of how a person with TPS could receive an automatic extension of their EAD, including through temporary final rules. USCIS, *Temporary Protected Status* (last updated Feb. 13, 2026), https://perma.cc/46ER-6N7H.

USCIS announced that if the "receipt notice has a 'Received Date' of July 21, 2025, or earlier, the up-to-540-day automatic extension applies; however, any part of this extension that falls after July 22, 2025, cannot last longer than 1 year from this date or for the duration of the TPS designation period, whichever is shorter." *Id.* In other words, the March 2026 Update provided that TPS holders who applied for and received 540-day automatic extensions of their EADs before H.R. 1 became effective were now only work authorized through July 22, 2026.

Following the March 2026 Update, many employers (including NTPSA member Isaac's employer) received an email from E-Verify[9] alerting them to the information contained in the March 2026 Update and referring them to USCIS's TPS website, where the full March 2026 Update appeared on the landing page. Isaac's employer forwarded this email to him and indicated that they would need to let him go if he could not produce a facially valid EAD by July 22, 2026. *See* Ex. 1, Palma Decl. ¶ 33. Other NTPSA, VAM, SEIU, and 32BJ SEIU members, including Luis, Sonia, Aleksandr, Hanafi, Estefania, and 32BJ SEIU Member B also have been told by their employers that their work authorization will expire on July 22, 2026. *Id*. ¶¶ 34–37; Ex. 2, Martin Decl. ¶ 23; Ex. 3, Locke Decl. ¶ 23; Ex. 4, Medina Decl. ¶ 15. This has created great confusion and anxiety among NTPSA, VAM, SEIU, and 32BJ SEIU members who unexpectedly face the loss of work authorized time on which they had relied in planning their employment and supporting their families. Ex. 1, Palma Decl. ¶ 28; Ex. 3, Locke Decl. ¶ 13; Ex. 4, Medina Decl. ¶ 15.

### E. USCIS Purports to Implement H.R. 1's TPS EAD Provisions in the April 2026 IFR

On April 29, 2026, USCIS issued an interim final rule purporting to interpret and

---

[9] "E-Verify is an Internet-based system that compares information entered by an employer from an employee's Form I-9, Employment Eligibility Verification, to records available to [DHS] and the Social Security Administration to confirm employment eligibility." E-Verify, *What is E-Verify?*, https://perma.cc/XHU3-U378 (archived June 29, 2026).

implement H.R. 1's TPS EAD provisions. 91 Fed. Reg. 22952 ("April 2026 IFR"). The IFR invited public comments, and, on May 29, NTPSA, SEIU, and ASAP submitted a joint comment, along with 81 other organizations, describing the IFR's negative and unlawful effects on TPS holders and asylum seekers. However, the IFR became effective on May 29, 2026, before USCIS considered any of the comments submitted. *Id.* The IFR did two things relevant to TPS.

First, the IFR disclosed the July 2025 Cap Policy for the first time (in a footnote). The IFR noted that, in July 2025, when some countries still had more than 12 months remaining in their TPS designations, USCIS "calculated the H.R. 1 caps [for TPS EADs] from the date of adjudication" of the EAD application. *Id.* at 22960 n.75. In other words, USCIS had been applying H.R. 1 "caps" to TPS holders who filed their EAD applications before H.R. 1 was enacted, issuing one-year EADs instead of EADs valid until the end of their TPS designation period.

Second, the IFR revised 8 C.F.R. § 244.12 to limit the duration of each initial EAD, and each renewal, to one year. *Id.* at 22972. It further provided that, when an EAD expires before the TPS period ends, the TPS holder "must obtain a renewal to continue employment authorization." *Id.* USCIS admitted that TPS holders "could face gaps in employment authorization" and lose their jobs while they waited for USCIS to adjudicate their renewal applications. *Id.* at 22961. And it acknowledged that, in the past, USCIS used methods like automatic extensions to avoid such gaps. *Id.* at 22960. Yet, USCIS did not provide any way to ensure that TPS holders could maintain their work authorization throughout their TPS designations, as the statute continues to require. *See* 8 U.S.C. § 1254a(a)(2).

In the IFR's preamble, USCIS suggested that it did not need to ensure that TPS holders remain work-authorized throughout their TPS designation because the statute no longer required it to do so. *See* 91 Fed. Reg. at 22961. USCIS acknowledged the statutory requirement that TPS

11

holders' work authorization be "effective throughout" the TPS designation," *id.* at 22960 (quoting 8 U.S.C. § 1254a(a)(2)). But it asserted that this provision governs only who is eligible for work authorization—not how long that authorization must remain valid. *Id.* at 22961. This ignores the language of § 1254a(a)(2), which requires TPS holders to have work authorization "throughout the period" of TPS, and the subsection's title, "Duration of work authorization."

USCIS also suggested that TPS holders could avoid losing authorization if they simply "file timely renewals." 91 Fed. Reg. at 22961. But USCIS ignored that its persistent backlog in processing TPS EAD renewals all but ensures timely-filed renewal applications will not be processed in time to avoid a lapse in work authorization. *See supra* page 6-7 & n.5.

USCIS later claimed that "current TPS designation timeframes do not place TPS beneficiaries and applicants at risk of experiencing gaps in employment authorization." 91 Fed. Reg. at 22961. But this is not correct. Two groups of TPS holders face impending gaps in employment authorization: (1) TPS holders who have not yet received new EADs and whose automatic extensions were cut short by the March 2026 Update and (2) TPS holders who received one-year EADs that expire before their TPS expires under the July 2025 Cap Policy.

## III.    Relevant Background on Asylum and Asylum-Based Work Authorization

Federal law gives noncitizens "physically present in the United States" the right to apply for asylum. 8 U.S.C. §§ 1158(a)(1), (2)(B). Asylum comes with significant benefits—asylees may live and work in the United States and apply for lawful permanent residence. 8 U.S.C. §§ 1158(c)(1), 1159. Noncitizens must apply for asylum within one year of their arrival in the United States or are barred from applying, unless they satisfy a narrow exception. *Id.*

§§ 1158(a)(2)(B), (D). Applicants not in removal proceedings must generally file an asylum application with USCIS. 6 U.S.C. § 271(b)(3).[10]

USCIS may reject applications that do not meet filing requirements when submitted. 8 C.F.R. § 103.2(a)(7)(ii). This intake-stage mechanism treats an application as though it was never accepted for processing. *See id.* §§ 103.2(a)(7)(ii), 208.3(c)(3). A decision to reject an application is not appealable. *Id.* § 103.2(a)(7)(iii). And a rejected application must be resubmitted if the applicant wants it to be considered. *Id.* § 208.3(c)(3)(iii). USCIS may also return incomplete asylum applications, but only at the time of filing. *Id.* § 208.3(c)(3). If USCIS determines an asylum application is incomplete, it must return the asylum application within 30 days so the applicant may correct and refile it. *Id.*

The asylum statute and regulations entitle asylum applicants to an individualized adjudication of their application once it is accepted for filing. *Id.* § 208.9(a); *RAICES v. Mullin*, 174 F.4th 81, 105–11 (D.C. Cir. 2026). USCIS may (1) grant the application, (2) refer the noncitizen to removal proceedings before an immigration judge, if the noncitizen is inadmissible to or deportable from the United States, or (3) deny the application, if the noncitizen has valid status in the United States. 8 C.F.R. §§ 208.14(c), 1208.14(b), (c). These regulations do not allow USCIS to reject an application it has already accepted for processing.

Congress requires asylum applications to be adjudicated within 180 days of filing, barring exceptional circumstances. 8 U.S.C. § 1158(d)(5)(A)(iii). In practice, however, USCIS takes years

---

[10] Removal proceedings are initiated when DHS alleges a noncitizen is inadmissible to or deportable from the United States. 8 U.S.C. §§ 1229(a); 1229a(a). Once those proceedings are initiated, a noncitizen may apply for relief from removal, such as asylum, before an immigration judge. *Id.* § 1229a(c)(4); 8 C.F.R. § 1003.1(b).

to adjudicate an asylum application due to massive backlogs.[11] Many ASAP members' asylum applications have been pending for years. Ex. 5, Reddy Decl. ¶¶ 8, 18, 48.

Most asylum applicants are eligible to apply for employment authorization after their asylum application has been accepted for filing and is pending for 150 days. 8 C.F.R. § 208.7(a)(1)(i) (2025). Before USCIS issued the April 2026 IFR, USCIS was required to adjudicate that initial work permit application within 30 days of filing, for a total of 180 days' wait to receive work authorization. *Id*. § 208.7(a)(1) (2025) (amended by 91 Fed. Reg. at 22972 (Apr. 29, 2026)). Since 1994, asylum seekers have relied on the 30-day adjudication timeline to secure timely work authorization.[12] Once granted, employment authorization can be renewed—including on appeal or if the case is referred to an immigration judge—until a final decision is made on the asylum application *Id.* § 208.7(b). Most asylum applicants must renew their asylum-based EAD many times due to the yearslong adjudication backlogs.

## IV.     H.R. 1 and USCIS's Implementation of the Act as to Asylum Seekers

### A.  USCIS's July 2025 FRN Purports to Implement the Annual Asylum Fee ("AAF")

In addition to the TPS employment authorization fee, H.R. 1 also imposed a fee on asylum applicants, to be paid for "each calendar year" that the asylum application "remains pending." 8

---

[11] USCIS itself has acknowledged a "massive backlog" of asylum applications, *Hasnat v. Rubio*, No. 24-02175, 2025 WL 675221, at *4 (D. Md. Mar. 3, 2025), with a recent report confirming a backlog of more than one million asylum applications at USCIS alone during Fiscal Year 2023. *See, e.g.*, Citizenship and Immigr. Servs. Ombudsman, DHS, *Annual Report 2024*, at 3 n.8 (June 28, 2024), https://perma.cc/W3YV-UV8C.

[12] *See Rules and Procedures for Adjudication of Applications for Asylum or Withholding of Deportation and for Employment Authorization*, 59 Fed. Reg. 62284, 62289–303 (Dec. 5, 1994); *Gonzalez Rosario v. USCIS*, 365 F. Supp. 3d 1156, 1160–62 (W.D. Wash. 2018) (permanently enjoining USCIS from further failing to adhere to the 30-day deadline); *CASA de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 973–74 (D. Md. 2020) (preliminarily enjoining USCIS rule that would have eliminated the 30-day deadline as likely arbitrary and capricious); *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 20–22 (D.D.C. 2022) (setting aside the rule on other grounds).

U.S.C. § 1808(a). Congress did not make the fee retroactive. In fact, the statute provided fee calculations only "[f]or fiscal year 2025," 2026, and "subsequent fiscal year[s]." *Id.* § 1808(b). In its July 2025 FRN, however, USCIS "interpreted" this provision of H.R. 1 to require that any noncitizen who filed an asylum application on or before October 1, 2024 (over nine months before H.R. 1 was enacted), pay the AAF for fiscal year 2025 and each year that their application remained pending. 90 Fed. Reg. at 34515. Any noncitizen who filed an asylum application after October 1, 2024, that remains pending with USCIS for more than 365 days must pay the AAF each year on the anniversary of their filing date. *Id.* USCIS said that it would provide notice to each asylum applicant who was required to pay the AAF of when and how the fee needed to be paid, as well as "the consequences of failure to pay." *Id.*[13]

Since the fee's implementation, however, many asylum applicants have not received notice that they must pay the AAF. Some ASAP members who did not receive notice were only able to pay the fee because they checked the online USCIS Annual Asylum Fee payment page ("AAF Payment Page"),[14] and realized that the 30-day clock to pay the AAF was running. And because the AAF Payment Page does not provide a deadline by which their AAF must be paid, these applicants are not certain when their 30-day clock to pay the AAF began, or when their fee would have been due. *See* Ex. 5, Reddy Decl. ¶¶ 28–31, 50–58.

---

[13] On October 3, 2025, ASAP sued USCIS and the Executive Office for Immigration Review ("EOIR") (the agency that administers the immigration courts) challenging the agencies' implementation of the AAF, including the July 2025 FRN. Compl., *ASAP v. EOIR*, No. 1:25-cv-03299-SAG (D. Md. Oct. 3, 2025), Dkt. No. 1. After USCIS published the April 29, 2026 IFR, ASAP voluntarily dismissed USCIS and Director Edlow from its lawsuit. Pl.'s Notice of Voluntary Dismissal, *ASAP v. EOIR*, No. 1:25-cv-03299-SAG (D. Md. May 22, 2026), Dkt. No. 114; Order Approving Pl.'s Notice of Voluntary Dismissal, *ASAP v. EOIR*, No. 1:25-cv-03299-SAG (D. Md. May 26, 2026), Dkt. No. 117.

[14] USCIS, *Annual Asylum Fee*, https://perma.cc/3FLU-NXYY (archived June 30, 2026).

15

The USCIS AAF Payment Page also can only be used to pay the AAF once the 30-day clock has begun, so asylum applicants cannot pay the AAF in advance. Without notice of when that 30-day window starts, an asylum applicant will inevitably miss it unless they somehow know to check the AAF Payment Page. *Id.*; Ex. 2, Martin Decl. ¶ 28.

**B. USCIS's April 2026 IFR Creates Severe Consequences for Failure to Pay the AAF**

In its April 2026 IFR, USCIS for the first time created new and extraordinarily severe consequences for asylum seekers who do not pay the AAF within the unknown 30-day window each year.[15] The IFR provided that USCIS would "reject" for nonpayment an asylum application it had already accepted and had been pending for years, thereby treating the filing as though it had never been properly accepted for processing. 91 Fed. Reg. at 22957, 22959 (adding 8 C.F.R. § 106.2(c)(15)). A rejection cannot be appealed. *Id.* at 22957. It would also immediately terminate asylum-based work authorization. *Id.* at 22957–58. These consequences are especially troubling because asylum seekers have repeatedly reported problems receiving AAF notices, including notices sent late, to incorrect addresses, to former representatives, or never received at all, forcing many applicants to continually monitor the AAF Payment Page. *See* Ex. 5, Reddy Decl. ¶¶ 28, 33–34, 50–58; Ex. 2, Martin Decl. ¶¶ 26–34.

The practical effect is that, each year an asylum application remains pending, a missed fee payment—potentially due to a notice the applicant never received—can result in the loss of a long-pending asylum application, immediate termination of asylum-based work authorization, and permanent loss of eligibility for asylum and asylum-based work authorization in the future, without

---

[15] Prior to the April 2026 IFR, USCIS represented in court that it would not take adverse action against asylum applicants who failed to timely pay the AAF until they completed rulemaking on the AAF. *See* Notice in Resp. to Order, *ASAP v. EOIR*, No. 1:25-cv-03299-SAG (D. Md. Oct. 29, 2025), Dkt. No. 50.

any adjudication of the underlying asylum claim's merits. Ex. 2, Martin Decl. ¶¶ 28–29.

The IFR also says that, if an applicant fails to pay the AAF, and they lack lawful status, DHS will either initiate expedited removal proceedings or issue a notice to appear and commence removal proceedings before an immigration judge. 91 Fed. Reg. at 22957. Because of the IFR, asylum applicants who are placed in removal proceedings will be forced to start over in a defensive process against DHS counsel, where they face detention and the threat of removal from the United States to countries where they fear persecution, instead of continuing in the non-adversarial affirmative asylum system they voluntarily entered. *See* 8 U.S.C. §§ 1226(a), 1229a. Other asylum applicants could be placed in expedited removal under the April 2026 IFR, which would subject them to detention and swift removal from the United States without access to the procedural protections traditional removal proceedings provide.[16]

### C. The April 2026 IFR Silently Eliminates the 30-Day Processing Requirement for Initial Asylum-Based EADs

Finally, the April 2026 IFR quietly amends an unrelated regulation governing initial asylum-based EAD applications. Without notice, explanation, or even acknowledgment, it deletes the longstanding requirement that USCIS adjudicate initial asylum-based EAD applications within 30 days. *See* 91 Fed. Reg. at 22972 (amending 8 C.F.R. § 208.7(a)(1)). Yet just two months earlier, DHS issued a notice of proposed rulemaking to amend the same provision by extending—not eliminating—the 30-day adjudication deadline. *See Employment Authorization Reform for Asylum Applicants*, 91 Fed. Reg. 8616, 8653–54 (Feb. 23, 2026). The April 2026 IFR neither acknowledges that rulemaking nor explains why it instead eliminated the deadline altogether,

---

[16] Expedited Removal is a truncated alternative to full removal proceedings. It applies to noncitizens arriving in the United States and noncitizens who have not been admitted or paroled into the United States, and who have not demonstrated that they have been physically present in the United States for two years. 8 U.S.C. § 1225(b)(1)(A)(i), (iii).

much less address the prior litigation around that provision. *See supra* n.13.

V.      **The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Harm the Plaintiffs**

Plaintiffs face serious harm due to USCIS's actions to implement H.R.1. NTPSA is a voluntary membership organization composed mainly of TPS holders, including TPS holders from El Salvador, Sudan, and Ukraine. Ex. 1, Palma Decl. ¶¶ 4–11.  Many of these members have lived and worked in the United States for decades. Because of the March 2026 Update, TPS holders like NTPSA members **Isaac**, **Luis**, **Sonia**, **Aleksandr**, and **Hanafi** have received notice from employers that their employment authorization will end on July 22, 2026. For example, **Isaac** has been working for the same employer for 20 years and is currently relying on an automatic extension of his EAD to continue working and paying the mortgage on the house where he and his wife live with their four U.S. citizen children. *Id*. ¶ 33. After receiving an E-Verify alert about the March 2026 Update, his employer told him he will be fired if he cannot produce an updated EAD by July 22, 2026.  *Id*. NTPSA member **Hanafi** is an ICU doctor who provides specialized care to severely ill patients. Hanafi is also relying on an automatic extension of his EAD to work and has been told by the medical center where he works that his extension will end on July 22, 2026. *Id.* ¶ 37. Hanafi has been forced to make plans to move his U.S. citizen wife and two U.S. citizen children to a smaller apartment to prepare for extended unemployment, and may have to delay necessary follow-up care for his three-year-old-son who recently had surgery if Hanafi loses his job and employer-provided health insurance. *Id.* ¶ 38.

Meanwhile, as a result of the July Cap Policy, other TPS holders, like NTPSA members **Fatima**, **Blanca**, and **Daniel**, have received new EADs that expire one year from the date their application was adjudicated, instead of the date their TPS status expires. *Id.* ¶¶ 40–42. For example, **Daniel** received a work permit that expires on July 30, 2026—one year after USCIS

18

granted his TPS re-registration application—instead of September 9, 2026, when his TPS status expires. His employer has told him he needs to provide updated work authorization documents by July 30, 2026 or he will lose his job. Daniel does not know how he will support himself or his U.S. citizen son if he cannot work. *Id.* ¶ 42.

32BJ SEIU, the largest union of property service workers in the United States, has members in similar positions. *See* Ex. 3, Locke Decl. ¶¶ 3, 14–35. These members rely on work authorization to support their U.S. citizen children and afford healthcare for their families' medical needs. *Id.* ¶¶ 22–24 (32BJ SEIU Member B would have incurred large medical debt for hospitalization without the health insurance that his job provided but his employer told him he will no longer be authorized to work after July 22, 2026); *id.* ¶ 33 (32BJ SEIU Member D is scheduled for surgery to remove several concerning growths in his throat but will be unable to pay for it without the medical insurance he receives because of his employment).

Plaintiff VAM's more than 23,000 members include TPS holders and thousands of people with asylum applications pending with USCIS. Ex. 2, Martin Decl. ¶¶ 7-10. Because of the March 2026 Update, VAM Member **Estefania,** a single mother to a U.S. citizen son, has been told by her employer that she will have to resign if she cannot present a new work permit before July 22. *Id.* ¶¶ 23-24. Many VAM Members also have expressed frustration and concern about the AAF, including **Yamileth**. *Id.* ¶¶ 26-34. Yamileth never received a notice to pay the AAF and only learned that she was able to pay it when VAM's Director went on the USCIS website to check for her. Yamileth is worried that she will not know when to pay the fee in the future, and USCIS will take away her work permit. *Id.* ¶ 34.

Plaintiff ASAP is the largest membership organization of asylum seekers in the United States, with over 700,000 members. Ex. 5, Reddy Decl. ¶ 5. Thousands of ASAP members have

19

pending asylum applications with USCIS, and many filed for asylum in September of 2024 or earlier. *Id.* ¶ 7. ASAP has heard from over 2,750 members over the past year who are subject to the AAF and the harsh consequences set forth in April 2026 IFR for failure to pay the AAF. *Id.* ¶ 48. For instance, ASAP member **Emad** applied for asylum, and completed his asylum interview nearly eight years ago but continues to wait for a decision. In October 2025, he received a new interview notice that did not include any information about the AAF. He proactively checked the USCIS website and learned he could pay the AAF, so he paid. But Emad is worried that since he did not receive notice the first time, he will not receive notice the next time his AAF is due. *Id.* ¶ 52. As another example, ASAP members **Reinaldo** and **Elena** have been waiting almost 10 years for USCIS to adjudicate their family's asylum claim, and the AAF has caused them significant stress, anxiety, and frustration. They received an AAF payment notice in May 2026, but by the time it arrived in the mail, about 15 days of the 30-day window had already passed. They paid the AAF but are fearful and anxious about whether and how they will receive notice in the future. *Id.* ¶ 58. ASAP member **Mehmet** lives with profound fear and anxiety that he will be deported if he does not receive notice of his next AAF or cannot afford to pay in time. *Id.* ¶ 51. Further, ASAP has members who joined before they have received their first work permit based on a pending asylum application, *id.* ¶ 7 and are thus impacted by the elimination of the 30-day requirement in the IFR.

Because USCIS announced these consequences via an IFR that took effect before USCIS could consider public comments, USCIS denied ASAP's members the opportunity to inform the government of their concerns. Ex. 5, Reddy Decl. ¶¶ 20, 47. Moreover, DHS published the IFR only five days after closing a notice-and-comment rulemaking addressing the 30-day processing deadline for initial asylum-based EADs, in which more than 7,000 individuals and organizations—

20

including ASAP—submitted comments. *Id.* ¶ 36. Nothing in the April 2026 IFR gave the public notice that DHS was eliminating the deadline altogether. *Id.* ¶¶ 38–47.

## LEGAL STANDARD

Section 705 of the APA authorizes courts "to postpone the effective date of an agency action" or "preserve status or rights" pending resolution of the proceedings when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Such stays may be issued by courts before or after the effective date of the challenged agency action. *E.g.*, *Doe v. Noem*, 784 F. Supp. 3d 437, 470 (D. Mass. 2025). A court may grant a Section 705 stay based on the same factors as for a preliminary injunction, *Doe v. Noem*, 816 F.Supp.3d 145, 148 (D. Mass. 2026): if the movant is "likely to succeed on the merits," "likely to suffer irreparable harm in the absence of preliminary relief," "the balance of equities tips in his favor," and "an injunction is in the public interest." *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022).

## ARGUMENT

Plaintiffs are likely to succeed on the merits of their claims that (1) the April 2026 IFR is procedurally invalid; (2) the July 2025 Cap Policy and March 2026 Update are procedurally invalid; (3) the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are contrary to law as to TPS holders; and (4) the March 2026 Update and April 2026 IFR are arbitrary and capricious as to TPS holders. Plaintiffs will suffer irreparable harm if the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are not set aside, and the remaining factors decisively weigh in favor of Plaintiffs. The Court should stay the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR pending resolution of this case.[17]

---

[17] *Mullin v. Doe* does not impact the issues at hand in this case. In *Mullin v. Doe*, the Supreme Court held that the Secretary's "determination[s] . . . with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS are not reviewable by the courts. No.

**I.   Plaintiffs Are Likely to Succeed on the Merits of their Claim That the April 2026 IFR Is Procedurally Invalid (Count I).**

**A.  All Plaintiffs Have Standing.**

To secure a Section 705 stay or other preliminary relief, a plaintiff is required to "show a substantial likelihood of standing." *Cabrera v. Dep't of Lab.*, 792 F. Supp. 3d 91, 101 (D.D.C. 2025) (internal quotation marks omitted). Plaintiffs have standing to pursue their procedural claim based on USCIS's failure to provide notice and an opportunity for comment before issuing the IFR. The standing inquiry differs "when a plaintiff seeks to vindicate a procedural right, such as having been unlawfully denied the opportunity to comment on a proposed rule." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37–38 (D.D.C. 2020) ("*CAIR Coal.*"). In such a "procedural injury" case, to show injury and causation, the plaintiff need only show that "the government act performed without the procedure in question"—here, notice and comment— "will cause a distinct risk to a particularized interest of the plaintiff." *Town of Winthrop v. Fed. Aviation Admin.*, 535 F.3d 1, 6 (1st Cir. 2008) (citation modified).

Plaintiffs easily satisfy that requirement: the IFR both deprived their members of the opportunity to participate in the APA rulemaking process and places their members at substantial risk of losing their work authorization—and with it, their income and ability to support their families. *See* Ex. 5, Reddy Decl. ¶¶ 20, 36, 38–47; Ex. 4, Medina Decl. ¶ 10; *see supra* pp. 18–20. For ASAP and VAM members, the IFR also substantially increases the risk of immigration enforcement against them by creating a mechanism through which their pending asylum claims

---

25A952, 2026 WL 1825840, at *7 (U.S. June 25, 2026) (quoting 8 U.S.C. § 1254a(b)(5)(A)). But this case is not about TPS country designations (or extensions or terminations), but instead about employment authorizations for individual TPS holders. The government conceded in *Mullin* that "[q]uestions about . . . the conditions and procedures for receiving work authorization are separate from TPS designation, extension, and termination decisions" and are not subject to the jurisdictional bar. Reply Br. for Pet. 9–10, *Mullin v. Doe*, No. 25A952 (U.S. Apr. 20, 2026).

are summarily terminated for nonpayment of the new annual asylum fee without adjudication, leaving affected individuals without work authorization and potentially subject to detention and removal. *See* 91 Fed. Reg. at 22964–68 (recognizing loss of work authorization, increased immigration enforcement, removal proceedings, and detention as predictable impacts of the AAF); *see also* Ex. 5, Reddy Decl. ¶¶ 35–37, 48–59; Ex. 2, Martin Decl. ¶¶ 20–25, 27–34.

The doctrine of procedural standing "relax[es]" the showing needed to establish "imminence and redressability." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021). In this context, a plaintiff "has standing if there is 'some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant.'" *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 28 (1st Cir. 2007) (quoting *Massachusetts v. EPA,* 549 U.S. 497, 521 (2007)). If the Court stays the April 2026 IFR, USCIS could then follow proper rulemaking procedures, including considering comments from Plaintiffs and other members of the public bearing directly on the consequences of USCIS's proposed actions. There is, at a minimum, "some possibility" that such reconsideration would lead the agency to retain or reinstate measures that would prevent Plaintiffs' members from unlawfully losing work authorization and their asylum claims. *Id.* (quoting *Massachusetts*, 549 U.S. at 521). Plaintiffs are likely to establish standing for their procedural challenge to the IFR.

### B.  The April 2026 IFR Is Final Agency Action.

The APA provides for judicial review of "final agency action." 5 U.S.C. 704. To be considered "final," an agency action must: (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) be one "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *New York v. Trump*, 133 F.4th 51, 67 (1st Cir. 2025) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). The IFR is final agency action. Although labeled "interim," the IFR went into effect on May 29, 2026 and therefore represents

USCIS's definitive position "pending any further formal rulemaking." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020). The IFR also "determine[s] rights and obligations" or has immediate "legal consequences." *Id.* at 80. It shortens the duration of TPS-based work authorization, subjects asylum applicants to new penalties for non-payment of fees, and eliminates the 30-day processing timeline for asylum EADs. 91 Fed. Reg. at 22953, 22972.

The IFR is therefore subject to review under the APA.

### C.  The IFR Was Issued Without Procedure Required By Law.

The APA requires notice-and-comment rulemaking whenever an agency promulgates a legislative rule. *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. § 553). Those requirements are not mere formalities. They ensure that agencies receive public input, consider alternative approaches, develop an adequate record, and explain their reasoning before imposing new obligations on regulated parties. *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023) ("*AFLCIO*"). "Failure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n*, 887 F.3d at 70.

USCIS bypassed these procedures entirely. It invoked two exceptions to notice-and-comment as reasons for doing so: good cause, 5 U.S.C. § 553(b)(B), and the exception for rules of agency organization, procedure, or practice, *id.* § 553(b)(A). 91 Fed. Reg. at 22962–63. As detailed below, neither exception applies to the April 2026 IFR. *See New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). It is therefore procedurally defective.

1.  The Good Cause Exception to Notice and Comment Does Not Apply.

USCIS first purported to invoke the good cause exception, claiming the policy changes made in the IFR "merely restate the statute they implement"; that "the rule is routine"; that USCIS had no discretion in the matter; and therefore that "the use of rulemaking would be inconsequential to the industry," 91 Fed. Reg. at 22962. But the exception applies only "when the agency for good

24

cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). The exception is narrowly construed, *Levesque v. Block*, 723 F.2d 175, 184 (1st Cir. 1983) (internal citation omitted). USCIS's justifications for bypassing notice and comment are factually incorrect, and even if they were true do not meet the agency's burden to justify an exception to notice-and-comment rulemaking.

First, USCIS is incorrect to claim that the IFR merely restates the statute. Although H.R. 1 directed USCIS to impose certain fees for pending asylum applications and limited the duration of TPS EAD cards, the IFR goes considerably further. As to the asylum fee, it imposes consequences that the statute does not, creating a new regime under which, each year, nonpayment of the AAF can result in the permanent loss of long-pending asylum claims without adjudication and the immediate and permanent termination of associated employment authorization. And it imposes those consequences based on a 30-day notice process that has proven inadequate—or nonexistent—in practice. Ex. 3, Locke Decl. ¶¶ 13–35; Ex. 4, Medina Decl. ¶¶ 17–18; Ex. 5, Reddy Decl. ¶¶ 28–34, 48–59; Ex. 2, Martin Decl. ¶¶ 27–28, 33–34. The IFR also shortens TPS work authorizations without any provision to ensure that DHS meets its statutory mandate to ensure TPS holders maintain work authorization throughout their temporary protected status. In doing so, it violates the TPS statute, departs from decades of settled agency practice, and implements a regime that is both operationally unworkable and highly disruptive to workers, employers, and the agency itself. Finally, the IFR silently eliminates the longstanding 30-day processing timeline at 8 C.F.R. § 208.7(a)(1), which is nowhere addressed in H.R. 1. In short, the IFR does far more than restate H.R. 1; it makes consequential policy and interpretive choices that the statute neither compels nor specifies.

Nor is the rule "routine" and "inconsequential." 91 Fed. Reg. at 22962; *see Levesque*, 723 F.2d at 184 ("Public procedures are unnecessary. . . when the regulation is technical or minor" (internal quotation marks omitted)); *Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 755 (D.C. Cir. 2001) ("unnecessary" prong of good cause exception reserved for "issuance of a minor rule in which the public is not particularly interested"). Far from it, the IFR jeopardizes employment authorization for hundreds of thousands of people and imposes extreme consequences on asylum seekers with longstanding pending claims. Public participation in the rulemaking process could have informed USCIS about economic impacts (which USCIS did not even attempt to analyze, 91 Fed. Reg. at 22953, 22964–65), unintended consequences, and alternative approaches that would have been less harmful (and lawful). *See Am. Fed'n of Gov't Emps. v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) ("the more expansive the regulatory reach … the greater the necessity for public comment"); *see CAIR Coal.*, 471 F. Supp. 3d at 44 (applying the principle in the immigration context).

Second, even accepting USCIS's characterization of the rule at face value, the good cause exception still would not apply. Courts have repeatedly emphasized that the exception is ordinarily limited to situations involving genuine emergencies, imminent harm, or circumstances in which ordinary rulemaking procedures would defeat the purpose of the rule. *See Util. Solid Waste Activities Grp.*, 236 F.3d at 754 (recognizing that exception's "use should be limited to emergency situations" (internal quotation marks omitted)). USCIS identified no such circumstances.

USCIS also invoked the "public interest" portion of the good cause exception, but it did not explain why it thought that language applies other than to say that "[i]mmediate effect is necessary to meet Congress's directive and [is] in the public interest." 91 Fed. Reg. at 22953, 29963. H.R. 1 did not require immediate implementation. Moreover, "Congress's view seems to

26

have been that any time one can expect real interest from the public in the content of the proposed regulation, notice-and-comment rulemaking will not be contrary to the public interest." *Levesque*, 723 F.2d at 185. Here, there was substantial interest in the content of the IFR, as established by the comment submitted by ASAP, NTPSA, SEIU, and 81 other organizations on May 29, 2026; the comment ASAP submitted on June 29, 2026; as well as the other 586 comments submitted. Yet the rule took effect before consideration of those comments.

### 2.   The Procedural Rule Exception to Notice and Comment Does Not Apply.

USCIS's alternative reliance on the procedural-rule exception fares no better. *See* 5 U.S.C. § 553(b)(A); 91 Fed. Reg. at 22962–63. The procedural rule exception is a "limited carveout . . . intended for internal house-keeping measures organizing agency activities," and "its purpose is to ensure that agencies retain latitude in organizing their internal operations." *AFLCIO*, 57 F.4th at 1034 (internal quotation marks and citations removed). It does not cover rules that "alter the rights or interests of parties." *President's All. on Higher Educ. and Immigr. v. Noem*, No. 25-cv-11109-PBS, 2026 WL 788185, at \*20 (D. Mass. Mar. 20, 2026). The April 2026 IFR is not a rule of internal "agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Rather, it creates severe consequences for nonpayment of the AAF that are not required by H.R. 1, silently eliminates the 30-day processing timeline for first-time asylum EADs that has been in place since 1994, and adopts a novel interpretation of H.R. 1 to sharply restrict TPS-based employment authorization contrary to the TPS statute. Those changes greatly affect asylum seekers' and TPS holders' substantive rights, obligations, eligibility for important immigration benefits, and ability to remain in the United States. They are therefore substantive, not procedural rules. *See id.* Accordingly, USCIS cannot invoke § 553(b)(A) to bypass notice-and-comment rulemaking.

27

For these reasons, Plaintiffs are likely to succeed on their claim that USCIS violated the APA by promulgating the April 2026 IFR without notice-and-comment rulemaking and that the IFR is therefore invalid.

## II.    Plaintiffs Are Likely to Succeed on the Merits of their Claim That the July 2025 Cap Policy and March 2026 Update Are Procedurally Invalid (Count I).

### A.  NTPSA, VAM, SEIU, and 32BJ SEIU Have Standing

Plaintiffs likewise have standing to pursue their procedural challenge to the July 2025 Cap Policy and March 2026 Update, for the same reasons discussed above. The July 2025 Cap Policy and the March 2026 Update deprived NTPSA, VAM, SEIU, and 32BJ SEIU's members of the opportunity to comment on USCIS's decision to apply H.R. 1's employment-authorization duration limitations retroactively. Without that input, the March 2026 Update limited the duration of automatic extensions granted to TPS holders who applied to renew their EADs before H.R. 1's enactment, and the July 2025 Cap Policy placed a one-year limitation on EADs granted to TPS holders who applied for their EADs before July 2025. The Cap Policy and Update, in turn, increase the risk that those members will experience gaps in their work authorization, disrupting their employment, income, and ability to support their families. *See* Ex. 1, Palma Decl. ¶¶ 33–38, 40–42; Ex. 3, Locke Decl. ¶¶ 13–35; Ex. 4, Medina Decl. ¶¶ 17–18; Ex. 2, Martin Decl. ¶¶ 19–25. The procedural injury is also redressable because staying the Cap Policy and March 2026 Update would require USCIS to reconsider those policies through lawful procedures, and there is at least some possibility that notice and comment would affect the agency's ultimate approach. NTPSA, VAM, SEIU, and 32BJ SEIU therefore have standing to pursue their procedural APA challenge to the Cap Policy and March 2026 Update.

28

**B.  The 2025 Cap Policy and March 2026 Update Are Final Agency Actions.**

Like the April 2026 IFR, *supra* 23-24, the July 2025 Cap Policy and the March 2026 Update are reviewable as final agency actions. The July 2025 FRN announced, among other things, that the renewal or extension period for TPS employment authorization "shall be approved for a period of no more than 1 year, or for the duration of the designation of TPS, whichever is shorter." 90 Fed. Reg. at 34511, 34514. It made no exception for TPS holders who applied to renew their EADs before H.R. 1 was enacted, and—as revealed months later, in the April 2026 IFR, 90 Fed. Reg. at 22960 n.75—USCIS decided to issue one-year EADs to those TPS holders as well. That decision—the July 2025 Cap Policy—marks the consummation of USCIS's decisionmaking process regarding the duration of each renewal or extension period and the retroactive application of the duration limit to EADs. It also determines TPS holders' rights and has legal consequences because it limits the duration of employment authorizations and renewals to one year, even for people who applied before H.R. 1's effective date.

The March 2026 Update is also final agency action because it limits any TPS EAD extension to one year after the date of the publication of the July 22, 2025 FRN. The Update carries immediate legal and practical consequences for TPS holders because it cuts off their employment authorization before its previous expiration date. Because of the Update, TPS holders will lose their jobs after July 22, 2026. Ex. 1, Palma Decl. ¶¶ 28–33; Ex. 3, Locke Decl. ¶ 23; Ex. 4, Medina Decl. ¶ 15; Ex. 2, Martin Decl. ¶ 23. *See Liu v. Noem*, 780 F. Supp. 3d 386, 401 (D.N.H. 2025) (revocation of a student visa and resultant loss of employment authorization and status was final agency action). The March 2026 Update and Cap Policy are reviewable under the APA. 5 U.S.C. § 704.

### C. The July 2025 Cap Policy and March 2026 Update Were Issued Without Procedure Required by Law.

Legislative rules must be promulgated through notice-and-comment rulemaking unless a statutory exception applies. *See* 5 U.S.C. § 553(b)–(c); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Unlike the April 2026 IFR, USCIS did not even attempt to invoke an exception to notice-and-comment rulemaking when it issued the 2025 Cap Policy and the March 2026 Update. Thus, if they are legislative rules, they are procedurally invalid.

"[A] legislative rule is one that creates rights, assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself." *N.H. Hosp. Ass'n*, 887 F.3d at 70 (internal quotation omitted). The 2025 Cap Policy and the March 2026 Update did exactly that. H.R. 1 does not require retroactive application of its TPS employment-authorization provisions. Yet the Update announced for the first time that USCIS would apply H.R. 1's TPS employment authorization duration provisions to limit automatic extensions for TPS holders who filed to renew their EADs before H.R. 1's enactment. And because of the 2025 Cap Policy, USCIS issued one-year EADs to TPS holders who filed EAD renewal applications before H.R. 1 was enacted but received their EADs after July 22, 2025. The July 2025 Cap Policy and March 2026 Update thus strip affected TPS holders of weeks or months of work authorization that they are entitled to under 8 C.F.R. § 274a.13(d)(1) and had already been granted by USCIS. *See* Palma Decl. ¶¶ 31–36 (NTPSA members granted 540-day automatic extensions were later told the extensions would last less than 540 days; others received one-year EADs that expire while they are still in TPS status).

The Cap Policy and Update are therefore analogous to the agency guidance found to be a legislative rule in *New Hampshire Hospital Association v. Azar*, 887 F.3d 62 (1st Cir. 2018). As in that case, the July 2025 Cap Policy and March Update do not merely restate the "only plausible interpretation" of a clear statutory command; they limit work authorizations already sought (and

30

already in effect) before H.R. 1 took effect—a matter H.R. 1 left "unaddressed." *Id.* at 71–72. In doing so, they altered the rights of regulated parties. *See id.* The Cap Policy and Update likewise lacked any reasoned interpretive explanation and announced new policies on a matter of considerable consequence. Because the July 2025 Cap Policy and the March 2026 Update are legislative rules, USCIS was required to provide notice and an opportunity for public comment before issuing them. Its failure to do so renders the Cap Policy and the Update procedurally invalid. 5 U.S.C. § 553(b)–(c); *Perez*, 575 U.S. at 96.

**III.    Plaintiffs Are Likely to Succeed on the Merits of their Claims That the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Are Contrary to Law as to TPS Holders (Counts II & IV).**

Even if the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR were not procedurally invalid, the Court should stay them because Plaintiffs NTPSA, SEIU, 32BJ SEIU, and VAM are likely to establish that they are contrary to law on two independent grounds: (A) the July 2025 Cap Policy and March 2026 Update are impermissibly retroactive to the extent that they limit the duration of employment authorizations for TPS holders who applied for such authorizations before H.R. 1's effective date, and (B) the July 2025 Cap Policy, March 2026 Update, and the portions of the April 2026 IFR that address the period of employment authorization for TPS beneficiaries violate the TPS statute. *See* 5 U.S.C. § 706(2)(A), (C), (D).

**A.    The July 2025 Cap Policy and March 2026 Update Are Impermissibly Retroactive As to the Duration of TPS Holders' Work Authorization (Count II).**

The July 2025 Cap Policy and March 2026 Update are impermissibly retroactive because they purport to shorten the validity period of existing TPS work permit extensions applied for before H.R. 1 was even enacted. Yet the text of H.R. 1 nowhere indicates that this was Congress's intent in enacting the statute, as would be required to apply these changes retroactively. *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994). Therefore, the policies are unlawful as

31

applied to TPS holders who applied for work authorization before H.R. 1's effective date.

"[T]he first step in determining whether a statute has an impermissible retroactive effect is to ascertain whether Congress has directed with the requisite clarity that the law be applied retrospectively." *Immigr. & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 316 (2001). "The standard for finding such unambiguous direction is a demanding one. Cases where this Court has found truly retroactive effect adequately authorized by statute have involved statutory language that was so clear that it could sustain only one interpretation." *Id.* at 316–17 (internal quotations omitted).

That standard is not met here. H.R. 1's TPS employment authorization provision, as codified at 8 U.S.C. § 1811(a), says that "[a]ny employment authorization for a[] [noncitizen] granted [TPS], or any renewal or extension of such employment authorization, shall be valid for a period of 1 year or for the duration of the designation of temporary protected status, whichever is shorter." *See also id.* § 1803(c). H.R. 1 therefore does not specify whether the one-year validity period for TPS EADs applies to EAD extensions sought or received before H.R. 1 was enacted.

The Court must therefore proceed to the second step of the retroactivity analysis to determine whether shortening the employment authorization periods for TPS holders who applied for their EAD extension before H.R. 1 "produces an impermissible retroactive effect." *St. Cyr*, 533 U.S. at 320; *accord Landgraf*, 511 U.S. at 280. This inquiry "demands a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment" and is "guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *St. Cyr*, 533 U.S. at 321 (internal quotations omitted).

USCIS's implementation of H.R. 1 in the March 2026 Update attaches new legal consequences to TPS EAD renewal applications filed before H.R. 1 was enacted and upsets the

settled expectations of TPS holders who filed those applications. The March 2026 Update specifically affects TPS holders from El Salvador, Sudan, and Ukraine who applied to renew their EADs between January 17, 2025 and March 18, 2025 but, due to USCIS processing delays, have still not received new EADs. When these TPS holders applied for renewal, their existing EADs were automatically extended for 540 days. *See* 90 Fed. Reg. at 5958 (El Salvador); 90 Fed. Reg. at 5950 (Sudan); 90 Fed. Reg. at 5941 (Ukraine). *See also* 8 C.F.R. § 274a.13(d)(1). Each received a Notice of Action from USCIS stating that they could rely on the 540-day automatic extension to establish ongoing employment authorization. *See* Ex. 1, Palma Decl. ¶ 26; Ex. A.  By the time H.R. 1 was enacted, these TPS holders had already been relying on their automatic extensions for months. But according to USCIS's March 2026 Update, their automatic extensions will now expire on July 22, 2026, instead of August 31, 2026 (El Salvador) and October 19, 2026 (Sudan and Ukraine), because of H.R. 1.

The July 2025 Cap Policy also attaches new legal consequences to TPS EAD renewal applications filed before H.R. 1 was enacted. In January 2025, when USCIS extended TPS for El Salvador, Sudan, and Ukraine, USCIS said that it would issue new EADs effective throughout their TPS designation. *See, e.g.*, 90 Fed. Reg. at 5953–54. But, under the July 2025 Cap Policy, USCIS reversed course and started issuing EADs that were valid for only year from the date of adjudication, rather than until the TPS designation expires. 91 Fed. Reg. at 22960 n.75; *see also* Ex. 1, Palma Decl. ¶¶ 40–42. As a result, these EADs are set to expire prematurely.

The July 2025 Cap Policy and April 2026 IFR therefore attach new legal consequences— premature loss of employment authorization—to events completed before its enactment. Rather than merely regulating future conduct, they retroactively curtail previously recognized periods of work authorization on which TPS beneficiaries had already relied in making employment,

financial, and family decisions and impinge on the settled expectations of TPS beneficiaries who relied on the law pre-H.R. 1. Therefore, the July 2025 Cap Policy and March 2026 Update are impermissibly retroactive. *See Arevalo v. Ashcroft*, 344 F.3d 1, 14 (1st Cir. 2003) (cutting off relief applied for before statute took effect was a retroactive application).

## B. The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Violate the TPS Statute (Count IV).

In addition, the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR are contrary to law because they violate the TPS statute. Each will inevitably cause gaps in TPS holders' work authorization, violating the TPS statute's mandate that the Secretary "shall" provide TPS holders with work authorization "effective throughout" the period they have TPS. 8 U.S.C. § 1254a(a)(1)–(2).

### 1. H.R. 1 Must Be Read to Co-Exist with the TPS Statute.

H.R. 1 does not purport to repeal—or even amend—the TPS statute's employment-authorization provisions. Rather, it imposes fees on TPS-related EAD applications and limits the validity of "each initial" TPS-related "employment authorization" and "any renewal or extension of [TPS-related] employment authorization" to one year or the duration of the TPS designation, whichever is shorter. *See* 8 U.S.C. §§ 1803(c), 1811.

"[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). H.R. 1 and the TPS statute's employment authorization mandate are "capable of co-existence." *Id.* As USCIS concedes, H.R. 1 limits only "how long employment authorization may remain valid in any single grant or renewal." 91 Fed. Reg. at 22961. The TPS statute requires the Secretary to provide TPS holders with employment authorization effective throughout the period of TPS. 8 U.S.C. § 1254a(a)(1)–(2). Those directives are fully compatible: if a TPS designation lasts longer than one year, USCIS must either process

34

EAD renewal applications quickly enough that TPS holders can receive new EADs before their old EADs expire or provide automatic extensions like it has done in the past to ensure work authorization "effective throughout" the TPS period. *Id.* § 1254a(a)(2); *see id.* § 274a.13(e) (noting that USCIS can automatically extend TPS EADs via "Federal Register notice regarding procedures for renewing TPS-related employment documentation").

The IFR adopts a different approach by choosing to effectively read the TPS statute's employment-authorization mandate out of existence. According to USCIS, the statute merely identifies who is eligible for work authorization. 91 Fed. Reg. at 22961. But the TPS statute does more than that: it directs the Secretary to "provide" TPS holders with employment authorization "effective throughout" their period of TPS. 8 U.S.C. § 1254a(a)(1)–(2). USCIS's interpretation fails to give effect to that language and cannot be reconciled with the TPS statute's plain text. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024) (courts owe no deference to agency's interpretation of statutes absent express delegation).

    2.    <ins>The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Violate the TPS Statute's Employment Authorization Mandate.</ins>

The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR each create gaps in TPS holders' employment authorization in violation of the TPS statute's employment authorization provisions. 8 U.S.C. § 1254a(a)(1)–(2). Under the July 2025 Cap Policy, USCIS issued one-year EADs to Salvadoran, Ukrainian, and Sudanese TPS holders who had more than one year remaining on their TPS. But, given EAD renewal backlogs, there was no way those TPS holders could obtain new EADs before their old ones expired. *See supra* n.5. Nor could they obtain a 540-day automatic extension, because such extensions are limited to TPS holders who file EAD renewal applications during the TPS re-registration period, which ended in March for the relevant countries. *See* 8 C.F.R. § 274a.13(d)(1)(i).

The March 2026 Update similarly left TPS holders with no means of obtaining employment authorization. The Update purports to shorten the automatic 540-day extension TPS holders from El Salvador, Ukraine, and Sudan received when they timely applied to renew their EADs in early 2025. *See supra* page 7. Many of those TPS holders have not yet received new EADs, despite applying over 15 months ago. *See supra* n.5; Ex. 1, Palma Decl. ¶¶ 31–38; Ex. 3, Locke Decl. ¶¶ 13–14, 23, Ex. 2, Martin Decl. ¶ 22-25. They are currently dependent on their 540-day automatic extensions to establish their ongoing work authorization. By purporting to terminate those extensions prematurely—while they remain "in temporary protected status," 8 U.S.C. § 1254a(a)(2)—without providing *any* alternative means to establish work authorization, the Update violates the TPS statute.

Finally, the April 2026 IFR amends 8 C.F.R. § 244.12 to require TPS holders to "obtain a renewal to continue employment authorization" upon expiration of their "1 year" EAD. *See* 91 Fed. Reg. at 22972. But, again—per USCIS's own reporting and Plaintiffs' experience—many EAD renewals take more than 12 months to process. *See supra* n.5. And, TPS holders who apply to renew no longer receive automatic 540-day extensions of their employment authorization pending adjudication, 8 C.F.R. § 274a.13(e). In other words, even if TPS holders applied to renew their EADs the minute they receive them, many would still inevitably face gaps in their work authorizations. Yet, the IFR does not adopt any of the methods USCIS previously used and could *still* use to avoid those gaps, such as granting country-wide automatic extensions via Federal Register notice or providing individual TPS holders with automatic extensions of 12 months or less upon the filing of an application for renewal.

## IV. Plaintiffs Are Likely to Succeed on Their Claim that the March 2026 Update and April 2026 IFR Are Arbitrary and Capricious as to TPS Holders (Count VI).

The March 2026 Update and April 2026 IFR also violate the APA because they are

arbitrary and capricious as to TPS holders. In issuing a rule, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). An agency action is arbitrary and capricious "if the agency . . . entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency." *Id.* Moreover, an agency must provide a "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *accord DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020). The agency must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 33.

Here, as discussed further below, USCIS acted arbitrary and capriciously when it failed to: (1) adequately consider important aspects of the problem, (2) account for obvious consequences of its policies, (3) acknowledge and explain a dramatic change in longstanding agency practice, (4) consider obvious and less burdensome alternatives, and (5) consider the reliance interests of people who applied for TPS EAD renewals before H.R. 1's effective date, among others.

First, USCIS failed to consider the obvious interaction between its implementation of H.R. 1's one-year TPS EAD duration limit and USCIS's own processing times. 8 U.S.C. § 1254a(a)(2) requires that TPS beneficiaries be work authorized effective throughout their TPS designation. Yet, because USCIS's current EAD processing times are so lengthy, TPS holders whose status continues for more than a year often cannot receive a new EAD before their old one

37

expires. As a result, they cannot possess an EAD that is facially valid for the entire TPS designation period. USCIS recognized that some TPS beneficiaries in this position "could face gaps in employment authorization and suffer temporary job loss until they receive a renewal of employment authorization." 91 Fed. Reg. at 22961. But USCIS's only answer to this is that applicants "would need to file timely renewals." *Id.* USCIS knew in promulgating the April 2026 IFR that it has a voluminous EAD renewal backlog. *See supra* n.5. But it failed to account for the effect of these delays on the operation of the rule. That failure to consider that "important aspect of the problem" renders the rule arbitrary and capricious. *Ohio v. EPA*, 603 U.S. 279, 293 (2024) (quoting *State Farm*, 463 U.S. at 43).

Second, the IFR also rests on the false premise that "current TPS designation timeframes do not place TPS beneficiaries and applicants at risk of experiencing gaps in employment authorization." 91 Fed. Reg. at 22961. This is plainly incorrect. For TPS holders who have not received new EADs and who have been relying on the 540-day extension to which they are entitled, the March 2026 Update prematurely cuts off this extension, making existing EADs expire on July 22, 2026. And for TPS holders who received EADs when they had more than 12 months remaining before their TPS expired, the July Cap Policy made their EADs valid for one-year after it processed their application, rather than until the TPS designation expired. As a result, impacted individuals face gaps in employment authorization. At best, therefore, USCIS failed to engage with the predictable effects of its rule, in violation of the APA. *See State Farm*, 463 U.S. at 43.

Third, USCIS failed to acknowledge it was dramatically altering its longstanding practice and provide a reasoned explanation for doing so. In the March 2026 Update, USCIS failed to provide a "reasoned explanation" for departing from 8 C.F.R. § 274a.13(d)(1) and notices it had already issued to TPS holders providing the automatic 540-day extension. *Fox*, 556 U.S. at 515.

Fourth, USCIS also failed to consider obvious alternatives, such as allowing individuals who applied for EAD renewals before H.R. 1 was passed to have their renewals processed under the law in effect at the time they filed, or prospectively issuing automatic extensions of less than one year sufficient to ensure work authorization for the full TPS designation period as required by the TPS statute. *Regents*, 591 U.S. at 28–29 (DACA rescission arbitrary and capricious where the Secretary failed to give any consideration to a less sweeping policy change).

Fifth, in the March 2026 Update, USCIS disregarded the reliance interests of TPS holders and employers who depended on the 540-day automatic extension and the promises made by USCIS to maintain TPS-related work authorization through the full TPS designation period. *See Fox*, 556 U.S. at 515; *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (consideration of reliance interests is "a critical factor in the analysis of an arbitrary-and-capricious claim").

The March 2026 Update and the April 2026 IFR are therefore arbitrary and capricious.

## V.   The Remaining Factors Weigh Decisively in Favor of Preliminary Relief.

### A. The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR Irreparably Harm Plaintiffs.

A plaintiff seeking a preliminary injunction "must demonstrate . . . that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). Here, Plaintiffs' members would be irreparably harmed absent urgent injunctive relief.

### 1.   Hardship from unrecoverable fees and lost work authorization

Plaintiffs face immediate and irreparable harm absent an order staying the July 2025 Cap Policy, March 2026 Update, and the April 2026 IFR. Courts have repeatedly recognized that the loss of employment authorization constitutes irreparable harm because it deprives noncitizens of the legal ability to work and pursue their occupations. *See Bowser v. Noem*, No. 26-cv-10382-AK, 2026 WL 555624, at *9 (D. Mass. Feb 27, 2026) (the loss of employment authorization constitutes

irreparable harm because the noncitizen loses the right to work at all); *Nat'l Educ. Ass'n-N.H. v. N.H. Att'y Gen.*, 806 F. Supp. 3d 166, 208 (D.N.H. 2025) ("Loss of the ability to practice one's chosen profession is irreparable harm." (citing *Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011)); *Varniab v. Edlow*, No. 25-cv-10602-SVK, 2026 WL 485490, at *22 (N.D. Cal. Feb. 20, 2026) (imminent loss of work authorization constitutes irreparable harm).

The consequences are concrete and immediate. For example, NTPSA, VAM, SEIU, and 32BJ SEIU members stand to lose their authorization to work in the United States as soon as July 22, forcing them to stop working while they are still in TPS status. Ex. 1, Palma Decl. ¶¶ 33–38; Ex. 3, Locke Decl. ¶ 23; Ex. 4, Medina Decl. ¶ 15; Ex. 2, Martin Decl. ¶ 23. As a result, they face loss of health care coverage, housing instability, and inability to support their U.S. citizen children. Ex. 1, Palma Decl. ¶ 33 (member Isaac faces the loss of employer-sponsored health insurance for himself, his wife, and their four U.S. citizen children, including coverage for his son's ongoing weekly medical treatment, and risks defaulting on the mortgage for the family's home); *id.* ¶¶ 34, 36–38 (members Luis, Aleksandr, and Hanafi must provide proof of new employment authorization by July 22, or they will not be able to support their U.S. citizen children); *id.* ¶ 35 (if member Sonia loses her job, she will lose access to the medicine she relies on to control her blood pressure and cholesterol); Ex. 3, Locke Decl. ¶¶ 15–35; Ex. 4, Medina Decl. ¶¶ 17–18; Ex. 2, Martin Decl. ¶¶ 21, 23–25. These injuries cannot be remedied through a later damages award. *See AFGE v. Trump*, 139 F.4th 1020, 1040 (9th Cir. 2025) (federal employees who would experience loss of healthcare and need to relocate from their homes after job loss would suffer irreparable harms), *stay granted pending appeal on other grounds, Trump v. AFGE*, No. 24A1174 (U.S. July 8, 2025); *E. Bay Sanctuary Covenant v. Garland,* 994 F.3d 962, 984 (9th Cir. 2020) (in an APA case, economic harms may be irreparable because plaintiffs cannot recover damages).

The same is true for asylum applicants subject to the April 2026 IFR. Many will incur unrecoverable filing fees and lose work authorization following the rejection of long-pending asylum applications, resulting in immediate lost wages and employment that cannot be restored after the fact. *See, e.g.*, Ex. 5, Reddy Decl. ¶¶ 35–36, 48; *id.* ¶ 52 (ASAP member Emad relies on his work permit as the sole provider for his wife and four children); Ex. 2, Martin Decl. ¶¶ 21, 29; *id.* ¶¶ 32–34 (VAM member Yamileth relies on her work permit to keep her job in a restaurant kitchen and fears losing both). Many other asylum seekers will face indefinite delays in receiving their first work permit, which is essential to their financial survival. Ex. 5, Reddy Decl. ¶¶ 41–42. Because these financial losses stem directly from the unlawful deprivation of employment authorization and cannot be compensated through monetary relief, they are irreparable.

2.    Adverse immigration consequences for asylum applicants

The April 2026 IFR will inflict irreparable immigration harms on asylum seekers by causing countless affirmative asylum applications to be unlawfully rejected for nonpayment of the AAF. Because many applicants may never receive adequate notice that the fee is due, they face a substantial risk of losing their pending asylum applications through no fault of their own. Ex. 5, Reddy Decl. ¶¶ 35–37, 48–59; Ex. 2, Martin Decl. ¶¶ 27–34. The IFR further provides that, once an application is rejected, USCIS may place applicants who lack other lawful status into expedited removal or removal proceedings and detain them while those proceedings are pending. *See* 91 Fed. Reg. at 22957, 22964–68; *Ramirez v. ICE*, 310 F. Supp. 3d 7, 31 (D.D.C. 2018) ("[T]he harm from detention surely cannot be remediated after the fact" and is a quintessential irreparable harm); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (highlighting the "irreparable harms imposed on anyone subject to immigration detention"). Even where removal proceedings are not immediately initiated, applicants lose their pending affirmative asylum applications and the ability to pursue asylum through the non-adversarial affirmative process, and are at heightened risk of

being detained by immigration authorities. *See* Graeme Blair & David Hausman, Deportation Data Project, *Immigration Enforcement in the First Nine Months of the Second Trump Administration* 2 (Jan. 27, 2026), https://perma.cc/8V84-HDCG; Am. Immigr. Council, *Immigration Detention Expansion in Trump's Second Term* 11–17 (Jan. 2026), https://perma.cc/S2YP-AD9N.

The consequences extend far beyond the rejection itself. By treating long-pending asylum applications as though they had never been filed, the IFR forces applicants whose cases have already been pending for more than one year to confront the one-year asylum filing deadline if they attempt to seek asylum in removal proceedings. As a result, many bona fide asylum seekers risk losing the opportunity to obtain asylum on the merits of their claims and instead face removal without ever receiving meaningful adjudication of their applications. "[T]hreatened removal satisfies the irreparable injury requirement." *Arias Gudino v. Lowe*, 785 F. Supp. 3d 27, 46 (M.D. Pa. 2025); *Dorcas Int'l Inst. of R.I. v. USCIS*, No. 1:26-cv-00132, 2026 WL 1622708, at *33 (D.R.I. June 5, 2026) ("[t]he mere fear of immigration detention and deportation may alone constitute a sufficient irreparable injury"); *L.G.M.L. v. Noem,* 800 F. Supp. 3d 100, 130–32 (D.D.C. 2025) (the "loss of . . . statutory procedures" designed to "kick in before" removal was "enough to show irreparable harm" when plaintiffs could not receive "effective relief by facilitation of [their] return" after being deported (internal quotation marks removed)); *A.O. v. Cuccinelli*, 457 F. Supp. 3d 777, 794–95 (N.D. Cal. 2020) (losing eligibility for immigration status and attendant benefits "constitutes irreparable harm").

Once removed from the United States, applicants face a significant threat of political persecution, torture or other forms of physical harm, wrongful imprisonment, or worse. *Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) ("the prospect of expulsion without any opportunity to apply for asylum," after which "a judicial remedy may be unavailable,"

threatens irreparable harm), *aff'd in relevant part*, 27 F.4th 718, 733–34 (D.C. Cir. 2022). And because many asylum applicants have lived in the United States for years, removal would mean separation from the families they have built here. *See Milligan v. Pompeo*, 502 F. Supp. 3d 302, 321 (D.D.C. 2020) ("'separation from family members' is an 'important irreparable harm factor'" (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011)); *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 503 (D.D.C. 2018) (family "[s]eparation irreparably harms" a person "every minute it persists"). These harms—including loss of a pending application, loss of access to the affirmative asylum process, the potential forfeiture of asylum eligibility altogether, and exposure to removal—are immediate, irreparable, and cannot be remedied after the fact.

### B. The Balance of Equities and the Public Interest Strongly Favor a Stay.

The balance of equities and public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these factors weigh heavily in favor of a stay of the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR. First, as described above, the July 2025 Cap Policy, March 2026, Update, and April 2026 IFR violate the TPS statute and the APA. "'[T]here is generally no public interest in the perpetuation of unlawful agency action.'" *New York v. Kennedy*, 155 F.4th 67, 77 (1st Cir. 2025).

Second, "it is in the public interest to prevent confusion." *El Pollo Rico, LLC v. Wings & Pollo, LLC*, No. 8:21-cv-02346, 2022 WL 2916168, at *3 (D. Md. July 25, 2022). The July 2025 Cap Policy, March 2026 Update, and April 2026 IFR have caused widespread confusion and concern among TPS holders and asylum applicants. TPS holders and their employers are confused about when their employment authorization expires, and asylum seekers are confused about when to comply to avoid rejection of their application. *See, e.g.*, Ex. 4, Medina Decl. ¶ 15; Ex. 1, Palma Decl. ¶¶ 28–30; Ex. 5, Reddy Decl. ¶ 34.

Third, as to TPS EADs, Defendants can demonstrate no harm from simply abiding by their

preexisting policies: (1) providing an automatic 540-day extension to TPS beneficiaries who applied for that extension before October 30, 2025 and have not received their EAD because of USCIS's delays, and (2) making all EADs USCIS issued to TPS holders from El Salvador, Ukraine, and Sudan who applied before H.R. 1 was passed effective throughout their TPS designation. *Nat'l Educ. Ass'n v. Dep't of Educ.*, 779 F. Supp. 3d 149, 201 (D.N.H. 2025) (defendants would suffer little harm from a preliminary injunction that would merely maintain the status quo); *Guerrero Orellana v. Moniz*, 802 F. Supp. 3d 297, 313 (D. Mass. 2025) (preliminary injunction would return the parties to the status quo of providing bond hearings to noncitizens); *RAICES v. Noem*, No. 25-5243, 2025 U.S. App. LEXIS 19422, at *53 (D.C. Cir. Aug. 1, 2025) (denying government's request for a stay pending appeal because the district court's stay order "simply requires the government to adhere to mandatory statutory procedures and standards").

Fourth, there is a public interest in requiring agencies to seek and consider public input on a rule like the April 2026 IFR that has such significant consequences for asylum seekers, TPS holders, their families, and the overall economy. A stay of the April 2026 IFR is the most equitable way to address USCIS's failure to comply with notice and comment procedures before creating such a drastic consequence for failure to pay the AAF and eliminating the 30-day processing timeline. Given that USCIS waited nine months to publish the April 2026 IFR, it cannot claim that it suffers harm from considering public comments on an issue of such importance.

When weighed against the irreparable harm to Plaintiffs, their families, and communities, the balance of the equities and public interest favor issuing a stay of the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR.

## VI. The Court Should Stay the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR in their Entireties.

Because Plaintiffs have demonstrated that they are entitled to relief under Section 705 of

44

the APA, the proper remedy is to stay the July 2025 Cap Policy, March 2026 Update, and April 2026 IFR in their entireties. *See R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 73 (D.R.I. 2025); *Woonasquatucket River Watershed Council v. USDA*, 778 F. Supp. 3d 440, 478–79 (D.R.I. 2025) (staying funding freeze orders in their entirety under Section 705 of the APA); *Massachusetts v. NIH*, 770 F. Supp. 3d 277, 322 (D. Mass. 2025) (preliminarily enjoining agency action in its entirety in APA case); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").

In addition, to "preserve" the "status" and "rights" of TPS holders pending final judgment in this case, 5 U.S.C. § 705, the Court's stay order should make clear that, for TPS holders who applied for work authorization before H.R. 1's effective date (July 4, 2025), the 540-day automatic employment authorizations remain valid for the full 540 days and EADs remain valid for the remainder of their period of temporary protected status. *See* Ex. A to Palma Decl. (Notice of Action providing 540-day extension); 90 Fed. Reg. at 5943–44 (TPS extension notice saying USCIS would issue new EADs valid for the full length of the extension).

## CONCLUSION

For the foregoing reasons, the Court should stay the July 2025 Cap Policy, March 2026 Update, and the April 2026 IFR under 5 U.S.C. § 705 pending the resolution of these proceedings.

45

Dated July 2, 2026

Conchita Cruz*
Jessica Hanson**
Marcela X. Johnson*
**ASYLUM SEEKER ADVOCACY
PROJECT**
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone: (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
marcela.johnson@asaptogether.org

Jessica Karp Bansal*
**NATIONAL DAY LABORER
ORGANIZING NETWORK**
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689
jessica@ndlon.org

Respectfully submitted,

*/s/ Sean Ouellette*
Sean Ouellette (MA Bar. No. 697559)
Jennie L. Kneedler ° (DC Bar No. 500261)
Steven Y. Bressler ° (DC Bar No. 482492)
Brian Netter ° (DC Bar No. 979362)
**DEMOCRACY FORWARD
FOUNDATION**
P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
souellette@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org

*Counsel for All Plaintiffs*

* Motion to appear *pro hac vice* forthcoming
** Application for admission forthcoming
° Admitted *pro hac vice*

46

## CERTIFICATE OF SERVICE

I hereby certify that on this July 6, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument. I also sent the government a copy of the foregoing by emailing the document to:

**Benjamin Moss**
Acting Senior Counsel for District Court Litigation
Office of Immigration Litigation
benjamin.m.moss2@usdoj.gov

**Catherine M. Reno**
Acting Assistant Director
Office of Immigration Litigation
catherine.m.reno@usdoj.gov

**Rayford Farquhar**
Chief, Defensive Litigation, Civil Division
U.S. Attorney's Office for the District of Massachusetts
rayford.farquhar@usdoj.gov

*/s/ Sean Ouellete*
Sean Ouellete