UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| VENEZUELAN ASSOCIATION OF MASSACHUSETTS, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*, <br><br> Defendants. | No. 1:26-cv-13038-NMG |

**OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

**INTRODUCTION**

On July 4, 2025, the President signed into law the H.R. 1 Reconciliation Act of 2025—known as the One Big Beautiful Bill Act ("H.R. 1")—which was a comprehensive legislative package that changed many existing laws and added new laws that affect many areas of government.  Among other things, H.R. 1 established a new framework for immigration fees that Congress directed the Department of Homeland Security ("DHS") to implement beginning in fiscal year 2025.  *See generally* 8 U.S.C. §§ 1802-1815.  This new framework was developed with the goal of ensuring that aliens who are applying or maintaining eligibility for immigration benefits bear more of the costs for administering the immigration system.  *See id*.

Among the many changes created by H.R. 1 was the establishment of an Annual Aylum Fee ("AAF") that requires all asylum applicants with pending asylum applications to pay a minimum $100 annual fee for each calendar year the application "remains pending," in addition to any other applicable fees.  *See* 8 U.S.C. § 1808.  Congress also specified new, uniform limits

and fees for employment authorization periods for aliens with temporary protected status ("TPS").[1] 8 U.S.C. § 1811(a) provides that any extension or renewal application for employment authorization "shall be valid for a period of 1 year or for the duration of the designation of temporary protected status, whichever is shorter," and imposes an extension or renewal fee that cannot be waived.

Consistent with the law's requirements, on July 22, 2025, DHS published a notice in the Federal Register describing how it would implement many of the fees—including the AAF and TPS employment authorization application fees—required by H.R. 1 (the "July 2025 FRN"). *See* 90 Fed. Reg. 34,511 (July 22, 2025). Approximately nine months later, on April 29, 2026, DHS published an Interim Final Rule (the "April 2026 IFR") codifying many of the H.R. 1 fees as well as the implementation of these fees as described in the July 2025 FRN. *See* 9 Fed. Reg. 22,9521 (April 29, 2026). The April 2026 IFR also provided further explanation for DHS's implementation measures. *Id.* Pursuant to the express language of H.R. 1, both the July 2025 FRN and the April 2026 IFR implemented the fees beginning in fiscal year 2025. *See* 8 U.S.C. § 1808(b)(1) ("For fiscal year 2025, the amount specified in this section shall be the greater of (A) $100; or (B) such amount as the Secretary of Homeland Security may establish, by rule); 8 U.S.C. § 1811(b)(1) ("For

---

[1] The Immigration Act of 1990 ("INA") established a program to create a means for providing temporary and discretionary protection—"temporary protected status"—in the United States for aliens from designated countries experiencing ongoing armed conflict, "extraordinary and temporary conditions" that temporarily prevent nationals of the country from safely returning, or an environmental disaster that temporarily renders the country unable to adequately handle the return of its nationals. Pub. L. No. 101-649, 104 Stat. 4978 (1990). Section 244 of the INA, 8 U.S.C. § 1254a, authorizes the Secretary of DHS to provide benefits to an alien in TPS status including eligibility for employment authorization.

fiscal year 2025, the amount specified in this subsection shall be the greater of (A) $275; or (B) such amount as the Secretary of Homeland Security may establish, by rule").

Plaintiffs—three interest organizations and two labor unions—subsequently filed this suit seeking to challenge the implementation of H.R. 1 under the Administrative Procedure Act ("APA"). Doc. No. 1. Plaintiffs claim the July 2025 FRN, the April 2026 IFR, and an update to DHS's website in March 2026 describing the implementation of H.R. 1, were either violative of administrative procedure or contrary to law and arbitrary and capricious. *Id.* Plaintiffs also filed a motion under 5 U.S.C. § 705 seeking to stay the July 2025 FRN, the April 2026 IFR, and the changes described on the website update in March 2026. Doc. No. 11. The Court should deny the motion.

*First*, this Court lacks jurisdiction because Plaintiffs have failed to establish associational standing.

*Second,* Plaintiffs have failed to demonstrate likely success on the merits. DHS's implementation of H.R. 1 simply effectuates the plain language of the statute and was both reasonable and reasonably explained. Additionally, the implementation of H.R. 1 did not violate any administrative procedure.

*Third*, Plaintiffs have failed to establish irreparable harm, and the balance of equities and public interest weigh against preliminary relief. The government and the public share an interest in ensuring that the law established by Congress—which DHS was required to implement—is followed. Delay in implementing the fee structure created by Congress threatens to undermine the United States' national interests.

For these reasons and those discussed below, the Court should deny Plaintiffs' motion.

3

**BACKGROUND**

**I.       H.R. 1**

As described above, H.R. 1 established a new framework of immigration fees including (1) the AAF (*see* 8 U.S.C. § 1808); and (2) an employment authorization initial application fee and an employment authorization extension/renewal request fee for aliens in TPS status (*see* 8 U.S.C. §§ 1803(c), 1811(a)).  Both the AAF and the TPS employment authorization fees commenced in fiscal year 2025.  *See* 8 U.S.C. §§ 1803(c), 1808(b)(1), 1811(b)(1)).

H.R. 1 provides that the AAF is required "for each calendar year that an alien's application for asylum remains pending," commencing in fiscal year 2025.  8 U.S.C. § 1808(a)-(b).[2]  For fiscal year 2025, the amount of the AAF "shall be the greater of $100; or such amount as the Secretary of Homeland Security may establish, by rule."  8 U.S.C. § 1808(b)(1).  Beginning in fiscal year 2026 and continuing for each subsequent fiscal year, the AAF "shall" be adjusted to account for inflation.  *See* 8 U.S.C. § 1808(b)(2).  The statute mandates collection and enforcement of the statute and prohibits waivers.  *Id.* (a) and (d).

H.R. 1 also requires, "[i]n addition to any other fee authorized by law," the payment of a fee each time an alien "seeks a renewal or extension of employment authorization based on a grant of [TPS]."  8 U.S.C. § 1811(a).  H.R. 1 provides that "[a]ny employment authorization for an alien granted [TPS], or any renewal or extension of such employment authorization, shall be valid for a period of 1 year or for the duration of the designation of [TPS], whichever is shorter."  *Id.*  Like

---

[2] H.R. 1 also created a new initial fee, commencing in fiscal year 2025, for any alien who files an application for asylum under section 208 (8 U.S.C. § 1158) at the time such application is filed. *See* 8 U.S.C. § 1802.  Together, the initial filing fee and the AAF now constitute the fees that the government "shall impose [] for the consideration of an application for asylum" pursuant to 8 U.S.C. § 1158(d)(3).

the AAF, the employment authorization renewal/extension fee is required for fiscal year 2025 and increases in amount each subsequent fiscal year to account for inflation. *Id.* § 1811(b)(1)-(2). Also like the AAF, the statute prohibits waivers of the employment authorization renewal/extension fee. *Id.* § 1811(d).

## II.     Implementation of H.R. 1

### A.     July 22, 2025 Federal Register Notice

On July 22, 2025, DHS published the July 2025 FRN providing the information necessary for the public to comply with H.R. 1, including how it would implement the fees required by 8 U.S.C. §§ 1808 and 1811. 90 Fed. Reg. 34,511 (July 22, 2025).

To implement the requirements of H.R. 1 with which it was charged, USCIS required all asylum applicants with pending asylum applications to pay a minimum of $100 annual fee for each calendar year the application "remains pending," from fiscal year 2025 forward in addition to any other applicable fee. *See id.* at 90 Fed. Reg. 34,512-34,513; *see also* 8 U.S.C. § 1808. The notice explained that USCIS interpreted the statutory phrase "remains pending" to encompass any Form I-589 (Application for Asylum and for Withholding of Removal) that remains pending with any federal government agency, court, or entity with jurisdiction over asylum claims. 90 Fed. Reg. 34,511, n. 1 (July 22, 2025). The notice further explained, based on the clear language of H.R. 1—which unambiguously requires an AAF for fiscal year 2025—that the initial minimum $100 AAF must be paid by asylum applicants whose applications were filed on or before the start of fiscal year 2025 and remain pending for a full calendar year through the end of fiscal year 2025.[3]

---

[3] The federal fiscal year runs from October 1 through September 30. https://www.usa.gov/federal-budget-process (last visited July 18, 2026). To that end, fiscal year 2025 ran from October 1, 2024, to September 30, 2025.

90 Fed. Reg. 34,511-34,515.  Because H.R. 1 expressly mandated that an AAF "shall" apply for fiscal year 2025, the notice explained that applying the requirement to pending cases as of October 1, 2024 (the first day of fiscal year 2025) was consistent with both congressional intent and case law and "not impermissibly retroactive because it merely applies changes in procedural rules required by statute."  90 Fed. Reg. 34,515 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 264 (1994)).

Additionally, to ensure that asylum applicants received adequate notice of the new fees required under H.R.1, the notice explained that:

> For the first time the [annual asylum fee] is due under this notice, asylum applicants need not monitor the time their application has been pending and if the [annual asylum fee] applies to them.  USCIS will provide personal, individual notice to each asylum applicant with an application pending with USCIS from whom the [annual asylum fee] is required, the amount of the fee, when the fee must be paid, how the fee must be paid, and the consequences of failure to pay.

90 Fed. Reg. 34,515 (emphasis added).  The notice also explained how USCIS would implement the fees required by 8 U.S.C. § 1811.  90 Fed. Reg. 34,514.  The fee for renewals or extensions of employment authorization for aliens granted TPS for fiscal year 2025 would be $275.  *Id.*

## B.      April 2026 Interim Final Rule

On April 29, 2026, DHS issued the April 2026 IFR to amend USCIS regulations to codify, among other things, the AAF requirement and period of employment authorization limitation for TPS holders as explained in the July 2025 FRN.  *See* 91 Fed. Reg. 22,952.  The IFR also expanded upon DHS's reasoning for its approach to implementing the new statutory requirements.  *Id.*

The IFR reiterated that H.R. 1 does not impose the AAF retroactively for years prior to fiscal year 2025, but that the plain language of 8 U.S.C. § 1808 requires applying the minimum $100 fee to applications that were already pending at the start of fiscal year 2025.  *See* 91 Fed. Reg. 22,957.  In doing so, the IFR underscored that USCIS provided several months' notice, via

6

the July 2025 FRN, to impacted applicants that they would be subject to a fee if they chose to pursue their applications through and beyond September 2025. *Id.* The IFR also reiterated that consistent with the July 2025 FRN, individualized notice was sent to each asylum applicant with a pending case identifying the amount owed and the time period in which to pay the fee. 91 Fed. Reg. 22,957. The IFR also codified that each asylum applicant has a 30-day window to make payment. *Id.*

The IFR also explained the consequence of failing to pay the AAF: rejection of the pending Form I-589, resulting in the rejection of the asylum application by USCIS. 91 Fed. Reg. 22,957. Further, rejection for nonpayment of the AAF immediately terminates any existing employment authorization per 8 U.S.C. § 1810(b). *Id.* at 22,958. As explained by the IFR, these consequences are consistent with Section 208 of the INA, 8 U.S.C. § 1158, which establishes the statutory framework governing asylum applications and related procedures. *Id.* Section 208(d) expressly authorizes the government to impose "fees for the consideration of an application for asylum" and "fees for employment authorization under this section," and permits DHS to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum." *Id.* (citing 8 U.S.C. § 1158(d)(3) and (5)). Rejection also aligns with USCIS filing rules and administrative practices. 91 Fed. Reg. 22,959. USCIS regulations provide that a benefit request "will be rejected" if it is submitted with an incorrect fee, no fee, or otherwise fails to satisfy the required fee payment conditions—codifying the longstanding practice of rejecting filings that do not include proper fees. 8 C.F.R. § 103.2(a)(7)(ii). Finally, rejection is consistent with the best interpretation of 8 U.S.C. § 1808(b); reading the statute to impose a mandatory AAF without consequence for nonpayment would render the provision a nullity, contrary to Congress' intent. *See* 91 Fed. Reg. 22,958 (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be

construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant")).  For these reasons, DHS explained that it "interprets 8 U.S.C. 1808 to operate in concert with existing USCIS fee practice, under which noncompliance with fee requirements results in rejection of the benefit request."  91 Fed. Reg. 22,959.

## LEGAL STANDARDS

"The same standard that governs the issuance of a stay under § 705 is the standard that governs the issuance of a preliminary injunction."  *California v. Kennedy*, No. 25-cv-12019-NMG, 2025 WL 2807729, at *3 (D. Mass. Oct. 1, 2025).  Accordingly, to obtain their requested relief, Plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008).  The moving party "bears the burden of satisfying each of these four elements," using evidence to support its contentions.  *Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 225 (D. Mass. 2020).  But, even then, "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

## ARGUMENT

### I.    The Court lacks jurisdiction over Plaintiffs' claims.

Before addressing the merits of Plaintiffs' motion for stay, the Court must assess whether it has subject matter jurisdiction.  *See Acosta Ramirez v. Banco Popular de P.R.*, 712 F.3d 14, 18 (1st Cir. 2013) ("Federal courts are obligated to resolve questions pertaining to subject-matter jurisdiction before addressing the merits of a case"); *see also Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (recognizing that complaint must be dismissed in its entirety if subject matter

8

jurisdiction is lacking).  Plaintiffs bear the burden of demonstrating subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs have not met their burden.

### A.      Plaintiffs lack associational standing.

Plaintiffs appear to rely on a theory of "associational standing."  Under that theory, an association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  As shown by the number of declarations submitted by the Plaintiffs in an attempt to show irreparable harm, the Plaintiffs fail the third requirement: individual members must participate to show entitlement to relief—particularly if this Court follows the proper practice of limiting any injunction to those individuals who have shown that the challenged conditions will cause them irreparable harm.

More fundamentally, the theory of associational standing is misguided:  It (1) improperly "relaxes both the injury and redressability requirements for Article III standing" by allowing the association to assert and obtain relief for someone else's injury (even in the absence of an injury of its own); (2) "subverts the class action mechanism" by allowing what amounts to classwide relief outside the strictures of Rule 23; and (3) creates the "possibility of asymmetrical preclusion," where the members might not be bound by the association's loss in litigation.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 399-403 (2024) (Thomas, J., concurring).  Thus, while Defendants acknowledge that the Supreme Court has recognized the theory of associational standing, they preserve their challenge to the theory of associational standing for further review.

II.    **Plaintiffs' claims are not likely to succeed on the merits.**

A.    **DHS lawfully implemented H.R. 1**

Plaintiffs cannot demonstrate a likelihood of success on their APA claims because DHS lawfully implemented H.R. 1 based on its plain language. "Under the APA, a reviewing court may set aside an agency's decision if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.'" *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (citing 5 U.S.C. § 706(2)). "This standard is quite narrow: a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" *Id.* (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)).

1.    **Lawful implementation of the AAF**

Starting with the AAF, the statute explicitly states that DHS must require the payment of this fee "for each calendar year than an alien's application for asylum remains pending." 8 U.S.C. § 1808(a). Because Congress provided an amount to be charged "[f]or fiscal year 2025," on an application pending for a full calendar year, DHS explained that the initial AAF must be paid by asylum applicants whose application had been filed with USCIS on or before October 1, 2024—the beginning of fiscal year 2025—and that were still pending on September 30, 2025—the close of fiscal year 2025. *Id.*; *see also* 8 U.S.C. § 1808(b) ("(1) *Initial amount…For fiscal year 2025*, the amount specified in this section shall be the greater of (A) $100; or (B) such amount as the Secretary of Homeland Security may establish, by rule") (emphasis added).

DHS contemplated whether H.R. 1 required retroactive imposition of AAFs for years prior to fiscal year 2025 and concluded that it did not. 91 Fed. Reg. 22,957. And because H.R. 1 expressly mandated that the annual asylum fee "shall" apply beginning in and for fiscal year 2025, applying the requirement to pending cases as of October 1, 2024 (the beginning of fiscal year

10

2025), was consistent with both congressional intent and case law. *Id.* (citing *Landgraf*, 511 U.S. at 264 (recognizing that "congressional enactments will generally not be construed to have retroactive effect unless their language requires this result" (quotation marks omitted))). DHS's implementation of H.R. 1 and was both reasonable and reasonably explained. *See Asylum Seeker Advoc. Project v. United States Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708, 718 (D. Md. 2025) (rejecting retroactivity challenge to AAF implementation).

### 2.    Lawful implementation of employment authorization fees for TPS holders.

Turning to the employment authorization fees for TPS holders, the statute explicitly states that a "fee" will be required any time an alien "seeks a renewal or extension of employment authorization based on a grant of temporary protected status." 8 U.S.C. § 1811(a). The statute goes on to provide that "any employment authorization for an alien granted temporary protected status, or any renewal or extension of such employment authorization, shall be valid for a period of 1 year or for the duration of the designation of temporary protected status, whichever is shorter." *Id.*

DHS expressly contemplated the potential tension between the newly enacted 8 U.S.C. § 1811(a)—which places a one year or duration-of-designation cap on TPS-related employment authorization—and the pre-existing 8 U.S.C. § 1254a(a)(2), which states that TPS-based employment authorization is "effective throughout" the period of TPS. 91 Fed. Reg. 22,961. Applying the ordinary tools of statutory construction, DHS gave effect to both statutes by assigning them complementary roles.[4] *Id.* DHS reasoned that Section 1254a(a)(2) continues to define who

---

[4] *See Corley v. United States*, 556 U.S. 303, 314 (2009) (recognizing that "a statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative of superfluous, void or insignificant") (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

11

is eligible to be employment authorized—TPS beneficiaries under 8 C.F.R. § 274a.12(a)(12) and prima facie-eligible beneficiaries receiving temporary treatment under 8 C.F.R. § 274a.12(c)(19) and 8 C.F.R. § 244.5—while Section 1811 defines the maximum duration for each period of authorization across both categories.  91 Fed. Reg. 22,961.  Put another way, DHS explained that while Section 1254a(a)(2) states that employment authorization is "effective throughout" TPS, that statute provides for a "status-based entitlement to be *eligible* for authorization during the life of the TPS designation, not as a guarantee that any single authorization period may exceed H.R. 1's specific limit."  91 Fed. Reg. 22,961.  Applying the later-in-time canon resolves the textual tension by allowing Section 1254a entitlement to persist while H.R. 1's later, more specific command regulates how long each authorization may run.[5]  91 Fed. Reg. 22,961.

That said, DHS recognized that, where a TPS designation is longer than 1 year, a possible impact of H.R. 1's renewal requirement is that some aliens with TPS status could face gaps in employment authorization until they receive a renewal of employment authorization.  91 Fed. Reg. 22,961.  However, DHS underscored that current TPS designation timeframes do not place TPS beneficiaries and applicants at risk of experiencing gaps in employment because none exceed one year.  *Id.*  Should future TPS designations be set for more than one year, applicants seeking to avoid gaps in employment authorization need only file timely renewals to maintain employment authorization.  *Id.*  DHS reasonably explained that "by requiring TPS beneficiaries and prima facie eligible applicants to regularly renew their requests for employment authorization, this approach provides predictable checkpoints for identity, eligibility, and security vetting."  91 Fed. Reg.

---

[5] *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is commonplace of statutory construction that the specific governs the general" particularly where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.").

22,961.  Ultimately, though Plaintiffs may disagree with DHS's interpretation of H.R. 1, it was reasonable and reasonably explained and, therefore, accords with the APA.

### B.     Plaintiffs' counterarguments lack merit

Plaintiffs' arguments to the contrary lack merit.  *First*, Plaintiffs allege that the April 2026 IFR violated the APA's notice-and-comment requirements.  Pl. Memo, ECF No. 12, pp. 25-29.  It did not.  When regulations merely restate the statute they implement, the APA does not require the agency to use notice-and-comment procedures.  *See* 5 U.S.C. § 553(b)(B); *Gray Panthers Advocacy Comm. v. Sullivan*, 936 F.2d 1284, 1291 (D.C. Cir. 1991); *World Duty Free Americas, Inc. v. Summers*, 94 F. Supp. 2d 61, 65 (D.D.C. 2000).

Additionally, the APA provides that the notice-and-comment requirements do not apply where any agency "for good cause finds (and incorporates the finding and a brief statement of the reasons therefore in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(4)(B); *see also Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*, 59 F.3d 1219, 1224 (Fed. Cir. 1995).  Such is the case here.  DHS explained that good cause exists here where H.R. 1 mandated the imposition of an AAF and yearly employment authorization extension/renewal request fee for TPS beneficiaries and applicants.  *See* 8 U.S.C. §§ 1803(c), 1811(a)).

Finally, the notice-and-comment procedures are not required for "rules of agency organization, procedure, or practice."  5 U.S.C. § 553(b)(A).  Here, H.R. 1 set forth the requirement that DHS collect new statutory fees for fiscal year 2025 and beyond, limit the length of TPS-related employment authorizations, and enforce remittance of such fees.  *See* 8 U.S.C. §§ 1801-1815; 8 U.S.C. § 1254a(c)(1)(B) (amended by H.R. 1 Sec. 100006).  While these new fees and limits may have a substantive impact on the affected parties, DHS had no discretion but to impose the fees

13

and dictate their implementation, attendant processes, and consequences for failure to comply. Because H.R. 1 was effective upon enactment, DHS was required to implement it by providing the procedures both for applicants and USCIS to pay, collect, and for failure to pay. Accordingly, notice-and-comment procedures were not required by the APA.

*Second*, Plaintiffs claim the July 2025 FRN and March 2026 website update are contrary to law because they are "impermissibly retroactive" to the extent they limit the duration of employment authorizations for TPS holders who applied for such authorizations before H.R. 1's effective date. Pl. Memo, ECF No. 12, pp. 32-35. While Plaintiffs are correct that TPS holders may no longer receive the full amount of the automatic 540-day extension that began to run prior to the enactment of H.R. 1 once their EAD expired, that is not because the July 2025 FRN or the March 2026 website are "impermissibly retroactive," it is because the express language of Congress deems it so. H.R. 1 capped the validity of any TPS-related employment authorization at one year, commencing in 2025. 8 U.S.C. § 1811(a). This reading is consistent with H.R. 1's structure of initial and renewed fees tied to time-limited employment authorization periods. *See* 8 U.S.C. §§ 1803(c) and 1811(a); 8 C.F.R. § 274a.12(a)(12), (c)(19); 8 C.F.R. § 244.5(d). The March 2026 website makes it clear that application of H.R. 1 to automatic extensions is forward-looking as it only begins on the effective date of the July 2025 FRN and not earlier, such that any period of the automatic extension that already accrued would not be retroactively taken away. Furthermore, the regulations establishing the automatic extension do not guarantee an automatic extension of 540 days. *See* 8 C.F.R. § 274a.13(d)(6). Instead, the regulations authorize an automatic extension period that is "up to" 540 days, which can be cut short for a variety of reasons. The regulations state: "Nothing in this paragraph (d)(6) will affect DHS's ability to otherwise terminate any employment authorization or Employment Authorization Document, or extension

14

period for such employment authorization or document, by written notice to the applicant, by notice to a class of aliens published in the FEDERAL REGISTER, or as provided by statute or regulations, including 8 CFR 274a.14." *Id.*  Therefore, Plaintiffs err in arguing that they are entitled to a full 540-day automatic extension under the regulation.  When H.R. 1 was passed into law, Plaintiffs were on notice that they could have TPS-based employment authorization in one-year increments, at most (or the duration of TPS, whichever is shorter).

*Third*, Plaintiffs claim the July 2025 FRN and March 2026 website update are contrary to law because they will "inevitably cause gaps in TPS holders' work authorization, violating the TPS statute's mandate that the Secretary "shall" provide TPS holders with work authorization "effective throughout" the period they have TPS."  Pl. Memo, ECF No. 12, pp. 35-37.  This argument fails for two reasons.  First, the July 2025 FRN and the March 2026 website update do not "inevitably" cause gaps in TPS holders' work authorizations for the reasons discussed *supra*.  Second, H.R. 1 controls and supersedes prior TPS employment authorization duration practices under the INA.  As discussed above, DHS expressly contemplated the potential tension between the newly enacted 8 U.S.C. § 1811(a) and the pre-existing 8 U.S.C. § 1254a(a)(2).  Applying the ordinary tools of statutory construction, DHS gave effect to both statutes by assigning them complementary roles.  91 Fed. Reg. 22,961.  DHS explained that Section 1254a(a)(2) continues to define who is *eligible* to be employment authorized, while Section 1811 defines the maximum *duration* for each period of authorization.  91 Fed. Reg. 22,961.  This harmonized reading provides a clear, administrable rule that aligns with H.R. 1's structure of initial and renewed fees tied to

15

time-limited employment authorization periods.  *See* 8 U.S.C. §§ 1803(c) and 1811(a); 8 C.F.R. § 274a.12(a)(12), (c)(19); 8 C.F.R. § 244.5(d).

Perhaps recognizing this substantive weakness, Plaintiffs do not provide any argument about the merits of their Count III claim that USCIS is impermissibly applying the AAF retroactively,  Pl. Complaint, ECF No. 1, pp 63-64, or Count V claim that USCIS' implementation of the AAF requirement is contrary to law, *id.* at pp. 66.  As to retroactivity, when Plaintiff ASAP previously brought this claim before the District of Marland, the court unequivocally sided with the government.  *See Asylum Seeker Advoc. Project v. United States Citizenship & Immigr. Servs.*, 808 F. Supp. 3d 708, 718 (D. Md. 2025) ("[T]his Court concludes that Plaintiff has failed to demonstrate a likelihood of success on the merits regarding its retroactivity arguments that would warrant preliminary relief.").  Plaintiffs have not provided any new factual or legal argument in this case that should yield a different result.

As to the lawfulness of the AAF policy implemented through the April 2026 IFR, Plaintiffs inaccurately claim that it conflicts with the government's obligations under 8 U.S.C. § 1158(a)(1), 8 C.F.R. § 208.9(a), and *RAICES v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026).  However, 8 U.S.C. § 1158(a)(1) is about who can apply for asylum, not the different procedural requirements that may render someone ineligible to have their asylum application adjudicated on the merits.  *Compare* 8 U.S.C. § 1158(a)(1) (aliens physically present in the United States "may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title") *with* 8 U.S.C. § 1158(d)(5)(b) ("The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application").  8 C.F.R. § 208.9(a) is inapplicable because it describes procedures with respect to asylum applications that are complete within the meaning of § 208.3(c)(3), which does not include applications that are rejected for failure to pay the AAF.  *See*

8 C.F.R. § 208.3(c)(6) (when the AAF is not timely paid, "the application will be rejected and this paragraph (c) shall not apply."). Finally, the *RAICES* decision hurts rather than helps Plaintiffs' contention. There, the D.C. Circuit concluded that changes to the "carefully structured and intricate [asylum] system" must by made by "the only branch of government able to amend the INA: Congress." *See RAICES v. Mullin*, 174 F.4th 81, 111 (D.C. Cir. 2026). That is exactly what happened here: Congress changed the law about maintaining an asylum application in the United States, which now requires payment of an annual fee. *Compare* INA 208(d)(3) (2024) (providing that the government may impose fees for the consideration of an application for asylum) *with* INA 208(d)(3) (2025) (providing that the government "shall impose fees for the consideration of an application for asylum"); *see also* 8 U.S.C. § 1808.

## III.   Plaintiffs' alleged harms flow from H.R. 1 itself, not from DHS's implementation of H.R. 1

Plaintiffs have also failed to show that their members are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. Plaintiffs claim that their members will lose their employment authorizations that extend beyond one year. But any harms flowing from the loss of employment authorization under these circumstances result from the statutory scheme that Congress designed. By its plain terms, H.R. 1 limits employment authorization periods to one year. *See* 8 U.S.C. § 1811(a). The statute does not allow for employment authorization periods beyond one year. Because the purported loss of benefits flows from the statute itself, Plaintiffs cannot show that their alleged harms "directly result from the action which [they] seek[] to enjoin." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

In any event, the loss of employment authorization beyond one year "cannot constitute the requisite irreparable injury" to justify a stay under these circumstances. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs claim, in conclusory fashion, that they "face immediate and irreparable

17

harm absent a stay." Pl. Memo, ECF No. 12, p. 40.  But Plaintiffs offer no explanation for why they waited until the eve of their impending injury to seek relief.  Plaintiffs were aware of DHS's implementation measures as early as July 22, 2025—exactly one *year* ago. Plaintiffs' delay in seeking a stay vitiates their allegations of irreparable harm.  *See Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977); *see also Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) ("where plaintiff seeking immediate, emergency relief delays in bringing suit, such delay may preclude emergency relief because failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury").

Finally, Plaintiffs claim that without an injunction, asylum applicants who have their form I-589 rejected for failure to comply with the statutory AAF requirement may be subject to removal proceedings.  Pl. Memo, ECF No. 12, pp. 41-43.  But as explained in the April 2026 IFR, USCIS will only initiate removal proceedings where the facts of an alien's immigration record support a charge of removability.  91 FR 22957.  What makes an alien subject to a charge of removability is not dictated by whether their Form I-589 has been rejected, but instead by whether they are inadmissible under 8 U.S.C. § 1182 or deportable under 8 U.S.C. § 1227.  *See Matter of V-X-*, 26 I. & N. Dec. 147, 152 (BIA 2013) (alien previously granted asylum was properly charged as inadmissible to initiate INA 240 removal proceedings).  Similarly, what makes an alien subject to expedited removal is the fact that they are an alien described under 8 U.S.C. § 1225(b)(1), not that their affirmatively filed Form I-589 was rejected.  Because the April 2026 IFR created no new authority for DHS to initiate proceedings against removable aliens, postponing its implementation would not address the alleged irreparable harm of being subject to removal proceedings.

Plaintiffs also claim that an injunction is necessary to prevent some of its members from having their asylum applications rejected for failure to pay the AAF without ever receiving notice that the AAF was due. Pl. Memo, ECF No. 12, p. 40. But bald assertions from a few asylum applicants out of over 1 million that they do not recall receiving a notice is not evidence that USCIS did not provide adequate notice.[6] The agency's notice mailing and emailing practices, which constitute adequate service under 8 C.F.R. § 103.8(a)(1), do not require judicial intervention, let alone on an emergency basis. Furthermore, aside from it being generally advisable for an applicant for immigration benefits to maintain a current address with and monitor his or her mail and email for notices from USCIS, USCIS informs every asylum applicant of the obligation to maintain a current address where the agency will serve notices by mail.[7] And it has long been the case that an asylum applicant's failure to respond to notices sent to such mailing address results in adverse consequences on their application. *See* 8 CFR § 208.10 (providing that failure to appear for an asylum interview or biometrics appointment in response to a notice mailed to the alien's current address may result in dismissal of the asylum application or waiver of an adjudication by USCIS). Despite the plaintiffs' anecdotal examples of applicants not being aware of having received an AAF notice, that rate of payments does not indicate that the agency has a problem with sending AAF notices at all, much less one that requires an emergency stay and judicial intervention to correct.

---

[6] As of July 15, 2026, USCIS has sent 1,236,638 AAF notices to pending asylum applicants and has received 986,959 payments. *See* Summary of USCIS Annual Asylum Fee Notices and Payments, attached hereto as *Exhibit 1*.

[7] *See* Form I-589 Form Instructions at p. 10 (available at https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf).

19

## IV.    The balance of the equities and public interest weigh against injunctive relief.

Plaintiffs have also failed to show that the remaining equitable factors weigh in their favor. The government suffers irreparable injury "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of [the] people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). The relief Plaintiffs seek would frustrate DHS's efforts to implement the express language of Congress in enacting H.R. 1. *See INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal court into the workings of a coordinate branch of Government").

## V.    Any relief must be limited to Plaintiffs.

Even if postponement were appropriate under 5 U.S.C. § 705, it should be limited to the Plaintiffs. Under settled constitutional and equitable principles, the Court may not issue relief broader than necessary to remedy actual harm shown by specific plaintiffs. *Trump v. CASA, Inc.*, 606 U.S. 831 (2025). Limits on courts' equitable authority apply just as squarely to APA relief under § 705 as to preliminary injunctions. Nothing in § 705 rebuts the presumption that traditional equitable rules apply, and so § 705 does not authorize universal relief. *See Hecht v. Bowles*, 321 U.S. 321, 330 (1944). Section 705's text embraces principles of equity, authorizing "all necessary and appropriate process" and making clear that "irreparable harm," a traditional equitable inquiry, is a key consideration. 5 U.S.C. § 705. In sum, § 705 does not depart from the "party-specific principles" that "permeate our understanding of equity," and the Court should therefore limit any relief to the Plaintiffs here. *CASA*, 606 U.S. at 844.

## CONCLUSION

The Court should deny the Motion to Stay under 5 U.S.C. § 705.

Dated: July 21, 2026                    Respectfully submitted,

                                        LEAH B. FOLEY
                                        United States Attorney

                          By:    */s/ Nicole M. O'Connor*
                                        NICOLE M. O'CONNOR
                                        Assistant U.S. Attorney
                                        U.S. Attorney's Office
                                        John Joseph Moakley U.S. Courthouse
                                        One Courthouse Way, Suite 9200
                                        Boston, Massachusetts 02210
                                        (617) 748-3112
                                        Nicole.O'Connor@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorneys of record by means of the Court's Electronic Case Filing system on July 21, 2026.

*/s/ Nicole M. O'Connor*
NICOLE M. O'CONNOR
Assistant U.S. Attorney

22