**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

VENEZUELAN ASSOCIATION OF MASSACHUSETTS, *et al.*,

*Plaintiffs*,

v.

U.S. CITIZENSHIP AND IMMIGRATION SERVICES, *et al.*,

*Defendants*.

Case No. 1:26-cv-13038-NMG

*Leave to file granted on July 27, 2026*

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY OF AGENCY ACTION UNDER 5 U.S.C. § 705**

## INTRODUCTION

In their opposition, Defendants concede several arguments by failing to address them, misunderstand what Plaintiffs challenge at this stage in the case, and do not meaningfully engage with Plaintiffs' claims. The Court should grant Plaintiffs' Motion for a Stay of Agency Action Under 5 U.S.C. § 705.

## ARGUMENT

### I. Plaintiffs Have Standing

An association can sue on behalf of injured members when the claims are germane to its purpose and "do not, in their nature, require individualized proof." *Doe v. Trump*, 157 F.4th 36, 48 (1st Cir. 2025). Without disputing the first two requirements, the government claims that Plaintiffs fail the third. But the First Circuit has repeatedly found the third requirement met when the association seeks prospective relief that would benefit injured members. *See id*. (association had standing to enjoin birthright citizenship order on behalf of members); *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos*., 89 F.4th 46, 55 (1st Cir. 2023) (holding that participation of individual members was not required where relevant facts regarding those members were uncontested and injunctive relief would benefit them); *New Hampshire Motor Transp. Ass'n v. Rowe*, 448 F.3d 66, 72 (1st Cir. 2006) (third prong met because resolution of claims did not require a "fact-intensive individual inquiry" (citation omitted)), *aff'd*, 552 U.S. 364 (2008); *see also United Food & Com. Workers Union Loc*. 751 *v. Brown Grp., Inc.*, 517 U.S. 544, 553–54 (1996) (the Supreme Court has "expressly recognized standing in associations to represent their members" when "the association seeks a declaration, injunction, or some other form of prospective relief" because in such cases, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured" (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).

As in these cases, Plaintiffs' claims do not "require individualized proof." *Doe*, 157 F.4th at 48. They turn solely on whether the challenged policies violate the Administrative Procedure Act, and their vacatur would "inure to the benefit of those members of the association[s] actually injured." *Bos. Parent Coal. for Acad. Excellence Corp.*, 89 F.4th at 55. Plaintiffs have standing to represent their members without joining them as individuals.

## II. Defendants Fail to Respond to Several of Plaintiffs' Arguments, Forfeiting Any Opposition

Plaintiffs explained in their Stay Memorandum, Dkt. No. 15, ("Stay Mem.") that the July 2025 Cap Policy and March 2026 Update[1] constitute final agency action, Stay Mem. at 29, that the July 2025 Cap Policy and March 2026 Update are procedurally invalid because they did not go through notice and comment, *id.* at 30–31, and that the March 2026 Update is arbitrary and capricious, *id.* at 36–40. Defendants did not respond to any of these arguments and have forfeited any opposition to them. *See United States v. Pizarro-Berríos*, 448 F.3d 1, 5 (1st Cir. 2006) ("We have consistently held that, except in extraordinary circumstances, arguments not raised in a party's initial brief and instead raised for the first time at oral argument are considered waived"); *Bean v. NICE Sys., Inc.*, No. 23-cv-12394, 2025 WL 1248899, at *9 nn.2 & 7 (D. Mass. Apr. 30, 2025) (the "failure to address [an] argument waives any opposition to it"). Because Defendants have not defended the procedural validity of the March 2026 Update and the July 2025 Cap Policy, the Court can and should stay those agency actions on this basis alone.

## III. Plaintiffs Did Not Delay in Bringing Suit

Plaintiffs are not challenging the July 2025 FRN in their Stay Motion, so Defendants' argument that Plaintiffs delayed seeking interim relief has no merit. Plaintiffs' instant motion seeks

[1] Plaintiffs realized after filing their Stay Memorandum that the permalink created for the March 2026 Update is inoperable. Plaintiffs apologize for the oversight and re-produce the permalink here: https://perma.cc/6PA2-XT85.

a stay of two actions regarding TPS holders: the March 2026 Update and the Cap Policy, which USCIS disclosed for the first time in the April 2026 IFR. The Cap Policy is USCIS's decision to apply H.R. 1 retroactively to issue one-year EADs to TPS holders from El Salvador, Sudan, and Ukraine who filed EAD renewal applications before H.R. 1 was enacted. The Cap Policy is not contained in the July 22, 2025 FRN, which did not state that it applied retroactively. Rather, USCIS first acknowledged the existence of the Cap Policy on April 29, 2026. *USCIS Immigration Fees and Related Procedures Required by H.R.1 Reconciliation Bill*, 91 Fed. Reg. 22952, 22960 (stating that after the July 22, 2025 FRN "USCIS began applying the validity rules to TPS-based employment authorization.").

## IV. The April 2026 IFR Is Procedurally Invalid

In their Opposition, Dkt. No. 48 ("Opp'n") Defendants rely on the statements in the IFR to justify bypassing notice and comment, but Plaintiffs have explained why the good cause and procedural exceptions do not apply. Stay Mem. at 24–28. The IFR does not "merely restate" H.R. 1, Opp'n at 13, because H.R. 1 does not prescribe a method for paying the annual asylum fee ("AAF") or the consequences for failure to pay the fee. *See* 8 U.S.C. § 1808. USCIS chose to give asylum seekers only 30 days to pay the fee, without allowing for any grace period, ability to cure late payment, or remedy if an asylum seeker never receives the payment notice that USCIS's regulations require. USCIS also chose to impose the harsh consequences of rejection and immediate termination of work authorization, exposing asylum seekers to permanent loss of long-pending asylum claims without an adjudication on the merits and the immediate and permanent termination of work authorization. As USCIS itself acknowledged in the interim final rule, nothing in H.R. 1 required those consequences. *See* 90 Fed. Reg. 22959 (acknowledging that H.R. 1 did not "codify the consequences for nonpayment explicitly in the statute").

Contrary to Defendants' suggestion, an alternative approach would not render H.R. 1's asylum fee a "nullity." Opp'n at 7; *see* 90 Fed. Reg. 22959–60 (acknowledging several alternative approaches). Instead of rejecting applications outright after 30 days' notice, USCIS might provide a grace period or allow the applicant to submit late payment with an explanation for the delay. It could use the usual methods that other agencies use for debt collections. *See*, *e.g.*, 31 U.S.C. § 3711. Because nothing in H.R. 1 requires the consequences the IFR imposes, the cases Defendants cite to justify the good cause exception do not help them. *See Gray Panthers Advocacy Comm. v. Sullivan*, 936 F.2d 1284, 1290–91 (D.C. Cir. 1991) (appellants did not contest that the regulations at issue faithfully restated self-executing statutory provisions); *Nat'l Customs Brokers & Forwarders Ass'n of Am. v. United States*, 59 F.3d 1219, 1224 (Fed. Cir. 1995) (good cause exception applied where Congress directed agency to change regulations). Indeed, *World Duty Free Ams., Inc. v. Summers* supports Plaintiffs' position. *See* 94 F. Supp. 2d 61, 65 (D.D.C. 2000) (holding that good cause exception was not satisfied where regulations went beyond statutory language to impose obligations and penalties).

The ample evidence of asylum seekers' difficulties in paying the AAF reinforce why the exceptions to notice and comment procedures do not apply. These experiences illustrate the severe, real-world consequences of USCIS's policy decisions in the IFR. Plaintiffs have not sought interim relief concerning the July 22, 2025 FRN nor raised arguments concerning the lawfulness of Defendants' decision to apply the AAF to applications filed before H.R. 1 was enacted. This is not because those claims are weak, Opp'n at 16, but rather because the procedural claim advanced in Plaintiffs' stay motion provides a sufficient basis to stay the consequences of failure to pay the AAF imposed by the April 2026 IFR. The AAF is contrary to law, *see* Compl. Counts III & V, and

Plaintiffs intend to vigorously litigate those claims at the appropriate time. This Court need not address those arguments now, however.[2]

### V. The TPS-Related Policies are Contrary to Law

Defendants' arguments defending the substance of USCIS's TPS policies also fail. The March 2026 Update and Cap Policy are impermissibly retroactive. The government admits that, due to the March 2026 Update, "TPS holders may no longer receive the full amount of the automatic 540-day extension that began to run *prior to the enactment of H.R. 1* once their EAD expired." Opp'n at 14 (emphasis added). It nonetheless suggests, without citing any statutory text, that H.R. 1's "structure" requires that result, because it imposes "initial and renewed fees tied to time-limited employment authorization periods." *Id.* But to apply to applications "pending" on the statute's effective date, a statute must include an "'unambiguous directive' or 'express command' that the statute is to be applied retroactively." *Martin v. Hadix*, 527 U.S. 343, 354 (1999); *accord Arevalo v. Ashcroft*, 344 F.3d 1, 11 (1st Cir. 2003). And here, the statute's structure only supports Plaintiffs' position. H.R. 1 requires USCIS to charge a fee "at the time [a TPS holder] seeks a renewal or extension of employment authorization . . . ." 8 U.S.C. § 1811(a). The government does not contend that this sentence applies to people (like Plaintiffs' members) who applied before H.R. 1 took effect. Similarly, the next sentence (the associated one-year cap) does not apply to

[2] Defendants presented a "Summary of USCIS Annual Asylum Fee Notices and Payments" to purportedly show adequate notice of the AAF, Dkt. No. 48-1, but do not rebut Plaintiffs' evidence that some of their members have not received notice. Payment by some applicants says nothing about whether notices were consistently generated, correctly addressed, timely sent, or received. This summary is also confusing in many respects. It uses undefined categories, reports inconsistent time periods, and includes an unclear number of attorney notice copies in at least some entries, making it difficult to determine what the figures measure or significantly compare them. The Court should ask for clarity regarding many of the data points in the summary before relying on it.

extensions sought—let alone granted—before H.R. 1's effective date. Nothing in the text indicates otherwise.[3]

The Cap Policy is also retroactive. In January 2025, when USCIS extended TPS for El Salvador, Sudan, and Ukraine, USCIS said that it would issue new EADs effective until September 9, 2026, for El Salvador and October 19, 2026, for Ukraine and Sudan. *See Extension of the Designation of El Salvador for Temporary Protected Status*, 90 Fed. Reg. 5953, 5953–54 (Jan. 17, 2025); *Extension of the Designation of Ukraine for Temporary Protected Status*, 90 Fed. Reg. 5936, 5937 (Jan. 17, 2025); *Extension of the Designation of Sudan for Temporary Protected Status*, 90 Fed. Reg. 5944, 5945 (Jan. 17, 2025). TPS holders from those countries then applied for a new EAD during the re-registration period, between January 17, 2025, and March 18, 2025. *See id.* They did so on the understanding that, when they received a new EAD, it would be valid until the end of their TPS designation period. But for TPS re-registration applications that USCIS processed after the July 2025 FRN, USCIS issued those TPS holders EADs that were effective until one year after the date USCIS processed their application, not until the end of their current TPS designation period. *See* 91 Fed. Reg. at 22960 n.75 (Because "some TPS designations in effect at the time H.R. 1 was signed into law in July 2025 exceeded 12 months, USCIS calculated the H.R. 1 caps from the date of adjudication."); *see also* Palma Decl. ¶¶ 39–42, Dkt. No. 12-1. As a result, these EADs—which Plaintiffs' members applied for before H.R 1 was enacted—are set to expire prematurely.

Although the government concedes that the March 2026 Update and Cap Policy shorten work authorization periods granted before H.R. 1's effective date, it argues that the one-year cap

[3] Contrary to Defendants' suggestion, 8 U.S.C. § 1811(a) does not cap the validity of TPS related employment authorization "commencing in 2025." Opp'n at 14. Section 1811(b) references the amount of the EAD fee for fiscal year 2025, not anything about the duration provision.

is "forward-looking" because it "only begins on the effective date of the July 2025 FRN and not earlier . . . ." Opp'n at 14. To the extent the government means the policies operated prospectively because they cut off authorization on a future date, that is incorrect. The challenged policies are impermissibly retroactive because they "impair[ed] rights" that TPS holders already "possessed" and "append[ed] new legal consequences to an event (the *filing of an application for . . . relief*) occurring *before* [H.R. 1's] effective date." *Arevalo*, 344 F.3d at 10–11, 14 (1st Cir. 2003) (emphasis added). When the impacted TPS holders filed their applications, they received Notices of Action providing an automatic work authorization extension of 540 days and were told USCIS would issue them EADs valid throughout their TPS designation period. The challenged policies plainly change the legal effects of the already-filed applications by shortening the duration of the work authorization periods they triggered. *See Pulido v. Cuccinelli*, 497 F. Supp. 3d 79, 93 (D.S.C. 2020) (new rule rescinding grant of automatic work authorization to people with visa applications pending for more than 90 days was impermissibly retroactive as applied to people who applied before effective date).

Indeed, USCIS acknowledged that cutting short an already-granted EAD extension would be retroactive when it amended 8 C.F.R. § 274a.13(d) after H.R. 1's passage to formally end automatic 540-day extensions: it applied that rule only to future-filed applications to ensure that it would not "retroactively affect those [noncitizens] who have already timely and properly filed a renewal EAD application before October 30, 2025." *Removal of the Automatic Extension of Employment Authorization* Documents, 90 Fed. Reg. 48799, 48811-12 (Oct. 30, 2025). In doing precisely what USCIS had previously declined to do, the March 2026 Update disrupted settled expectations. TPS holders took jobs, leased housing, and enrolled their children in schools relying on Notices of Action from USCIS telling them they were entitled to the automatic 540-day

extension. And while the regulation authorizes USCIS to terminate an EAD or extension period, USCIS can do so only in specified circumstances and by following procedures that the government does not claim USCIS followed here. *See* 8 C.F.R. § 274a.13(d)(3).[4] Moreover, even if USCIS were authorized to terminate an extension period early, applications for entirely "discretionary relief" can "become a source of expectation and even reliance" that an agency cannot unsettle without a clear statement that Congress intended it to do so. *Arevalo*, 344 F.3d at 14.

Both policies also violate the TPS statute because they will cause gaps in TPS employment authorization, contrary to the statute's command that a TPS holder's work authorization be "effective throughout" their TPS status. 8 U.S.C. § 1254a(a)(2). Although the government halfheartedly repeats USCIS's claim that "current TPS designation timeframes do not place TPS beneficiaries and applicants at risk of experiencing gaps in employment because none exceed one year," Opp'n at 12, the government ultimately does not dispute that the challenged policies cut off TPS holders' work authorizations before they otherwise would have expired or that many affected TPS holders have not received renewed EADs despite timely applying for them, due to agency backlogs. *See* Stay Mem. at 35–36.

Instead, the government suggests that 8 U.S.C. § 1254a(a)(2) does not require USCIS to avoid gaps in TPS holders work authorizations, suggesting that it only defines "who is *eligible* to be employment authorized" and not the "duration" that they must remain work authorized. Opp'n at 15. This ignores the text of subsection 1254a(a), which requires that "[w]ork *authorization*"—not just *eligibility* for work authorization—must "be effective throughout" TPS status, and that USCIS must "provide [TPS holders] with an 'employment authorized endorsement' or other

[4] Defendants' brief refers to 8 C.F.R. § 274a.13(d)(6) but there is no subsection (d)(6).

appropriate work permit" reflecting their work authorization. 8 U.S.C. § 1254a(a)(1)–(2).[5] And it ignores the title of subsection (a)(2): "Duration of work authorization." *Id.* The government cannot rewrite the statute to suit its preferred interpretation; it must read H.R. 1 consistently with Subsection 1254a(a)(2), which it failed to do here. While H.R. 1 limits only "how long employment authorization may remain valid in any single grant or renewal," 91 Fed. Reg. at 22961, subsection 1254a(a)(2) requires USCIS to ensure that TPS holders can avoid gaps in work authorization through automatic extensions if necessary.

## VI. Defendants Do Not Contest that Plaintiffs Are Suffering Irreparable Harm

Defendants do not contest that the harms Plaintiffs will experience are irreparable. Their argument that those harms are a result of H.R. 1, rather than USCIS's policy choices, rehash their merits arguments and are incorrect for the reasons discussed above. Defendants also fail to acknowledge the many harms that flow directly from the consequences USCIS imposed in the IFR for failure to pay the AAF within a 30-day window. For example, Defendants make no mention of the fact that rejection will mean that many asylum applicants will forfeit their eligibility for asylum altogether due to the one-year deadline. *See* 8 U.S.C. § 1158(a)(2)(B). Ineligibility for asylum exposes applicants to removal—whether to their home country or a third country. *See id.* §§ 1229a(c)(4), 1231(b); 8 C.F.R. § 1208.16–18. In addition, while certain asylum applicants may be removable regardless of whether they pay the AAF, the IFR makes it more likely. *See* 91 Fed. Reg. at 22964-68 (recognizing increased immigration enforcement, removal proceedings, and detention as predictable impacts of the AAF).

[5] Section 1254a(a)(1), not § 1254a(a)(2), defines who is eligible for TPS work authorization: any noncitizen "who is a national of a foreign state designated under subsection (b) (or in the case of [a noncitizen] having no nationality, is a person who last habitually resided in such designated state) and who meets the requirements of subsection (c)." 8 U.S.C. § 1254a(a)(1).

## VII. The Court Should Stay the Relevant Agency Actions

Finally, Defendants are incorrect that relief should be "limited to the Plaintiffs." Opp'n at 20. "Section 705 stays operate on the legal source of authority for an agency to act at all" and "empower[] the judiciary to act directly against the challenged agency action" *Make the Rd. N.Y. v, Noem*, No. 25-5320, 2025 WL 3563313, at *35–36 (D.C. Cir. Nov. 22, 2025). Because a stay operates "directly" on the agency's action, it is not a "party-specific" remedy. *Id.* at *16, *36 (rejecting "argument that Section 705 stays must be confined to the plaintiffs before the court"); *see also Massachusetts v. NIH*, 770 F. Supp. 3d 277, 329 (D. Mass. 2025), *aff'd* 164 F.4th 1 (1st Cir. 2026) (preliminarily enjoining agency action in its entirety in APA case). Although the Supreme Court held in *Trump v. CASA* that federal courts lack "the equitable authority to issue universal injunctions" under the Judiciary Act of 1789, 606 U.S. 831, 839 (2025), "*CASA* does not control the scope of relief available under Section 705." *Make the Rd.*, 2025 WL 3563313, at *34; *see CASA, Inc.*, 606 U.S. at 847 n.10; *id.* at 869, 873 (Kavanaugh, J., concurring) (court may still "preliminarily set aside" agency action under the APA, even if such a stay is "functional equivalent of a universal injunction").

## CONCLUSION

For the foregoing reasons, the Court should stay the July 2025 Cap Policy, March 2026 Update, and the April 2026 IFR in their entireties.

Dated July 24, 2026

Respectfully submitted,

/s/ Jennie L. Kneedler
Jennie L. Kneedler* (DC Bar No. 500261)
Sean Ouellette (MA Bar No. 697559)
Steven Y. Bressler* (DC Bar No. 482492)
Brian Netter* (DC Bar No. 979362)
**DEMOCRACY FORWARD FOUNDATION**

Conchita Cruz* (NY Bar No. 5550769)
Jessica Hanson (MA Bar. No. 714653; CA Bar No. 313247)**
Marcela X. Johnson* (GA Bar No. 328871)
**ASYLUM SEEKER ADVOCACY PROJECT**
228 Park Ave. S. #84810
New York, NY 10003-1502

Telephone: (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
marcela.johnson@asaptogether.org

Jessica Karp Bansal* (CA Bar No. 277347)
**NATIONAL DAY LABORER ORGANIZING NETWORK**
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689
jessica@ndlon.org

P.O. Box 34553
Washington, DC 20043
Phone: (202) 448-9090
souellette@democracyforward.org
jkneedler@democracyforward.org
sbressler@democracyforward.org
bnetter@democracyforward.org

*Counsel for Plaintiffs*

* Admitted *pro hac vice*
**Application for admission pending

**CERTIFICATE OF SERVICE**

I hereby certify that on this July 27, 2026, I caused the foregoing to be electronically filed with the clerk of the court for the U.S. District Court for the District of Massachusetts by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record, a true and correct copy of the foregoing instrument and all attachments.

*/s/ Jennie L. Kneedler*
Jennie L. Kneedler