United States District Court
District of Massachusetts

```
—————————————————————————————      )
Venezuelan Association of          )
Massachusetts, et al.,             )
                                   )
          Plaintiffs,              )
                                   )      Civil Action No.
     v.                            )      26-13038-NMG
                                   )
United States Citizenship and      )
Immigration Services, et al.,      )
                                   )
          Defendants.              )
—————————————————————————————      )
```

MEMORANDUM & ORDER

GORTON, J.

Pending before the Court is a motion to stay agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. §705 (Docket No. 11). Plaintiffs are various membership-based organizations representing two categories of aggrieved parties: those holding Temporary Protected Status ("TPS") and those with pending applications for asylum. Plaintiffs challenge new policies of the United States Citizenship and Immigration Services ("USCIS") and the Department of Homeland Security ("DHS") that will allegedly result in retroactive discontinuation of work authorization for TPS holders and the rejection of properly filed applications for asylum.

For the following reasons, that motion will be allowed, in part, and denied, in part.

-1-

## I.    Background

On July 4, 2025, the One Big Beautiful Bill Act ("H.R. 1") was signed into law.  It addresses several elements of immigration law that are of particular current interest.  As discussed in detail below, H.R. 1 modifies the existing frameworks for TPS employment authorization documents ("EADs") and asylum applications.

Plaintiffs challenge three USCIS policies purporting to implement those statutory provisions: 1) a one-year cap on the issuance or renewal of TPS-based work authorization ("the Cap Policy"); 2) a March 2026 update to the USCIS website explaining that the Cap Policy will apply to previously-issued EAD extensions ("the March 2026 Update"); and 3) portions of the April 29, 2026 interim final rule ("the April 2026 IFR") pertaining to the Cap Policy and asylum applications. Plaintiffs generally challenge these polices as procedurally invalid and otherwise unlawful.

### A. TPS Holders

The TPS program allows a foreign national to live and work in the United States if and while his or her home country is designated unsafe by the United States government. 8 U.S.C. §1254a.  Foreign nationals from those countries ("TPS holders") are entitled to apply for EADs. Id.  Before the promulgation of the challenged policies, EADs were typically issued for the

-2-

duration of a country's TPS designation.  Upon an extension of that designation, TPS holders who filed timely EAD renewal applications were granted an automatic 540-day extension of their expiring EADs to prevent gaps in work authorization. See 8 C.F.R. §274a.13(d)(1).

On January 17, 2025, USCIS extended existing TPS designations for EL Salvador, Ukraine and Sudan for 18 months. Any TPS holders who submitted timely EAD renewal applications were granted the automatic 540-day extension of their expiring EADs.  Those extended EADs issued to TPS holders from El Salvador were set to expire on August 31, 2026, while those issued to TPS holders from Ukraine and Sudan were set to expire on October 11, 2026.

H.R. 1 limits the duration that any EAD may be valid. It mandates that an EAD, or the renewal or extension thereof,

> shall be valid for a period of 1 year or for the duration of the designation of temporary protected status, whichever is shorter.

8 U.S.C. §1811(a).  This is the Cap Policy, which USCIS reiterated verbatim in a July, 2025, Federal Register Notice ("the July 2025 FRN") and again in the April 2026 IFR.  The March 2026 Update further announced that, pursuant to the Cap Policy, any 540-day extensions issued before July 21, 2025, would be valid no later than July 22, 2026, regardless of when those extensions otherwise would have expired.

-3-

### B. Asylum Applicants

Noncitizens present in the United States may apply for asylum. 8 U.S.C. §1158. Although USCIS may reject applications that are improperly filed, federal law entitles applicants to an individualized adjudication of their application once it is accepted for filing. 8 C.F.R. §208.9(a). Most asylum applicants are eligible to apply for employment authorization after their asylum application has been accepted for filing and pending for 150 days. 8 C.F.R. §208.7(a)(1)(i). Historically, USCIS was required to adjudicate that initial work permit application within 30 days of filing.

H.R. 1 changes that framework, requiring applicants to pay an Annual Asylum Fee ("AAF") for every year that an asylum application remains pending. The April 2026 IFR reiterates that mandate and provides that failure to pay the AAF within 30 days may result in rejection of the pending application and, in some cases, initiation of removal proceedings against the applicant. Moreover, the IFR removed the requirement that USCIS process initial asylum-based work authorizations within 30 days of filing.

## II.  Standing

The government first challenges plaintiffs' standing to bring this suit. Under the theory of associational standing, an association may sue on behalf of its members when 1) its members

would otherwise have standing to sue in their own right, 2) the interests the association seeks to protect are germane to its purpose and 3) neither the claim asserted nor the relief requested requires the participation of individual members. Hunt v. Washington State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  The government challenges plaintiffs' standing with respect to the third prong, arguing that the declarations filed by individual members show their required participation in this case.

The Court concludes that plaintiffs are proper parties to bring this suit.  While individual members may have filed declarations to provide support for their claims of irreparable harm, such participation is not of a kind anticipated by the third Hunt factor.  That factor proscribes associational standing in lawsuits that would require the court to undergo a "fact-intensive-individual inquiry," which is not the case here. New Hampshire Motor Transp. Ass'n v. Rowe, 448 F.3d 66, 72 (1st Cir. 2006).  Indeed, in order to satisfy the first Hunt factor, it is necessary for plaintiffs to show that individual members would have standing to sue in their own right.  The declarations here serve to satisfy that factor and do not otherwise require the involvement of those members.

The government also challenges the constitutionality of associational standing itself.  Because the United States

-5-

Supreme Court ("the Supreme Court") and the First Circuit Court of Appeals ("the First Circuit") still recognize the availability of associational standing, that argument will not be addressed. See, e.g., Doe v. Trump, 157 F.4th 36, 48 (1st Cir. 2025).

## III. Motion for a Stay

The legal standard for a motion for stay under 5 U.S.C. §705 is identical to that of a preliminary injunction. California v. Kennedy, 802 F. Supp. 3d 273, 281 (D. Mass. 2025). That is, plaintiffs seeking a stay under §705 must establish that 1) they are likely to succeed on the merits, 2) they are likely to suffer irreparable harm in the absence of preliminary relief, 3) the balance of equities tips in their favor and 4) an stay is in the public interest. See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

### A. Likelihood of Success

The plaintiffs must first prove that they have a likelihood of success on the merits of their claims. The Court will therefore address that likelihood with respect to each claim presented.

### i. Cap Policy

Plaintiffs contend that the Cap Policy is procedurally invalid, impermissibly retroactive and in conflict with existing TPS legislation, 8 U.S.C. §1254a(a)(2).

-6-

### 1. Procedural Requirements

Plaintiffs first argue that the policies at issue are procedurally invalid because the government did not undertake notice and comment.  They assert that the cited exceptions, good cause and the exception for rules of agency organization, procedure or practice, do not apply.

The APA requires that federal agencies publish proposed rules to the Federal Register and provide the public with an opportunity to comment on the proposal. New Hampshire Hosp. Ass'n v. Azar, 887 F.3d 62, 70 (1st Cir. 2018) (citing 5 U.S.C. §553).  A failure to undertake a notice and comment practice renders a rule procedurally invalid. Id.  An agency need not go through notice and comment where, for good cause, it finds such procedure would be impracticable, unnecessary or contrary to the public interest. 5 U.S.C. §553(b)(B).  Similarly, notice and comment is unnecessary for rules of agency organization, procedure or practice.  §553(b)(A).

The Court finds that there was good cause not to undertake notice and comment with respect to the Cap Policy.  When a regulation merely restates the statute they implement, notice-and-comment procedures are unnecessary. See Gray Panthers Advoc. Comm. v. Sullivan, 936 F.2d 1284, 1291 (D.C. Cir. 1991).  Here, the language implementing the Cap Policy in both the July 2025 FRN and the April 2026 IFR is virtually identical to the

-7-

language found in H.R. 1. Because the agency had no choice but to effectuate the command of the statute, submission of the rule for public comment was not necessary. Plaintiffs therefore have not demonstrated a likelihood of success on that claim.

### 2. Retroactivity

Next, plaintiffs assert that the Cap Policy is impermissibly retroactive because it limits the duration of employment authorizations for TPS holders who applied for authorizations before July 4, 2025. In evaluating whether a statute enacted after a particular event can nonetheless impose legal consequences on that event, the Court first must determine whether Congress intended for the statute to apply to past conduct. Arevalo v. Ashcroft, 344 F.3d 1, 10 (1st Cir. 2003). If it did not, the Court must then determine whether the retroactive application at issue would significantly impair existing substantive rights and thereby disappoint legitimate expectations. Id.

The Court concludes that H.R. 1 does not clearly mandate retroactive application of the Cap Policy but that application of the Cap Policy to those TPS holders who applied for EADs, or EAD renewals before July 4, 2025, is not impermissibly retroactive. Unlike the statute in Arevalo, the Cap Policy does not revoke a substantive right to discretionary relief outright. Rather, it limits the maximum duration for which an individual

may enjoy that right.  Applicants for an EAD have no legitimate expectation in the duration of such an authorization.

Similarly, the Court finds that application of the Cap Policy to TPS holders from El Salvador, Ukraine and Sudan who had previously been issued 540-day EAD extensions is not impermissibly retroactive.  The language of H.R. 1 requires that all EADs "shall be valid for a period of 1 year."  8 U.S.C. §1811(a).  By mandating that no previously issued extension may last longer than one year from the date of the July 2025 FRN, USCIS has simply confirmed the intent of the statute.  Moreover, the policy concerns a future expiration date and is not impermissibly retroactive simply because it pertains to a previously issued extension. See Arevalo v. Ashcroft, 344 F.3d 1, 11 (1st Cir. 2003) ("A new law is not impermissibly retroactive simply because subsequent proceedings under that law's authority implicate past events.").

### 3. Conflict with 8 U.S.C. §1254a(a)(2)

Finally, plaintiffs allege that the Cap Policy is unlawful because it conflicts with existing statutory requirements that mandate work authorization be "effective throughout the period the alien is in temporary protected status." 8 U.S.C. §1254a(a)(2). Plaintiffs explain that the challenged policies may result in gaps in employment authorization if, for example, an EAD expires before a TPS designation and USCIS does not

timely grant a renewal application.  The government resolves this apparent conflict by interpreting the TPS statute as requiring a TPS holder to maintain eligibility for work authorization throughout his or her status, while H.R. 1 defines the maximum duration for each period of authorization.

While the Court is unconvinced by the government's interpretation of the TPS statute, it nonetheless concludes that the plaintiff has failed to show the Cap Policy is unlawful on those grounds.  The possibility that implementation of H.R. 1 will create a gap in employment authorization is insufficient to find that the policy itself is unlawful.  The government could, for example, issue one-year automatic extensions of expiring EADs to prevent such gaps.  A failure to comply with the TPS statute may result in independent liability but such failure would be independent of the mere implementation of the Cap Policy as required by H.R. 1.

In sum, the Court concludes that the plaintiffs have not shown that they have a likelihood of success in proving that the Cap Policy is unlawful or that its application to those previously issued EAD extensions is impermissibly retroactive.

### i.  Asylum Application Fee

Plaintiffs also contend that the April 2026 IFR is procedurally invalid with respect to the consequences for failure to pay the AAF and the removal of the 30-day processing

window.  They argue that those consequences, rejection of the asylum applicants and initiation of removal proceedings, are not authorized by H.R. 1 and implicate individuals' substantive rights.  The government reiterates its argument with respect to the exceptions for good cause and rules of agency procedure, explaining that without consequences for failure to pay the fee would be rendered a nullity.  It further argues that long-standing practice and other regulations support rejection of applications for failure to pay a filing fee.

Here, the Court concludes that plaintiffs are likely to prevail on their claim that the April 2026 IFR is procedurally invalid with respect to those consequences.  While the Court is persuaded that failure to implement any consequences for not paying the AAF may indeed render the fee a nullity, it finds that these specific consequences are not required by the statute.  Further, such regulations cannot properly be considered rules of agency organization, procedure or practice. The rejection of an application for asylum is an agency action that affects the applicant's eligibility for immigration benefits and legal presence in the United States.  Those consequences implicate the substantive rights of those applicants, not rules of procedure.  See Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Nat'l Lab. Rels. Bd., 57 F.4th 1023, 1034 (D.C. Cir. 2023) (explaining that the procedural

-11-

exception covers agency actions that do not themselves alter the rights or interests of parties).

Moreover, the government concedes that Congress has never implemented a "pending" application fee, that is, a fee owed for each year an application remains pending.  Past practice and existing rules of procedure therefore cannot dictate consequences for failure to pay that new fee.

On the other hand, the Court finds that the removal of the 30-day processing window for asylum-based work authorization is properly characterized as a rule of agency procedure.  Unlike the consequences for failure to pay the AAF, the removal of the processing window does not, in itself, alter the rights or interests of asylum applicants.  It simply alters the internal processes for reviewing and adjudicating applications for work authorization which, by itself, is a rule of agency procedure.

### B. Irreparable Harm

Plaintiffs next contend that rejection of a pending asylum application is unappealable and, if the applicant has been present in the country for more than one year, precludes the applicant from filing a new application.  The government does not deny that those consequences reflect irreparable harm but instead contends that those harms 1) emanate from H.R. 1 itself, not the challenged regulations, and 2) are a product of the existing removal authority of DHS.

-12-

As discussed above, the consequences for failure to pay the AAF are not a mandate of H.R. 1.  Rather, that is an application of H.R. 1 that involves independent agency decision making. Furthermore, while the government is correct that the April 2026 IFR does not create new removal authority, it does require the rejection of an application, which, in turn, results in the initiation of removal procedures.  That process constitutes irreparable harm even if the government relies on otherwise acceptable methods of removal.

The Court concludes that plaintiffs have shown a likelihood of irreparable harm with respect to the consequences for failure to pay the AAF.

### C. Balance of the Equities and Public Interest

When the government is the opposing party in a motion for preliminary relief, the assessment of the equities and weighing of the public interest merge into a single analysis. Nken v. Holder, 556 U.S. 418, 435 (2009).

The government correctly contends that a regulatory stay under §705 would injure its function of implementing public policy.  In cases such as this, however, there is generally no public interest in perpetuating unlawful agency action. New York v. Kennedy, 155 F.4th 67, 77 (1st Cir. 2025).  Because plaintiffs have shown a high likelihood of success on their claim regarding the consequences for failure to pay the AAF, the

-13-

Court finds that a stay of that policy is in the public interest.

## IV.  Scope of Relief

Finally, the Court must consider the scope of relief available under 5 U.S.C. §705.  The government contends that, pursuant to Trump v. CASA, Inc., 606 U.S. 831 (2025), injunctive relief can extend no further than to the plaintiffs in this case.  In response, plaintiffs point to caselaw indicating that relief under the APA may apply nationwide even if similar injunctive relief is no longer available.

The Court concludes that the Supreme Court decision in CASA does not limit the scope of relief under the APA.  That decision found that injunctive relief issued under the authority of Judiciary Act of 1789 must be plaintiff specific. CASA, 606 U.S. at 860.  As acknowledged by Justice Kavanaugh, however, such a conclusion does not apply to relief issued under the APA. Id. at 869, 873 (Kavanaugh, J., concurring).  Further, federal courts have found that CASA does not extend to the scope of relief available under §705. See, e.g., Make the Rd. New York v. Noem, No. 25-5320, 2025 WL 3563313, at *34 (D.C. Cir. Nov. 22, 2025); Massachusetts v. Dep't of Educ., No. CV 26-11229-FDS, 2026 WL 1114877, at *13 (D. Mass. Apr. 24, 2026); Massachusetts v. Nat'l Institutes of Health, 770 F. Supp. 3d 277, 330 (D. Mass. 2025), aff'd, 164 F.4th 1 (1st Cir. 2026).

Just because relief under the APA is distinguishable from that available under the Judiciary Act of 1789 and need not be limited to the parties to this lawsuit does not mean that broad relief is necessarily warranted.  Universal relief "strains our separation of powers," and this Court takes seriously its responsibility to exercise judicial restraint. See United States v. Texas, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring).

In this case, however, the Court concludes that universal relief is appropriate.  Section 705 allows this Court to "issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. §705.  In granting the requested stay, at least in part, the Court postpones the effective date of a challenged policy that it has found to be procedurally invalid.  Its ruling is with respect to the action of the agency itself, rather than to a party-specific conflict, and is not appropriately limited to the parties to this case.

**ORDER**

For the forgoing reasons, the motion of plaintiffs to stay agency action under 5 U.S.C. §705 (Docket No. 11) is, with respect to the implementation of consequences for failure to pay the Annual Asylum Fee, **ALLOWED**. The Court hereby stays the implementation of that policy until the Court issues a final ruling on the merits of the case.  With respect to all other challenged policies, the motion is **DENIED**.

**So ordered.**

_____
Nathaniel M. Gorton
Senior United States District Judge

Dated: August 5 , 2026